# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBERT S. GARNER, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>GLOBAL PLASMA SOLUTIONS INC.,<br><br>        Defendant. | C.A. No. _____<br><br><br>**JURY TRIAL**<br><br>**DEMANDED** |

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................ 1

**PARTIES** ............................................................................................................. 6

**JURISDICTION AND VENUE** ........................................................................ 7

**FACTUAL ALLEGATIONS** ............................................................................ 8

  A.  THE MARKET FOR AIR TREATMENT SYSTEMS ...................................... 8

  B.  GLOBAL PLASMA SOLUTIONS: THE COMPANY AND THE PRODUCTS .................... 12

  C.  GLOBAL PLASMA SOLUTIONS REPRESENTS TO CONSUMERS THAT ITS
     PRODUCTS WILL IMPROVE AIR QUALITY WITHOUT HARMFUL SIDE EFFECTS ..... 13

  D.  GLOBAL PLASMA SOLUTIONS' REPRESENTATIONS ARE FALSE, DECEPTIVE,
     AND MISLEADING ................................................................................ 37

    a. *Global Plasma Solutions' Representations to Consumers that Its Products
      Are Superior to Other Air Treatment Systems Are False, Deceptive, and
      Misleading.* ...................................................................................... 37

    b. *Global Plasma Solutions' Representations to Consumers that Its Products
      Will Safely Clean the Air and Eliminate VOCs with No Harmful
      Byproducts Are False, Deceptive, and Misleading.* ......................... 40

    c. *Global Plasma Solutions' Representations to Consumers that Its Products'
      Claims Are Supported By Sound, Independent Testing and
      Can Achieve Quantified Toxin-Removal Benchmarks Are False, Deceptive,
      and Misleading.* ................................................................................ 45

    d. *Global Plasma Solutions' Representations to Consumers that Its Products
      Are Effective Against COVID-19 Are False, Deceptive, and Misleading.* ........ 48

  E.  PLAINTIFF AND CLASS MEMBERS RELIED ON DEFENDANT'S FALSE
     REPRESENTATIONS .............................................................................. 61

F.   GLOBAL PLASMA SOLUTIONS CONCEALED THESE DECEPTIONS AND DEFECTS.... 72

**FACTS SPECIFIC TO PLAINTIFF** ........................................................................ 73

**CLASS DEFINITIONS AND ALLEGATIONS** .................................................... 75

**CAUSES OF ACTION** ......................................................................................... 79

COUNT I: DECEIT AND FRAUDULENT CONCEALMENT .............................................. 79

COUNT II: BREACH OF EXPRESS WARRANTY ........................................................... 83

COUNT III: BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY ............... 88

COUNT IV: VIOLATION OF THE MAGNUSSON-MOSS WARRANTY ACT ....................... 93

COUNT V: BREACH OF THE IMPLIED WARRANTY OF FITNESS
         FOR A PARTICULAR PURPOSE .................................................................. 95

COUNT VI: VIOLATION OF STATE CONSUMER PROTECTION STATUTES ..................... 99

COUNT VII: VIOLATION OF THE MCPA ................................................................. 100

COUNT VIII: UNJUST ENRICHMENT ....................................................................... 103

**RELIEF DEMANDED** ......................................................................................... 105

**JURY DEMAND** ................................................................................................. 106

Plaintiff Robert S. Garner brings this action on behalf of himself and all others similarly situated against Defendant Global Plasma Solutions Inc. Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## INTRODUCTION

1.      Global Plasma Solutions Inc. preys on people desperate to cleanse the air and protect themselves from ailments including the COVID-19 virus.

2.      Despite representations that its Products[1] clean the air – including eliminating the COVID-19 virus – Defendant's products make the air worse for people because the products reduce some volatile organic compounds (VOCs) but **actually increase the concentration of other VOCs**.

---

[1] The Products included with this definition include all products that used Defendant's NPBI technology. Presently this includes the GPS-FC48-AC, GPS-FC24-AC, GPS-DM48-AC, GPS-FC-3-BAS, GPS-IMOD, GPS-IRIB-18, and GPS-IRIB-36.

3.      To further its deception – while also hiding significant defects in its Products – Defendant deceptively represents company-funded testing as "independent" while also using test conditions that are not representative of the real-world use of the Products.

4.      Defendant's "profits over people" scheme won the company acclaim, publicity, and generated hundreds of millions of dollars in sales at the expense of the Plaintiff and Class Members across the country.

5.       "The worst thing that can happen is installing a product you believe is keeping you safe, but it's not."[2]  But that is precisely what GPS is doing, instilling customers with a false sense of security through misleading claims.

6.      Further, Defendant overstates its Products' COVID-19 mitigation performance and uses methods that are "unvalidated"[3] and

---

[2]Quote from Global Plasma Solutions Vice President of Sales David Archer. *Why Your Customers Should Care About Their Indoor Air Quality* [https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality](https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality).

[3] Talia Wiener, *Parents Tell Montclair District: We're Worried New Air Cleaners Aren't Safe*, MONTCLAIR LOCAL (April 22, 2001), [https://www.montclairlocal.news/2021/04/22/parents-tell-montclair-district-were-worried-new-air-cleaners-arent-safe/](https://www.montclairlocal.news/2021/04/22/parents-tell-montclair-district-were-worried-new-air-cleaners-arent-safe/).

"under conditions that are not representative of actual application conditions."[4]

7.     For example, in one instance, Global Plasma Solutions used a chamber the size of a shoebox to support its claim that its Products could kill COVID-19 for a home or school. In another instance, Global Plasma Solutions "blasted" the testing chambers with 27,000 ions per cubic centimeter – far in excess than concentrations achievable by its Products.

8.     When Defendant's Products have been independently tested in real world conditions, they consistently fail to achieve the results as represented by Defendant.

9.     COVID-19 has taken more than 578,000 American lives.

10.    In an effort to capture dollars from COVID-19 fear, Defendant markets directly to consumers seeking protection and relief from the virus.

---

[4] Ross Pomeroy, *Schools Are Spending Millions on Ionization Technology to Fight COVID and There's No Good Evidence It Works*, MASS LIVE (January 22, 2021), https://www.masslive.com/coronavirus/2021/01/schools-are-spending-millions-on-ionization-technology-to-fight-covid-and-theres-no-good-evidence-it-works.html.

11.    This tactic is "enhanced" by Defendant's marketing which provides information to consumers on how to obtain government funding to purchase Defendant's Products.

12.    These "free money" purchases boost the Defendant's revenues by not only taking from tax funds but also shifting these precious dollars away from effective means of virus mitigation.

13.    However, as Defendant knows, its Products suffer from defects which cause its Products to fail to meet its lofty representations. Thus, the Defendant's representations that its products are a safe technology to cleanse the air of VOCs and the COVID-19 virus without generating harmful byproducts is false, misleading, and designed to deceive consumers into paying a price premium and choosing its products over a competitor's product.

14.    In pursuit of "profits over people," Global Plasma Solutions uses many deceptive representations as described herein.

15.    For example, Defendant deceptively represented that its technology was installed in the White House for COVID mitigation: [5]

---

[5] Gregory Barber, *The Ionizer in Your School May Not Do Much to Fight Covid*, WIRED (March 26, 2021), https://www.wired.com/story/ionizer-school-not-fight-covid/.

> A spokesperson for the company directed WIRED to research commissioned by the company showing the technology neutralized SARS-CoV-2 on surfaces and aerosols in lab settings, as well as case studies from customers including universities and the White House.

However, the technology was installed in 2018 – well before COVID-19 appeared.[6]

16.     Defendant manufactures, sells, and distributes the Products using marketing and advertising campaigns specifically targeted to consumers that are aware and fearful of the COVID-19 virus.

17.     For example, in CEO Glenn Brinckman's words, "it's all about pathogens and coronavirus and COVID-19."[7]

18.     Plaintiff and those similarly situated ("Class Members") relied on Defendant's misrepresentations.

19.     Defendant's fraudulent, deceptive, and misleading conduct violated and continues to violate the consumer protection statutes of multiple states. Further, Defendant breached and continues to breach

---

[6] Additionally concerning, Defendant used the White House logo in its marketing to project legitimacy of its Products even though the White House logo may not be used for marketing purposes.
[7] Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.

5

its implied and express warranties regarding the Products.

Additionally, Defendant has been and continues to be unjustly enriched.

Accordingly, Plaintiff brings this action against Defendant on behalf of

himself and Class Members who purchased the Products during the

applicable statute of limitations period (the "Class Period").

## PARTIES

20.    Plaintiff is a citizen of Maryland and domiciled therein.

21.    Defendant Global Plasma Solutions, Inc. is a Delaware

corporation with its principal place of business located in Charlotte, NC.

Defendant manufactures, markets, and distributes its products

throughout the United States.

22.    Plaintiff reserves the right to amend this Complaint to add

different or additional defendants, including without limitation any

officer, director, employee, supplier, or distributor of Defendant who has

knowingly and willfully aided, abetted, or conspired in the false and

deceptive conduct alleged herein.

23.    Whenever reference is made in this Complaint to any

representation, act, omission, or transaction of a defendant, that

allegation shall mean that the defendant did the act, omission, or

transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## JURISDICTION AND VENUE

24.   This Court has personal jurisdiction over the Defendant because the Defendant is  incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in this state; maintains sufficient contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through the promotion, sale, marketing and distribution of its Products in and from Delaware, which renders the exercise of jurisdiction by this Court proper and necessary as Defendant is "at home" in Delaware.

25.   This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of

$5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs. In addition, this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

26.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant is incorporated within this District and a substantial part of the events or omissions giving rise to the claims occurred within this District.

## FACTUAL ALLEGATIONS

### A. The Market for Air Treatment Systems

27.     The COVID-19 pandemic has caused demand for air treatment systems (ATS) to skyrocket.

28.     In 2020, the ATS market grew by 57% and is expected to have a double-digit growth rate in each of the next two years.[8]

29.     Market growth at these rates is unprecedented.

---

[8] *Air Purifier Sales Surge in the U.S. Amid the COVID-19 Pandemic*, VERIFY MARKETS (January 26, 2021), https://www.globenewswire.com/news-release/2021/01/26/2164712/0/en/Air-Purifier-Sales-Surge-in-the-U-S-Amid-the-COVID-19-Pandemic.html.

30.    For example, one air filter company CEO was so overwhelmed with orders that he had to turn customers away and stated, "I've been in this business for 20 years and this is the most chaotic time I've ever had in the air filter business."[9]  In summary, he described the demand from customers as "like toilet paper in April [2020] times two."[10]

31.    As a result of COVID-19's airborne transmission, residential and commercial customers sought air treatment systems to ensure safety.

32.    COVID-19 has taken more than 575,000 American lives.

33.    Certain underlying medical conditions that are relatively common in the population produce a significantly increased risk of death when a person is infected with COVID-19.

---

[9] Will Feuer, *Airborne Transmission of Coronavirus Has Made High-End Air Filtration Systems More Popular Than 'Toilet Paper in April' As HVAC Systems Sell Out*, CNBC (October 15, 2020), https://www.cnbc.com/2020/10/15/airborne-transmission-of-coronavirus-has-made-high-end-air-filtration-systems-more-popular-than-toilet-paper-in-april.html.

[10] *Id.* (referring to the demand for toilet paper during the onset of the pandemic that led to shortages, fights, and arrests as consumers battled for toilet paper).

34.    For example, one common underlying condition is age. Compared to the CDC reference group, adults aged 30-39 are 45x more likely to die from COVID and 10x more likely to be hospitalized.[11]

35.    With each successive age group, these numbers increase drastically until hitting frightening numbers for people aged 65 and above:

| Age Range | Death | Hospitalization |
|:---:|:---:|:---:|
| 65-74 | 1300x | 40x |
| 75-84 | 3200x | 65x |
| 85+ | 8700x | 95x |

36.    To protect people, locations that have high amounts of "foot traffic" in an indoor setting have invested in safety precautions to mitigate the spread of COVID-19.

37.    The feeling of safety and security is pivotal to the public. As a result, there is strong demand for goods and procedures that "may make people feel safer without actually being substantially safer."[12]

---

[11] Center for Disease Control, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (updated April 16, 2021).

[12] Lindsay Christians, *Cold Comfort: With Winter On Its Way, Madison Restaurants Scramble To Stay Alive*, THE CAPITAL TIMES (November 7, 2020), https://madison.com/ct/entertainment/dining/cold-comfort-with-winter-on-its-way-madison-restaurants-scramble-to-stay-alive/article_2fdc210d-f78e-55cb-a251-96fc41516a1e.html.

38.    Installation of air treatment systems has been one of the most popular mitigation efforts.

39.    Because of the strong likelihood of death for the elderly population, senior living facilities have invested heavily in air treatment systems.

40.    Because of the strong likelihood of children acting as super spreaders,[13] schools from coast to coast invested heavily in air treatment systems to protect not only the students and school staff but also their friends and family.

41.    Because of the strong desire to celebrate their faith in person, religious organizations throughout the country invested in air treatment systems to allow congregations to worship safely.

42.    In addition to these public areas, similar concerns caused demand and interest to swell with residential owners.

---

[13] MGH News and Public Affairs, *Children's Role In Spread Of Virus Bigger Than Thought*, THE HARVARD GAZETTE (August 20, 2020), https://news.harvard.edu/gazette/story/2020/08/looking-at-children-as-the-silent-spreaders-of-sars-cov-2/.

11

43.     One survey found that the COVID-19 pandemic caused a

54% increase in consumer focus for indoor air quality in their homes.[14]

44.     The Wall Street Journal labeled clean air as the next luxury

apartment perk, and Elisa Orlanski Ours, Chief Planning and Design

Officer for Corcoran Sunshine, stated, "Air quality is now front of mind

for our buyers."[15]

45.     Throughout every business sector and every home, demand

for clean air and the equipment that creates the perception of clean air

is growing exponentially.

46.     To harness this demand, companies, like Global Plasma

Solutions, have increased marketing efforts and product lines.

**B. Global Plasma Solutions: The Company and the Products**

47.     Global Plasma Solutions was founded in 2008. The

company's previous focus was providing energy savings solutions.

However, when the COVID-19 pandemic hit, the company's focus

---

[14] *New Survey Reveals Increased Concern for Air Quality and Safety in Homes*, PR NEWSWIRE (October 28, 2020), https://www.prnewswire.com/news-releases/new-survey-reveals-increased-concern-for-air-quality-and-safety-in-homes-301162159.html.
[15] Katy McLaughlin, *CLEAN AIR: THE NEXT LUXURY APARTMENT PERK*, WALL STREET JOURNAL (December 9, 2020), http://www.wsj.com/articles/clean-air-the-next-luxury-apartment-perk-11607526064.

shifted, and in CEO Glenn Brinckman's words, "it's all about pathogens and coronavirus and COVID-19."[16]

48.   The backbone of Global Plasma Solutions' product line is its patented Needlepoint Bipolar Ionization technology (NPBI).

49.   NPBI is used in all seven of Defendant's Products.

## C. Global Plasma Solutions Represents to Consumers that Its Products Will Improve Air Quality Without Harmful Side Effects

50.   In marketing the Products, Defendant makes numerous representations regarding the performance and abilities of its Products and the benefits purchasers should expect to gain therefrom.

51.   This uniform, widespread marketing campaign is coordinated to present universal representations concerning the effectiveness of Defendant's Products and the NPBI technology.

52.   These representations fall into a few broad categories:

   a.   Representations that the Products are superior to other air treatment system technologies;

   b.   Representations that the Products eliminate VOCs;

---

[16] Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.

c. Representations that the Products have no harmful byproducts;

d. Representations that the Products are safe to use;

e. Representations that the Products produce cleaner air;

f. Representations that the Products are capable of achieving quantified toxin-removal benchmarks (for example, that its technology can reduce SARS-CoV-2 by 98.33% within 60 minutes);

g. Representations that Defendant's assertions about the Products are based on "independent testing;"

h. Representations that attempt to capitalize on the COVID-19 pandemic.

53. These representations are false, misleading, and deceptive:

| Representation Category | False, Misleading, and Deceptive |
|---|---|
| Products are superior to other air treatment system technologies | Comparisons to other technologies are based on the other misrepresentations herein. |
| Products eliminate VOCs | Independent studies show the Products actually increase the concentration of other harmful VOCs. |
| Products have no harmful byproducts | Independent studies show the Products' byproducts include harmful toxins including Acetone, Ethanol, Toluene, and Butyraldehyde. |

| | |
|---|---|
| Products are safe to use | Independent studies show the Products' byproducts include harmful toxins including Acetone, Ethanol, Toluene, and Butyraldehyde. |
| Products produce cleaner air | Independent studies show that the Products are not effective at cleaning the air in real world conditions. Further, the studies show that the Products' byproducts include harmful toxins including Acetone, Ethanol, Toluene, and Butyraldehyde. |
| Products are capable of achieving quantified toxin-removal benchmarks (for example, that its technology can reduce SARS-CoV-2 by 98.33% within 60 minutes) | These benchmarks fail to be replicated in real world environments. |
| Defendant's assertions about the Products are based on "independent testing" | Defendant's testing is fundamentally flawed and biased because these company-funded studies are not "independent." Further, Defendant's test results are not replicated in real world conditions because Defendant's tests are carefully constructed in order to achieve the outcomes Defendant desires. |
| Attempts to capitalize on the COVID-19 pandemic | Through a coordinated campaign to profit from COVID-19 fear, Defendant overstates the efficacy of its Products' ability to eliminate COVID-19. |

54.    These representations were promulgated to the public through Defendant's website, social media, YouTube videos, testimonials, third party publications, and other media. Below is a non-exhaustive selection of the representations made by Global Plasma Solutions concerning its NBPI Products.

55.    Defendant represents that its Products are <u>superior to other air treatment system technologies</u>.[17]

    a.    "That's why GPS is committed to science and ongoing research to ensure we have **the safest**, **most effective technology on the market**." Charles Waddell, GPS' Founder and Chief Technology Officer.[18]

    b.    "Most important, **unlike many other solutions on the market, GPS NPBI technology is also safe for occupied spaces**."[19]

    c.    In a podcast interview, shared on the Global Plasma Solutions' official Facebook page on June 15, 2020, Founder and CTO, Charlie Waddell states:[20]

        i.    "You know, half the filters and UV lights are what I consider passive devices, they sit there and they wait for stuff to come to them. **Our technology NPBI is**

---

[17] Emphasis added throughout.
[18] Global Plasma Solutions, *The Future of Indoor Air Quality Is Now*, https://globalplasmasolutions.com/articles/the-future-of-indoor-air-quality-is-now.
[19] Global Plasma Solutions, *PROJECT SPOTLIGHT: Boston Children's Hospital*, https://globalplasmasolutions.com/articles/project-spotlight-boston-childrens-hospital.
[20] Global Plasma Solutions' Official Facebook Page, June 15, 2020, https://www.facebook.com/globalplasmasolutions/posts/190279179097329.

**actually going out into the space and seeking out these contaminants within the space. So that's really solving the problems as we see them today.** Where you have people talking coughing, sneezing, generating the actual contaminants in the space. So I would rather see a technology actively coming out into the space to treat those contaminants versus waiting for them to come back to the air handler to be reactive versus proactive."[21]

d.  In a presentation entitled "How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization" by Charlie Waddell, Defendant's Founder and CTO:[22]

---

[21] *Id.* at approximately the 4:00 minute mark.

[22] Global Plasma Solutions Presentation (conducted by Charlie Waddell), How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization, https://www.total-mechanical.com/wp-content/uploads/2020/09/How-to-Make-Your-HVAC-Pandemic-Ready.pdf.

17

**% of SARS VIRUS CONTROLLED BASED ON TECHNOLOGY[1]**

| MERV Rating | Filter Only | Filter+UVC*** | Filter + Ionization*, ** |
|---|---|---|---|
| 6 | 6.2% | 10% | 34% |
| 7 | 7% | 12% | 61% |
| 8 | 11% | 19% | 84% |
| 10 | 12% | 35% | 89% |
| 13 | 46% | 84% | 97% |
| 15 | 71% | 97% | 99% |
| 16 | 76% | 98.80% | 99.90% |
| 17 (HEPA) | 99.90% | 99.99% | 99.999% |

*Ionization increases the filter efficiency 4-5 MERV levels – this column added by GPS
**Does not take into account ionization kills in the space and on surfaces
***UVC does not effectively kill airborne pathogens in high RH conditions[2]

e.  In a sales presentation from September 1, 2020, Defendant

compares its technology vs. competitor technologies:[23]



---

[23] Global Plasma Solutions Sales Presentation, <u>Better Air through Science</u>,
September 1, 2020, <u>https://www.sde.idaho.gov/communications/files/public-records-requests/GPS-Presentation.pdf</u> (slide 13).

56.   Defendant represents that its Products <u>eliminate VOCs</u>.[24]

a.   "Odors neutralized by **destroying VOCs**."[25]

b.   "Needlepoint bipolar ionization (NPBI®) technology breaks down odors into basic, harmless compounds, **leaving indoor air smelling fresh and free of odor-causing volatile organic compounds (VOCs)**."[26]

c.   "The GPS-iMOD, which is UL 2998-listed for no ozone, helps control fine particles while **destroying VOCs**."[27]

d.

**THE GPS ADVANTAGE**

| | GPS NPBI | OTHER BPI | CORONA DISCHARGE | HEPA FILTERS | CARBON FILTERS | ULTRAVIOLET (UV) | UV-PCO |
|---|---|---|---|---|---|---|---|
| **Produces Harmful Byproducts** | None | Yes | Yes | No | No | Yes | Yes |
| **Reduces Airborne Particles** | ✔ | Yes | Yes | Yes | No | No | No |
| **Destroys VOCs** | ✔ | Yes | Yes | No | Captures | No | Yes |

[28]

---

[24] Emphasis added throughout.
[25] Global Plasma Solutions, <u>Product Data Sheet: GPS-FC48-AC</u>, <u>https://globalplasmasolutions.com/uploads/products/data-sheets/GPS-FC48-AC_Data-Sheet.pdf</u> (citing to the GPS-FC48-AC, but this representation is present on every single Product's Data Sheet).
[26] Global Plasma Solutions, *PROJECT SPOTLIGHT: Clean Room Applications*, <u>https://globalplasmasolutions.com/articles/project-spotlight-clean-room-applications</u>.
[27] Global Plasma Solutions Sales Presentation, <u>Better Air through Science</u>, September 1, 2020, <u>https://www.sde.idaho.gov/communications/files/public-records-requests/GPS-Presentation.pdf</u> (slide 49).
[28] Global Plasma Solutions Brochure, p. 3, <u>https://resource.carrierenterprise.com/is/content/Watscocom/iwave_gps-fc-3-bas_article_1604089090642266_en_cc1</u>.

19

57.     Defendant represents that its Products <u>have no harmful</u>

<u>byproducts</u>.[29]

    a.  "Are there **byproducts**?

      **No**. Passing through an ionization field causes compounds to

      break into one or more of four basic elements: oxygen,

      nitrogen, carbon dioxide or water vapor."[30]

    b.  In a sales presentation from September 1, 2020:[31]



Our proven NEEDLEPOINT BIPOLAR IONIZATION technology, also known as NPBI,

*delivers indoor air that's*

safer and free of ozone

and other harmful byproducts.

---

[29] Emphasis added throughout.
[30] Global Plasma Solutions FAQ Page, https://globalplasmasolutions.com/faqs (last visited May 6, 2021).
[31] Global Plasma Solutions Sales Presentation, <u>Better Air through Science</u>, September 1, 2020, https://www.sde.idaho.gov/communications/files/public-records-requests/GPS-Presentation.pdf.

GPS' NPBI™ technology breaks down chemical, pet, cooking and other odors into basic harmless compounds, leaving indoor air fresh smelling and free of odor-causing VOCs.



*The NPBI plasma breaks down odors, gases and VOC's into harmless compounds.*

c. "Safe solution: NPBI delivers clean indoor air **without producing** ozone or other **harmful byproducts**."[32]

---

[32] Global Plasma Solutions, *To Bring Employees Back Safely, This Agency Turned to Ionization Technology*, https://globalplasmasolutions.com/articles/to-bring-employees-back-to-work-safely-this-agency-turned-to-ionization-technology.

d. [33]

e. "Since 2009, GPS has delivered clean indoor air solutions that are safe and healthy. **Our technology delivers clean indoor air without producing ozone or other harmful byproducts.**"[34]

f. "GPS' technology generates the same ions as Mother Nature creates with lightning, waterfalls, and ocean waves. Mother Nature uses energy to break apart molecules. It is nature's way of cleansing the air naturally and creating a healthy environment. The only difference is that GPS' technology does it **without forming ozone or other harmful byproducts**."[35]

---

[33] Global Plasma Solutions Sales Presentation, <u>Better Air through Science</u>, September 1, 2020, https://www.sde.idaho.gov/communications/files/public-records-requests/GPS-Presentation.pdf.
[34] Global Plasma Solutions, *Global Plasma Solutions® Appoints Edward Sobek as Chief Science Officer*, March 2, 2021, https://globalplasmasolutions.com/articles/indoor-air-quality-solutions-leader-global-plasma-solutions-appoints-edward-sobek-as-chief-science-officer.
[35] Global Plasma Solutions Marketing Brochure, http://www.icecenter.net/covid/bipolar-ionization.pdf.

g. **"**GPS NPBI technology is certified by UL 867 and UL 2998, meaning it delivers indoor air that's free of ozone and other harmful byproducts. **This sets it apart from other ionization technologies that are known to produce ozone, making them unsafe for occupied spaces."[36]**

58. Defendant represents that its Products <u>are safe to use</u>.[37]

a. "For the immediate and post-pandemic new normal, GPS is uniquely positioned to address IAQ and pathogen control challenges by providing an **effective, safe and dependable solution**."[38]

b. "GPS NPBI technology helps with all aspects of indoor air quality. In addition, **unlike many other solutions on the market, it's also safe for occupied spaces**. This means

---

[36] Global Plasma Solutions, *Why Your Customers Should Care About Their Indoor Air Quality*, https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.
[37] Emphasis added throughout.
[38] Global Plasma Solutions, *The Future of Indoor Air Quality Is Now*, https://globalplasmasolutions.com/articles/the-future-of-indoor-air-quality-is-now.

building occupants can get back to work, school and more in

**a safe manner**."[39]

c. "**Safer**, fresher indoor air"[40]

d. "Many are turning to Global Plasma Solutions' NPBI

technique as an affordable, **safe, effective solution.**"[41]

e. In a podcast interview, shared on the Global Plasma

Solutions' official Facebook page on June 15, 2020, Founder

and CTO, Charlie Waddell has the following discussion:

   i. Question: "Okay. So, you said that it didn't produce

   ozone. And so that's often a concern with bipolar

   ionization. And so is there anything that this the NPI

   technology could how it could adversely affect

   components or occupants? Or is it completely safe?"

---

[39] Global Plasma Solutions, *10 Facts About Needlepoint Bipolar Ionization*, https://globalplasmasolutions.com/articles/10-facts-about-needlepoint-bipolar-ionization.
[40] This representation appears throughout Defendant's website. For example, it appears on the "Transportation," "Office Buildings," and "Health Care" tabs under "Markets Served."
[41] Global Plasma Solutions, *PROJECT SPOTLIGHT The University of Maryland, Baltimore*, https://globalplasmasolutions.com/articles/project-spotlight-the-university-of-maryland-baltimore.

Answer: "**It is completely safe**. And the reason why we can make that claim is because we don't produce the ozone as a byproduct. With the older systems and other types of technologies that may compete against NBPI. They are producing ozone as a byproduct, and a lot of people like to go out and market it as ozone free technology, or they'll claim they don't produce ozone. But really, where the rubber meets the pavement is actually being able to produce that test report from UL that states per 2998 you don't produce ozone. So for those people out there using these other technologies, that ASHRAE has now come out and said in their ASHRAE standards in Section 5.7.1, if you look that up, it'll say all air purification technologies that require power should have UL 2998 certification and that confirms that, in fact, **it is a safe technology**. If we're not creating the ozone, we're not going to be oxidizing or breaking down any organics in the airstream. **So it's safe and effective**. And actually, I just read a great

paper from the National Institutes of Health that
discussed on ionization and the positive impact that
actually has on health. So I was very pleased to see
that coming from the NIH."[42]

   ii.   Later in that same interview at approximately 13:13
         minute mark: "So that's **safe** in itself, and confirmed
         by third party that **it's safe**."

f.   "GPS patented NPBI® technology **safely and effectively**
     reduces airborne viruses and other pathogens while also
     making dust, pollen and other particles easier to capture in
     air filtration systems."[43]

g.   On the first page of a marketing document distributed to
     potential customers:[44]

**GPS is Safe**
Our needlepoint bipolar ionization is OZONE free and safe to use across
commercial, industrial and residential buildings. Traditional bipolar
ionization systems produce harmful ozone as a byproduct.

---

[42] Global Plasma Solutions Official Facebook Page,
https://www.facebook.com/globalplasmasolutions/posts/190279179097329 at
approximately the 8:00 mark.
[43] Global Plasma Solutions, Large Spaces,
https://globalplasmasolutions.com/applications/large-spaces.
[44] Global Plasma Solutions, INDEPNDENT LABORATORY TEST RESULTS,
https://newhorizonacademy.net/wp-
content/uploads/2020/08/GPS_Pathogen_Testing_Summary_6.10.20.pdf.

h. "GPS' NPBI (needlepoint bipolar ionization) products are **completely safe for humans and animals**. With over 250,000 installations and many testimonials, GPS products have not only **proven to be safe,** but they also make the air cleaner and **safer**. GPS technology produces what naturally occurs in nature, and since GPS' technology has been certified by UL 2998 as ozone-free, **there are no health concerns**."[45]

i. "Needlepoint bipolar ionization (NPBI®) technology is a **safe and effective** way to filter the virus out of the air."[46]

j. "NPBI technology **safely and effectively** tackles airborne viruses and other pathogens while also making dust, pollen and other particles easier to capture in air filtration systems."[47]

---

[45] Global Plasma Solutions FAQ Page, https://globalplasmasolutions.com/faqs (last visited May 5, 2021).
[46] Global Plasma Solutions, *The American Rescue Plan Can Help Schools Reopen Safely*, https://globalplasmasolutions.com/articles/the-american-rescue-plan-can-help-schools-reopen-safely-with-air-purification-technology.
[47] Global Plasma Solutions, *Project Spotlight: Amalie Arena*, https://globalplasmasolutions.com/articles/project-spotlight-amalie-arena.

59.    Defendant represents that its Products <u>produce cleaner air</u>.[48]

    a.  "**CLEANER AIR**, NATURALLY"[49]

    b.  "Through our needlepoint bipolar ionization or NPBI®
technology, **we deliver clean indoor air** — producing
neither ozone nor other harmful byproducts."[50]

    c.  "NPBI is a proactive approach to **cleaner air**."[51]

    d.  "This instantly results **in cleaner indoor air** and a safer
environment."[52]

    e.  GPS products provide an affordable, effective and low-
maintenance **solution for cleaner air**.[53]

    f.  "AN ENGINEERED SOLUTION FOR **CLEANER, SAFER**
INDOOR AIR"[54]

---

[48] Emphasis added throughout.
[49] Global Plasma Solutions, <u>How It Works</u>, https://globalplasmasolutions.com/how-it-works (last visited May 5, 2021).
[50] *Id.*
[51] Global Plasma Solutions, *The American Rescue Plan Can Help Schools Reopen Safely*, https://globalplasmasolutions.com/articles/the-american-rescue-plan-can-help-schools-reopen-safely-with-air-purification-technology.
[52] *Id.*
[53] *Id.*
[54] Global Plasma Solutions, *Why Your Customers Should Care About Their Indoor Air Quality*, https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.

28

g. "The combined effect is air that is **cleaner and safer** to breathe."[55]

h. In March 2021, Global Plasma Solutions appointed Edward Sobek as the company's first Chief Science Officer. In the press release announcing his arrival, Mr. Sobek states:[56]

   i. "What is most compelling about NPBI is its ability to **clean air and surfaces** in the occupied space."

   ii. "This technology can help create **healthy environments** at home, at work, at school and beyond. I welcome the opportunity to further GPS' goal of improving indoor air quality for all."[57]

i. "**GPS delivers clean indoor air** without producing ozone or other harmful byproducts."[58]

---

[55] Global Plasma Solutions, *PROJECT SPOTLIGHT The Learning Experience*, https://globalplasmasolutions.com/articles/project-spotlight-the-learning-experience.

[56] Global Plasma Solutions, *Global Plasma Solutions® Appoints Edward Sobek as Chief Science Officer*, March 2, 2021, https://globalplasmasolutions.com/articles/indoor-air-quality-solutions-leader-global-plasma-solutions-appoints-edward-sobek-as-chief-science-officer (emphasis added).

[57] *Id.*

[58] Global Plasma Solutions, Pathogen Reduction, https://globalplasmasolutions.com/pathogen-reduction (last visited May 5, 2021).

j. "Our patented needlepoint bipolar ionization (NPBI®)

technology is a **proactive approach to cleaner air**."[59]

60. Defendant represents that its Products <u>can achieve toxin-

removal benchmarks</u>.[60]

a. "**Within 24 hours of installation**, NPBI technology

**effectively neutralized odors from all sources** entering

these buildings."[61]

b. For example, the following tables appear on both the

Defendant's "Independent Testing" and "Pathogen

Reduction" pages:

| Pathogen | Time in Chamber | Testing Methodology | Rate of Reduction |
|---|---|---|---|
| SARS-CoV-2 | 60 minutes | In-Air | **98.33%** |
| SARS-CoV-2 | 60 minutes | Surface | **99.98%** |

i.

---

[59] Global Plasma Solutions, *The Japanese Industrial Standard for Ion Measurement*, https://globalplasmasolutions.com/articles/the-japanese-industrial-standard-for-ion-measurement.
[60] Emphasis added throughout.
[61] Global Plasma Solutions, *Project Spotlight: Edmonton International Airport*, https://globalplasmasolutions.com/articles/project-spotlight-edmonton-international-airport.

| Pathogen | Time in Chamber | Rate of Reduction |
|---|---|---|
| Tuberculosis | 60 minutes | 69.1% |
| MRSA | 30 minutes | 96.2% |
| Staphylococcus | 30 minutes | 96.2% |
| E. coli | 15 minutes | 99.7% |

    ii.

| Pathogen | Time in Chamber | Rate of Reduction |
|---|---|---|
| Norovirus[†] | 30 minutes | 93.5% |
| Human Coronavirus 229E* | 60 minutes | 99.0% |
| Legionella | 30 minutes | 99.7% |
| Clostridium Difficile | 30 minutes | 88.9% |

    iii.

c. "The air purification system was able to target and reduce pathogens and odors **within just 24 hours of installation**."[62]

d. "The GPS-iMOD **drastically reduced the exhaust fume odors within 24 hours** and **reduced the particles in the space by up to 85%**."[63]

---

[62] Global Plasma Solutions, *PROJECT SPOTLIGHT: Clean Room Applications*, https://globalplasmasolutions.com/articles/project-spotlight-clean-room-applications.
[63] Global Plasma Solutions, *PROJECT SPOTLIGHT The University of Maryland, Baltimore*, https://globalplasmasolutions.com/uploads/customer-resources/Resource-Library/Case-Studies/University-of-Maryland-Case-Study.pdf (emphasis in original).

61.     Defendant represents that <u>its assertions about the Products</u> <u>are based on "independent testing."</u>[64]

   a. "This process is **proven by independent laboratory testing** to be both safe and effective."[65]

   b. In a presentation entitled "How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization" by Charlie Waddell, Defendant's Founder and CTO:[66]

   ### *Independent Testing by World Renowned EMSL & ATS Labs*

   c. On its website, under the "Independent Testing" page:[67]

   ## Independent Testing
   We put our needlepoint bipolar ionization (NPBI) technology to the test: Third-party testing confirms it limits the spread of viruses.

      i.

---

[64] Emphasis added throughout.
[65] Global Plasma Solutions, <u>Pathogen Reduction</u>, <u>https://globalplasmasolutions.com/pathogen-reduction</u> (last visited May 5, 2021).
[66] Global Plasma Solutions Presentation (conducted by Charlie Waddell), <u>How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization</u>, <u>https://www.total-mechanical.com/wp-content/uploads/2020/09/How-to-Make-Your-HVAC-Pandemic-Ready.pdf</u>.
[67] Global Plasma Solutions, <u>Independent Testing</u>, <u>https://globalplasmasolutions.com/independent-testing</u> (last visited May 5, 2021).

PERFORMANCE VALIDATION

*Third-party testing confirms: GPS gets the job done*

Our results-driven technology fights pathogens and limits the spread of viruses.

ii.

62.     Defendant's representations concerning the <u>COVID-19 pandemic</u>.[68]

a. "While the **COVID-19 pandemic** has inspired virtually every industry to take steps toward ensuring cleaner, safer indoor air, Global Plasma Solutions (GPS) began tackling air purification long before the coronavirus emerged."[69]

b. "**COVID-19 is top of mind**, of course, including the different mutations of the virus we're seeing come into the

---

[68] Emphasis added throughout.
[69] Global Plasma Solutions, *Project Spotlight: Edmonton International Airport*, https://globalplasmasolutions.com/articles/project-spotlight-edmonton-international-airport.

United States," Waddell said. "**NPBI creates additional peace of mind during this evolving pandemic**."[70]

c. "**This pandemic may be the first most of us have seen, but it won't be the last**, and we need to be prepared. That's why GPS is committed to science and ongoing research to ensure we have the safest, most effective technology on the market."[71]

d. "Pathogens such as SARS-CoV2, **the new strain of coronavirus that causes COVID-19**, can reside on surfaces and be suspended in the air we breathe. NPBI technology is **designed to mitigate these harmful pathogens by safely creating and releasing ions** via a building's existing HVAC system."[72]

e. "In the case of **SARS-CoV2** and other pathogens, contact with positive and negative ions has microbicidal effects,

---

[70] Global Plasma Solutions, *The Future of Indoor Air Quality Is Now*, https://globalplasmasolutions.com/articles/the-future-of-indoor-air-quality-is-now.
[71] *Id.*
[72] Global Plasma Solutions, *Why Better Indoor Air Quality May Be the Key to Safer Indoor Events*, https://globalplasmasolutions.com/articles/why-better-indoor-air-quality-may-be-the-key-to-safer-indoor-events.

ultimately disrupting their surface proteins and rendering them inactive. Independent laboratory studies have shown **that NPBI technology limits the spread of viruses such as SARS-CoV2**, MRSA and E. coli."[73]

f.  "In addition, when ions come into contact with pathogens, such as the **SARS-CoV-2 virus that causes COVID-19**, they disrupt the pathogens' surface proteins. This, in turn, renders them inactive."[74]

| Pathogen | Time in Chamber | Rate of Reduction | Test Agency |
|----------|-----------------|-------------------|-------------|
| SARS-CoV-2 | 30 minutes | **99.9%** | Innovative Bioanalysis |

g. [75]

h.  "Imagine an individual with **COVID-19** walks into a room in your office building. With the smallest of actions – like a cough or a sneeze – harmful pathogens have been released into the air. From that moment forward, anyone who walks into the room is exposed to the virus. These scenarios

---

[73] *Id.*
[74] *Id.*
[75] Archived version of Defendant's website from October 24, 2020, https://web.archive.org/web/20201024175828/https://globalplasmasolutions.com/pathogen-reduction.

happen countless times each day, and historically there have not been solutions to address the problem. That's where NPBITM comes in." Charlie Waddell, GPS Founder and CTO.[76]

i. "Though **a proven tool in the fight against COVID-19**, NPBI is just one critical measure in a comprehensive approach to improving IAQ and providing cleaner, safer indoor air."[77]

j. "...announced today industry-leading ionization testing results, demonstrating a **99.4% reduction rate on a SARS-CoV-2 (COVID-19)** surface strain within 30 minutes, the **first instance in which an air purification company has effectively neutralized SARS-CoV-2.**"[78]

---

[76] Charlie Waddell*, The Future of IAQ Lies in Needlepoint Bipolar Ionization*, HVAC INSIDER & REFRIGERATION (July 7, 2020), https://hvacinsider.com/the-future-of-iaq-lies-in-needlepoint-bipolar-ionization/.
[77] Global Plasma Solutions, *Why Your Customers Should Care About Their Indoor Air Quality*, https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.
[78] Global Plasma Solutions, *GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology*, June 10, 2020, https://globalplasmasolutions.com/articles/gps-virtually-eliminates-static-sars-cov-2-with-proprietary-npbi-technology.



k.

63.     Global Plasma Solutions' representations were largely repeated uncritically by news outlets, publications, press releases, social media, and other forms of media.

64.     Global Plasma Solutions' representations were used in the marketing efforts of its sellers, distributors, and other agents.

65.     But these representations failed to hold up when they were examined by independent academic studies and industry watchdogs.

### D. Global Plasma Solutions' Representations Are False, Deceptive, and Misleading

#### a. Global Plasma Solutions' Representations to Consumers that Its Products Are Superior to Other Air Treatment Systems Are False, Deceptive, and Misleading.

66.     As outlined above, Defendant represents NBPI as the safest, most effective technology on the market.

67.     These statements are not mere puffery because Defendant presents direct comparisons to other technologies throughout its uniform, wide scale marketing campaign.

68.   For example, the following table is used multiple times in Defendant's marketing literature:

| | GPS NPBI™ | Other BPI | Corona Discharge | HEPA Filters | Carbon Filters | Ultraviolet (UV) | UV-PCO |
|---|---|---|---|---|---|---|---|
| GPS NEEDLEPOINT BIPOLAR IONIZATION VS. OTHERS | | | | | | | |
| No Harmful Byproducts | ● | | | ● | ● | | |
| Reduces Airborne Particles | ● | ● | ● | ● | | | |
| Reduces VOCs | ● | ● | ● | | ● | | ● |
| Reduces Pathogens | ● | ● | ● | ● | ● | ● | ● |
| Reduces Energy Cost | ● | ● | ● | | | | |
| Treats In-Room Air | ● | ● | ● | | | | |
| No Replacement Parts | ● | | | | | | |
| No Maintenance | ● | | | | | | |
| Simple To Install | ● | | | | | | |
| Low Total Cost | ● | ● | | | | | |

69.   These statements are made by the Defendant in order to siphon sales from the competitors that use other technologies to clean the air.

70.   If the statements were true and accurately represented, then Defendant's "superior technology" representations might be within the bounds of the law.

71.   However, many of Defendant's representations are false, misleading, and deceptive.

72.   For example, Defendant represents to consumers that NPBI does not produce harmful byproducts.

38

73.   As outlined below, this statement is not true and is included in order to lure consumers that may be interested in competing technologies like HEPA filters and carbon filters which do not produce harmful byproducts.[79]

74.   When NPBI is compared to other technologies, "[existing] proven measures that should be taken to address airborne transmission risk include properly sized and maintained ventilation (mechanical and natural), mechanical filtration (including portable HEPA filter units), and germicidal ultraviolet light systems. Such measures are practical and often can be easily implemented; many are not costly...."[80]

75.   As described in greater detail below, many of these comparisons are false, misleading, and deceptive, and solely created to induce sales of Defendant's Products.

---

[79] Professor Glenn Morrison from the University of North Carolina Chapel Hill notes that "[a] cheap portable HEPA filter would work many times better and have fewer side effects (possibly ozone or other unwanted chemistry)."  Lauren Weber and Christina Jewett, *As Schools Spend Millions on Air Purifiers, Experts Warn of Overblown Claims and Harm to Children*, KAISER HEALTH NETWORK (May 3, 2021), https://khn.org/news/article/as-schools-spend-millions-on-air-purifiers-experts-warn-of-overblown-claims-and-harm-to-children/.

[80] Drs. Marwa Zaatari and Marcel Harmon, *Open Letter to address the use of Electronic Air Cleaning Equipment in Buildings*, April 12, 2021, https://medium.com/open-letter-to-address-the-use-of-electronic-air/no-to-ionizers-plasma-uvpco-bc1570b2fb9b (this letter is supported by 11 other doctors).

### b. Global Plasma Solutions' Representations to Consumers that Its Products Will Safely Clean the Air and Eliminate VOCs with No Harmful Byproducts Are False, Deceptive, and Misleading.

76.    In February 2021, professors at three major universities released an academic article that was selected for publication in the academic journal *Building and Environment*.[81]

77.    The article examined the effectiveness of bipolar ionization technology. Specifically, Defendant's GPS-FC48-AC device was tested by the scientists.

78.    The article concluded that "[t]he device in our testing was ineffective in addressing the air pollutants that it's advertised to remove from the space."[82]

79.    After conducting its detailed experiments, the panel of scientists concluded that Defendant's GPS-FC48-AC device introduces harmful volatile organic compounds into the air.

---

[81] Yicheng Zeng, Prashik Manwatkar, Aurélie Laguerre, Marina Beke, Insung Kang, Akram S. Ali, Delphine K. Farmer, Elliott T. Gall, Mohammad Heidarinejad, Brent Stephens, *Evaluating A Commercially Available In-Duct Bipolar Ionization Device For Pollutant Removal And Potential Byproduct Formation*, BUILDING AND ENVIRONMENT, Volume 195, 2021, 107750, ISSN 0360-1323, https://doi.org/10.1016/j.buildenv.2021.107750.
[82] Keely Chalmers, *Researchers Warn Against Some Electronic Air Purifiers*, KGW8 (April 15, 2021), https://www.kgw.com/article/news/health/researchers-warn-against-some-electronic-air-purifiers/283-1da342a6-75ca-4ca3-aa82-c4e4717fc491.

80.    The article notes:[83]

Both the chamber and field tests suggested that the use of the tested bipolar ionization unit led to a decrease in some hydrocarbons (e.g., xylenes) among the lists of compounds we were able to analyze, but an **increase in others, most prominently oxygenated VOCs (e.g., acetone, ethanol) and toluene.**

81.    In other words, Defendant's GPS-FC48-AC device does not clean the air and produce a healthy environment. Rather, it trades one group of harmful chemicals for another group of harmful chemicals.

82.    The study showed the following increases in Acetone, Ethanol, Toluene, and Butyraldehyde.[84]

83.    **Acetone** is a toxic substance.

a. According to the CDC, inhalation of Acetone can cause the following ailments:[85]

    i.   nose, throat, lung, and eye irritation;

    ii.  headaches;

    iii. light-headedness;

---

[83] Zeng, Manwatkar, et. al., *supra* note 76.

[84] Other toxic substances may be produced by Defendant's Products. Plaintiff's investigation is ongoing and will seek to amend the Complaint to specify other potential toxic substance produced by these Products in the future.

[85] Center For Disease Control and Prevention, *Acetone: ATSDR Fact Sheet*, September 1, 1995, https://wonder.cdc.gov/wonder/prevguid/p0000467/p0000467.asp.

    iv.  confusion;

    v.  increased pulse rate;

    vi.  effects on blood;

    vii.  nausea;

    viii.  vomiting;

    ix.  unconsciousness and possibly coma; and

    x.  shortening of the menstrual cycle in women.

b. Additional evidence shows that "Acetone may damage the male reproductive system (including decreasing the sperm count) and affect female fertility in animals."[86]

c. Acetone is toxic to the central nervous system.[87]

d. Acetone is toxic to the kidneys, the liver, the skin, and the reproductive system.[88]

---

[86] New Jersey Department of Health, *Hazardous Substance Fact Sheet: Acetone*, June 2015, https://www.nj.gov/health/eoh/rtkweb/documents/fs/0006.pdf.

[87] ScienceLab.com, *Material Safety Data Sheet Acetone MSDS*, November 6, 2008, https://www.conncoll.edu/media/website-media/offices/ehs/envhealthdocs/acetone.pdf.

[88] New Jersey Department of Health, *Hazardous Substance Fact Sheet: Acetone*, June 2015, https://www.nj.gov/health/eoh/rtkweb/documents/fs/0006.pdf.

[88] ScienceLab.com, *Material Safety Data Sheet Acetone MSDS*, November 6, 2008, https://www.conncoll.edu/media/website-media/offices/ehs/envhealthdocs/acetone.pdf.

    e.  Long-term exposure to Acetone can produce damage to these targeted organs and systems.[89]

84.  **Ethanol** is a toxic substance.

    a.  Inhalation of ethanol can irritate the nose, throat and lungs causing coughing and shortness of breath.[90]

    b.  Studies show that chronic intermittent ethanol vapor exposure produces widespread significant tissue injury including hepatic, pulmonary, and cardiovascular changes in mammals.[91]

    c.  Over 50 years ago, researchers at Stanford University confirmed that inhalation of ethanol over a period of a few days by mammals is toxic. In fact, the absorption of the alcohol was so strong, that every single animal in the study

---

[89] New Jersey Department of Health, *Hazardous Substance Fact Sheet: Acetone*, June 2015, https://www.nj.gov/health/eoh/rtkweb/documents/fs/0006.pdf.
[89] *Id.*
[90] New Jersey Department of Health, *Hazardous Substance Fact Sheet: Ethyl Alcohol*, March 2016, https://www.nj.gov/health/eoh/rtkweb/documents/fs/0844.pdf.
[91] Mouton AJ, Maxi JK, Souza-Smith F, Bagby GJ, Gilpin NW, Molina PE, Gardner JD (2016) *Alcohol Vapor Inhalation As A Model Of Alcohol-Induced Organ Disease.* ALCOHOL CLIN EXP RES 40:1671–1678.

developed signs of alcohol withdrawal upon removal from the environment containing ethanol vapors.[92]

85. **Toluene** is a toxic substance and part of the "toxic trio."[93]

    a. According to the CDC, inhalation of Toluene can cause the following ailments:[94]

        i. headaches,

        ii. dizziness, and numbness;

        iii. irritated eyes, nose, throat, and lungs;

        iv. damage to liver and kidneys; and

        v. harm to unborn children during pregnancy.

    b. The CDC further warns that long-term inhalation of Toluene "can cause permanent damage to the brain, muscles, heart, and kidneys."[95]

86. **Butyraldehyde** is a toxic substance.

---

[92] Dora Goldstein and Nandita Pal, *Alcohol Dependence Produced in Mice by Inhalation of Ethanol: Grading the Withdrawal Reaction*, Science (April 16, 1971), https://science.sciencemag.org/content/172/3980/288.

[93] Occupational Safety and Health Administration, *Health Hazards in Nail Salons*, https://www.osha.gov/nail-salons/chemical-hazards.

[94] Agency for Toxic Substances and Disease Registry, Medical Management *Guidelines for Toluene*, October 21, 2014, https://wwwn.cdc.gov/TSP/MMG/MMGDetails.aspx?mmgid=157&toxid=29.

[95] *Id.*

a. Inhalation of Butyraldehyde can irritate the lungs causing coughing and shortness of breath.[96]

b. Higher exposures can cause a pulmonary edema.[97]

87.     In other words, use of Defendant's Products creates a "pick your poison" proposition for consumers.

**c. Global Plasma Solutions' Representations to Consumers that Its Products' Claims Are Supported By Sound, Independent Testing and Can Achieve Quantified Toxin-Removal Benchmarks Are False, Deceptive, and Misleading.**

88.     The Products not only produce harmful VOCs but also they fail to clean the air at the rates as claimed by its "independent testing."

89.     For example, in an attempt to improve cleanliness and efficiency, Boeing conducted a technical assessment of air ionization technologies.[98]

90.     One of the tested technologies was NPBI.

---

[96] New Jersey Department of Health and Senior Services, *Hazardous Substance Fact Sheet: Butyraldehyde*, July 2002, https://nj.gov/health/eoh/rtkweb/documents/fs/0299.pdf.
[97] *Id.*
[98] Boeing, *Use of Bipolar Ionization for Disinfection within Airplanes*, https://www.boeing.com/confident-travel/research/use-of-bipolar-ionization-for-disinfection-within-airplanes.html (2021).

91.    The test results in the Huntsville location found "minimal reductions in viral inactivation."[99]

92.    The test also found only "minimal reductions in surface bacteria viability by bipolar ionization."[100]

93.    Further, the Huntsville test found "no reductions in Staphylococcus aureus, Pseudomonas aeruginosa, Enterococcus faecalis, and Enterobacter cloacae with <20.6% or <0.1 log10 reduction over a 60 minute exposure duration."[101]

94.    The "New 787-10 Ground Testing" found the reductions in Escherichia coli and MS2 Bacteriophage to be far lower than needed for cabin disinfection.[102]

95.    At the end of the assessment, Boeing found:[103]

The use of air ionization in an airplane remains inconclusive as a methodology for deployment during the SARS-CoV-2 virus pandemic. Boeing's limited testing was unable to replicate supplier results in terms of antimicrobial effectiveness. The systems were unable to properly deliver and maintain the necessary ion levels in the airplane to achieve disinfection. Similarly, laboratory-based tests did not show proper rates of disinfection with higher ion concentrations. It is pertinent to be able to demonstrate

---

[99] *Id.* at 16.
[100] *Id.*
[101] *Id.*
[102] *Id.* at 20-21.
[103] *Id.* at 22.

effective performance in an airplane environment given aircraft installation constraints.

96.    In summary, "Boeing's current position is that air ionization has not shown significant disinfection effectiveness for further inclusion in the Confident Travel Initiative Program."[104]

97.    Boeing's results and conclusions stand in stark contrast to Defendant's statements concerning NPBI's effectiveness in an airplane environment:[105]

> In the laboratory, a test was conducted to mimic ionization conditions like that of a commercial aircraft's fuselage. Based on viral titrations, it was determined that at 10 minutes, 84.2% of the virus was inactivated. At 15 minutes, 92.6% of the virus was inactivated, and at 30 minutes, 99.4% of the virus was inactivated.

98.    When Trane Technologies tested NPBI, while it found some efficacy for some in-air pathogens, it found no efficacy for surface pathogens and VOCs.[106]

---

[104] *Id.*

[105] *Global Plasma Solutions (GPS) Launches Needlepoint Bipolar Ionization To Virtually Eliminate Static SARS-CoV-2 with Proprietary NPBI™ Technology*, PR NEWSWIRE (September 15, 2020), https://www.prnewswire.com/in/news-releases/global-plasma-solutions-gps-launches-needlepoint-bipolar-ionization-to-virtually-eliminate-static-sars-cov-2-with-proprietary-npbi-tm-technology-860417185.html.

[106] Trane Technologies, *A Taxonomy of Air-Cleaning Technologies Featuring Bipolar Ionization*, January 27, 2021,

99.    Focusing on VOCs, Trane found "[t]he inability of the needlepoint bipolar ionization device to reduce VOCs (formaldehyde, toluene) has serious ramifications… if the technology cannot reduce VOCs, it cannot supplant outdoor air ventilation, so it cannot conserve energy."[107]

### d. Global Plasma Solutions' Representations to Consumers that Its Products Are Effective Against COVID-19 Are False, Deceptive, and Misleading.

100.   From the early days of COVID-19, Global Plasma Solutions viewed the pandemic as a potential windfall for its technology and Products.

101.   Two days before the World Health Organization increased the status of COVID-19 from an epidemic to a pandemic,[108] Global Plasma Solutions issued a press release in an attempt to capture the new burgeoning market.[109]

---

https://www.jp.trane.com/content/dam/Trane/Commercial/global/about-us/wellsphere/Technology%20Whitepaper%20-%20Bipolar%20Ionization.pdf  at 8.
[107] *Id.* at 7.
[108] Kathy Katella, *Our Pandemic Year—A COVID-19 Timeline*, YALE MEDICINE (March 9, 2021), https://www.yalemedicine.org/news/covid-timeline.
[109] Global Plasma Solutions, *Indoor Air Quality Technology Company Responds to Coronavirus*, March 9, 2020, https://globalplasmasolutions.com/articles/indoor-air-quality-technology-company-responds-to-coronavirus.

102.   The press release – entitled "Indoor Air Quality Technology Company Responds to Coronavirus" – was a flag-planting moment for Global Plasma Solutions. From the point onward, the company's focus shifted and became "all about pathogens and coronavirus and Covid-19."[110]

103.   On June 10, 2020, a date where COVID-19 killed 860 Americans, Defendant published a press release entitled "GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology."[111]

104.   In this press release, Defendant "announced today industry-leading ionization testing results, demonstrating a 99.4% reduction rate on a SARS-CoV-2 (COVID-19) surface strain within 30 minutes, the first instance in which an air purification company has effectively neutralized SARS-CoV-2."[112]

---

[110] Quoting CEO Glenn Brinckman. Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.
[111] Global Plasma Solutions, *GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology*, June 10, 2020, https://globalplasmasolutions.com/articles/gps-virtually-eliminates-static-sars-cov-2-with-proprietary-npbi-technology.
[112] *Id.*

105.   In that same release, Global Plasma Solutions' founder and CTO declared, "The testing results we achieved through our proprietary needlepoint bipolar ionization technology clearly demonstrate that Global Plasma Solutions is the gold standard in air purification."

106.   Building from the themes in its press releases, Defendant describes its Products as "proven tool[s] in the fight against COVID-19."[113]

107.   This "proof" comes from "[i]ndependent laboratory studies [that] have shown that NPBI technology limits the spread of viruses such as SARS-CoV2."[114]

108.   These results are summarized into a simple table:

| Pathogen | Time in Chamber | Testing Methodology | Rate of Reduction | Test Agency |
|---|---|---|---|---|
| SARS-CoV-2 | 60 minutes | In-Air | 98.33% | Innovative Bioanaylsis |
| SARS-CoV-2 | 60 minutes | Surface | 99.98% | Innovative Bioanaylsis |

109.   The results and Defendant's statements are interpreted in a similar fashion by consumers and the general public.

---

[113] *Id.*
[114] Global Plasma Solutions, *Why Better Indoor Air Quality May Be the Key to Safer Indoor Events,* https://globalplasmasolutions.com/articles/why-better-indoor-air-quality-may-be-the-key-to-safer-indoor-events.

50

a.



b.  "We've done our homework on this. It's the only company that we found that claimed that they could kill the COVID-19 virus."[115]

### Charlotte City Club Installs Ion System that Claims to Kill COVID-19

c.                                                                          [116]

---

[115] Dana Winter, *Faith Academy Gets New Technology Killing COVID-19 In The Air*, WKRG (July 22, 2020), https://www.wkrg.com/local-news/faith-academy-gets-new-technology-killing-covid-19-in-the-air/.

[116] Rob Thomas, *Charlotte City Club Installs Ion System that Claims to Kill COVID-19*, CLUB AND RESORT BUSINESS (July 14, 2020), https://clubandresortbusiness.com/charlotte-city-club-installs-ion-system-that-claims-to-kill-covid-19/.

d.  "The Indiana Welcome Center is installing a state-of-the-art
    bipolar ionization system to kill COVID-19…Third-party
    testing has shown the system kills 99.47% of SARS-CoV-2,
    the disease that causes COVID-19, within 30 minutes,
    Project Manager Doug Lavin said. "It's like having Purell
    and hand sanitizer in the air," he said. "It starts killing
    viruses in the air and on surfaces immediately. It has a 75%
    kill rate within five minutes, an 85% kill rate within 10
    minutes, and a 92% kill rate within 15 minutes. Within half
    an hour, the kill rate is 99.47%."[117]

e.  "In September, Abiding Savior Lutheran Church and School
    will have an air purification system installed to assist in
    mitigating Covid-19 and other viruses, allergens and
    bacteria. "The installation of this air purification system will
    help keep our air healthier and surfaces cleaner in an
    environmentally friendly way. Not only has testing proven

---

[117] Joseph S. Pete, *Indiana Welcome Center Installs Bipolar Ionization System To Kill COVID-19*, NORTHWEST INDIANA TIMES (July 23, 2020), https://www.nwitimes.com/business/local/indiana-welcome-center-installs-bipolar-ionization-system-to-kill-covid-19/article_f88835a1-2d72-56a6-acff-f6653178cb54.html.

remarkable results in the killing of SARS-Cov-2, but it will also help our students who struggle with seasonal allergies," said Brian Ryherd, Principal of Abiding Savior Lutheran School. Global Plasma Solutions is the first air purification solution to test SARS-CoV-2, achieving a 99.4% reduction of the surface strain within 30 minutes. See detailed information below [reproduces Defendant's June 10, 2020 Press Release]."[118]

110.   Global Plasma Solutions' representations concerning COVID-19 were largely repeated uncritically by news outlets, publications, press releases, social media, and other forms of media.

111.   But these representations failed to hold up when scrutinized by the nation's top engineering and environmental experts.

112.   "The consistent message from experts is to avoid being too creative with airborne solutions. Stay away from worthless — or even dangerous — add-ons to filtration like bipolar ionization.…"[119]

---

[118] Abiding Savior Lutheran School, *Keeping Our Students* Healthy, July 24, 2020, https://www.aslsonline.org/news/2020/7/24/keeping-our-students-healthy.
[119] Drs. Alex Huffman, Delphine Farmer, and Marina Vance, *Opinion: We Need Safer Air In Colorado's Schools — But Let's Be Careful How We Get There*, THE

113.   Needlepoint bipolar ionization is "an emerging technology" with "little research [ ] available that evaluates it outside of lab conditions."[120] Further, "as typical of newer technologies, the evidence for safety and effectiveness is less documented than for more established ones...."

114.   With minimal evidence to support the technology, any representation that it is effective against COVID-19 must be based with solid science and consistent with real world application.

115.   However, the scientific community has concluded that this technology – and the testing methods used by Defendant – lack the foundation to support these lofty representations.

116.   For example, Dr. F. James Lo, an assistant professor of engineering at Drexel University states that ionization technology will "clean the air only when it [passes] through the purifier, which means it

---

COLORADO SUN (April 23, 2021), https://coloradosun.com/2021/04/23/safer-air-schools-opinion/.
[120] United States Environmental Protection Agency, *Air Cleaners, HVAC Filters, and Coronavirus (COVID-19)*, March 22, 2021, https://www.epa.gov/air-cleaners-hvac-filters-and-coronavirus-covid-19.

helps very little in terms of person-to-person localized virus transmission."[121]

117.  Similarly, an engineering professor from the University of North Carolina Chapel Hill believes that "[a] cheap portable HEPA filter would work many times better and have fewer side effects (possibly ozone or other unwanted chemistry)."[122]

118.  Defendant's use of company-funded, specialized studies are not independent as represented by Global Plasma Solutions.

119.  Further, the studies are designed to support Defendant's deceptive, misleading, and false lofty representations and are not applicable to real world conditions.

120.  In other words, in a real world application, ionization is not effective against COVID-19 transmission.

---

[121] Jason Abbruzzese, Denise Chow and Vaughn Hillyard, *Can Air Filtration Stop Coronavirus At A Trump Rally In Phoenix? Experts Doubt It.*, NBC NEWS (June 22, 2020), https://www.nbcnews.com/tech/tech-news/trump-rally-phoenix-boasts-coronavirus-protections-experts-are-skeptical-n1231910.

[122] Lauren Weber and Christina Jewett, *As Schools Spend Millions on Air Purifiers, Experts Warn of Overblown Claims and Harm to Children*, KAISER HEALTH NETWORK (May 3, 2021), https://khn.org/news/article/as-schools-spend-millions-on-air-purifiers-experts-warn-of-overblown-claims-and-harm-to-children/.

121.  Defendant's representations are not only false and misleading but also the Defendant misrepresents the validity of its testing that builds the foundations for its representations.

122.  Dr. Monica Mazurek, a professor in civil and environmental engineering at Rutgers University, describes the Defendant's COVID-19 representations as "unvalidated" and the tests presented by Defendant are under unmonitored conditions.[123]

123.  Further, she outlines her specific concerns, "Where is the data? Where are the facts? Where are the monitoring data?"[124]

124.  Simply, the Products "do not prevent exposure and transmission of COVID-19."[125]

125.  Dr. Sarah F. Evans, an Assistant Professor in the Department of Environmental Medicine and Public Health and a member of the Institute for Exposomic Research at the Icahn School of

---

[123] Talia Wiener, *Parents Tell Montclair District: We're Worried New Air Cleaners Aren't' Safe*, MONTCLAIR LOCAL (April 22, 2001), https://www.montclairlocal.news/2021/04/22/parents-tell-montclair-district-were-worried-new-air-cleaners-arent-safe/.
[124] *Id.*
[125] *Id.*

Medicine at Mount Sinai, also has concerns about Defendant's COVID-19 representations.[126]

126.  After review, Dr. Evans and her "team of pediatricians, scientists, occupational medicine doctors and industrial hygienists have concerns about the safety and efficacy of emerging air cleaning," and ultimately recommended against Defendant's Products being used in schools.[127]

127.  The National Air Filtration Association website states, "There is no direct scientific evidence of benefit, but some reduced exposure can reasonably be inferred based on the ability of some filters to remove particles that contain a SARS-CoV-2 virus."[128]

128.  However, mere inferences are insufficient to support the prominent representations made by Defendant.

129.  Dr. William Bahnfleth, a professor of architectural engineering at Pennsylvania State University also doubts the soundness of the testing methods implemented. He believes that

---

[126] *Id.*
[127] *Id.*
[128] National Air Filtration Association, *COVID-19 (Corona Virus) and Air Filtration Frequently Asked Questions (FAQs)*, https://www.nafahq.org/covid-19-corona-virus-and-air-filtration-frequently-asked-questions-faqs/.

"[m]uch of the proof of their performance is in the form of laboratory studies commissioned by manufacturers that are often performed under conditions that are not representative of actual application conditions."[129]

130.   In response to these commissioned studies, Dr. Bahnfleth wrote, "Many in the scientific community are skeptical."[130]

131.   Dr. Amesh Adalja, a senior scholar at the Johns Hopkins University Center for Health Security, warns that untested representations that air treatment systems can stop the spread of COVID will give people "a false sense of security."[131]

132.   When additional details about Defendant's testing methods were revealed, this "false sense of security" generated significant public concern.

---

[129] Ross Pomeroy, *Schools Are Spending Millions on Ionization Technology to Fight COVID and There's No Good Evidence It Works*, MASS LIVE (January 22, 2021), https://www.masslive.com/coronavirus/2021/01/schools-are-spending-millions-on-ionization-technology-to-fight-covid-and-theres-no-good-evidence-it-works.html.
[130] Jason Abbruzzese, Denise Chow and Vaughn Hillyard, *Can Air Filtration Stop Coronavirus At A Trump Rally In Phoenix? Experts Doubt It.*, NBC NEWS (June 22, 2020), https://www.nbcnews.com/tech/tech-news/trump-rally-phoenix-boasts-coronavirus-protections-experts-are-skeptical-n1231910.
[131] *Id.*

133.   One review of Defendant's testing methods and

representations was summarized: [132]

> Last summer, Global Plasma Solutions wanted to test whether the company's air-purifying devices could kill Covid-19 virus particles, but **could find only a lab using a chamber the size of a shoebox** for its trials. In the company-funded study, the virus was blasted with 27,000 ions per cubic centimeter. The company said it found a 99% reduction of virus. The report **doesn't say how this reduction was measured**, and in September, the company's founder incidentally mentioned that **the devices being offered for sale would actually deliver a lot less ion power -- 13 times less -- into a full-sized room**.

134.   Further, one testing flaw was described as "[Global Plasma

Solutions] nonetheless used the shoebox results in marketing its device

heavily to schools as something that could combat Covid in classrooms

far, far larger than a shoebox."[133]

135.  Glenn Morrison, an engineering professor at the University

of North Carolina Chapel Hill, believes that the Products' COVID-19

---

[132] Lauren Weber and Christina Jewett, *As Schools Spend Millions on Air Purifiers, Experts Warn of Overblown Claims and Harm to Children*, KAISER HEALTH NETWORK (May 3, 2021), https://khn.org/news/article/as-schools-spend-millions-on-air-purifiers-experts-warn-of-overblown-claims-and-harm-to-children/(emphasis added).
[133] *Id.*

reductions would not be very effective under normal building

conditions, outside a test chamber.[134]

136.   Defendant's funding of its own studies not only flies in

opposition to Defendant's testing representations but also presents a

clear conflict.

137.   Relying on company-funded studies, as one concerned parent

stated, "is like only listening to advice from Philip Morris as to whether

smoking is safe or not."[135]

138.   When Defendant's Products are tested in real world

conditions, they fail to meet their marketed "independent testing"

results.

139.  When Boeing tested the technology – under real world

conditions – to see if it could be successfully implemented in its aircraft,

it found:[136]

---

[134] *Id.*

[135] *Id.*

[136] Boeing, *Use of Bipolar Ionization for Disinfection within Airplanes*, https://www.boeing.com/confident-travel/research/use-of-bipolar-ionization-for-disinfection-within-airplanes.html (2021).

a. "Use of air ionization in an airplane remains **inconclusive** as a methodology for **deployment during the SARS-CoV-2 virus pandemic**."

b. "Testing was **unable to replicate supplier results** in terms of antimicrobial effectiveness."

c. "The systems were **unable to properly deliver and maintain** the necessary ion levels in the airplane to achieve disinfection."

d. "Similarly, laboratory-based tests **did not show proper rates of disinfection** with higher ion concentrations."

## E. Plaintiff and Class Members Relied on Global Plasma Solutions' False Representations

140. Defendant's misrepresentations and false statements were woven into an extensive and long-term advertising campaign conducted during the statutory period and accelerating during the COVID-19 pandemic. Defendant spent millions of dollars to spread the misrepresentations and material omissions about the Products through

its own website, social media, YouTube, interviews with traditional media, and other mediums.

141.   Defendant and its founders, executives, and employees authored these false and misleading representations and propagated them through various outlets, including through third party publications who repeated the claims without question. Defendant's intent was to generate substantial publicity in light of the COVID-19 pandemic that would attract customers and construct a veneer of credibility around their falsehoods. They largely succeeded.

142.   When questions about NPBI's efficacy were published, Defendant responded by filing lawsuits.[137]

143.   These misleading advertisements and representations were viewed by millions of people and drove sales of the Products throughout the country. The misleading representations grew like a virus because many purchasers were struggling small businesses which "boasted"

---

[137] *See Global Plasma Solutions, Inc.  v. IEE Indoor Environmental Engineering*, 3:21-cv-02884-TSH (N.D. Ca. 2021); *Global Plasma Solutions, Inc. v. D Zine Partners, LLC and Marwa Zaatari*, 3:21-cv-00884-D (N.D. Tx. 2021);  *Global Plasma Solutions, Inc.  v. IEE Indoor Environmental Engineering*, 1:21-cv-01059-MHC (N.D. Ga. 2021).

about COVID-19-fighting investments in order to make customers feel safe.

144.   Facebook and other social media provided a common forum for the distribution of these "COVID safety announcement" posts which largely re-broadcast Defendant's representations:









145.  Moreover, many of Defendant's images and diagrams are reproduced in these posts:



**Summit Salon Studios**
Feb 25 · 🌐

We've partnered with GPS: A PROVEN PROCESS TO CLEAN THE AIR

Pollutants, dust, dander, pollen, smoke and even pathogens such as mold, viruses and bacteria all can be suspended in the air we breathe, even when you don't see them.

Their patented needlepoint bipolar ionization technology safely creates and releases ions into the airstream using your existing HVAC system as the delivery method.

#globalplasmasolutions #cleanairsalon #cleanair #summitsalonstudios #fortcollinshairstylist #northerncoloradohairstylist #timnathhairstylist #greeleyhairstylist #lovelandhairstylist #wellingtonhairstylist #staysafe #covidprecautions #goingaboveandbeyond



**Renaissance Square**
Jan 14 · 🌐

Ownership at Renaissance Square is investing in tenants' health and wellness! Our valued service partner @sunmechanicalcontracting is in the final stages of installing Global Plasmas Solutions (@gps_dr) Needlepoint Bipolar Ionization System to safely clean the indoor air at Ren Square! This remarkable project is one of several enhancements at Ren Square to provide cleaner air, naturally! #globalplasmasolutions #sunmechanicalcontracting #rensquarephx #DTPHX #healthandwellness #hvac #leeandassociatesaz



👍 2

👍 Like          💬 Comment          ↪ Share

66

146.  Plaintiff was familiar with Defendant's representations regarding the superiority of its NPBI technology over other technologies for creating a clean air environment without harmful byproducts and the effective destruction of COVID-19. This was a critical selling point for Plaintiff, as Plaintiff hoped to purchase the most effective air treatment system available. And this was core theme in Defendant's advertising.

147.  Defendant's marketing focusing on the superiority of its technology even led to organizations and businesses creating fundraisers to purchase Defendant's Products. For example:



148.   Plaintiff also believed, based on his familiarity with Defendant's claims, that the Products would eliminate VOCs. This claim is also false or, at the very least, made recklessly and without substantiation. Rather than eliminating VOCs, Defendant's Products reduce some VOCs while also creating additional harmful VOCs.

149.   The Class Members also relied on various other misrepresentations and material omissions made by Defendant in purchasing the Products. Many Class Members were impressed by Defendant's claims that the Products are capable of achieving quantified benchmarks (for example, that its technology can reduce COVID-19 by 98.33% within 60 minutes), which were typically communicated in text, tables, and graphs. But these claims are misleading as they are the results of controlled test conditions and have little relevance to the capabilities of the Products when operating in the real world.

150.   Defendant's claims were bolstered by Defendant's assertion it was communicating the results of "independent testing," and many Class Members found this compelling. But it is now clear that these

tests were anything but independent tests as they were critically flawed and funded by Defendant.

151.  Additionally, this is confirmed by the independent testing conducted by professors at the Illinois Institute of Technology, Portland State University, and Colorado State University.[138]

152.  Defendant's messaging to consumers included detailed information concerning the CARES ACT.

153.  For example, on its website, it has an entire page dedicated to the topic:[139]

## How to Channel the CARES Act into Cleaner, Safer Indoor Air

154.  On this page, Defendant provides the roadmap for purchasers to obtain government funding to purchase its Products. For example: [140]

    a.  "Your company may be able to **tap into federal funds** to improve indoor air quality and fight pathogens such as

---

[138] *See* Zeng, Manwatkar, et. al., *supra* note 76.
[139] Global Plasma Solutions, *How to Channel the CARES Act into Cleaner, Safer Indoor Air*, https://globalplasmasolutions.com/articles/how-to-channel-the-cares-act-into-cleaner-safer-indoor-air.
[140] *Id.* (emphasis added).

COVID-19. Several provisions outlined in new legislation allow schools and universities, health care providers and small businesses **to tackle air quality improvement projects with minimal financial impact**."

b. "Small Businesses: As payments from the second round of the Paycheck Protection Program (PPP) begin rolling out, small businesses can apply funds to utility expenses and other related costs as a result of the COVID-19 pandemic."

155.   Purchasers relied upon these representations that they were obtaining a product that would not only make the air cleaner but also eliminate the COVID-19 virus. For example, numerous purchasers used CARES ACT funds to pay for Defendant's Products:





156. One critical factor for Plaintiff and Class Members' decision to purchase the Products was the belief that it could safely protect them from COVID-19, and that the representations made by Defendant were based on sound, scientific studies.

157. Defendant amplified its deceptions in many venues over a multi-year period with the intent to instill in consumers the belief that the Products were vastly superior to existing technology and capable of providing safe, clean air that lowers, removes, and eradicates VOCs while also attacking the COVID-19 virus. Plaintiff and the Class Members saw these claims and relied on them in purchasing the Products, believing that they were buying the best air treatment

systems available when in fact they were purchasing systems that produce harmful byproducts and are largely ineffective.

## F. Global Plasma Solutions Concealed these Deceptions and Defects

158. Defendant designed, manufactured, marketed, and sold the Products throughout the United States while knowingly concealing these defects and deceptions.

159. As described by independent testing sources, the Products are incapable of performing as marketed. The Products are not able to "safely" clean the air of VOCs and the COVID-19 virus without generating harmful byproducts. Consequentially, Defendant's claims regarding the performance, capabilities, and therapeutic benefits of the Products are false, deceptive, and misleading.

160. Defendant's claims were material to Plaintiff and the Class Members but Defendant did not disclose to purchasers of the Products that the devices were defective and unable to fulfill many of Defendant's advertising claims. As a result, Plaintiff and the Class Members purchased devices that they would not have otherwise purchased or for which they would have paid less. Many Class Members relied on Defendant's assertions that the Products were capable of producing

72

specific outcomes—e.g., creating a safe environment by safely eradicating the COVID-19 virus —and received devices that were unfit for the purposes for which they were purchased.

161.  Defendant's "profits over people" scheme won the company acclaim, publicity, and generated hundreds of millions of dollars in sales at the expense of the Plaintiff and Class Members across the country and in violation of all applicable laws referenced herein.

## FACTS SPECIFIC TO PLAINTIFF

162.  In March 2021, Plaintiff purchased Defendant's GPS-FC48-AC Compact Auto-Cleaning Ionization System from Ecozapp, located in College Station, Texas.

163.  Plaintiff paid approximately $750.67 for the device.

164.  Plaintiff was in the market for a device to improve air quality, particularly one that would mitigate the effects of COVID19.

165.  Prior to purchasing, Plaintiff had observed and read Defendant's representations on its website, brochures, interviews, articles, videos, and social media that its Products could safely clean the air, remove VOCs, effectively attack COVID-19, and supported by sound

independent testing. Further, Plaintiff observed and read similar representations that were repeated by distributors and sellers of the Products.

166.  Plaintiff has seen Defendant's representations regarding Defendant's superior air treatment system, which persuaded him to keep using the device.

167.  At all relevant times, Plaintiff used and maintained the unit as would any reasonable consumer and in accordance with Defendant's instruction.

168.  At no point during his ownership or use of the Product did Plaintiff notice any improvement in the air quality and continued to endure the presence of airborne irritants, despite Defendant's claim that its Products would improve air quality.

169.  Plaintiff fears future injury and physical harm for himself, family members, friends, and other people that may have been exposed as a result of his use of Defendant's Product.

170.  He would not have purchased the Product if he had known about the defects or that Defendant was misrepresenting the performance, capabilities, and benefits of the Product. In particular, he

would not have purchased the Product if he had known that

Defendant's representations were false and that Defendant concealed

the product's defective nature.

171.  Prior to the filing of this Complaint, Plaintiff sent a pre-suit

notice concerning the defects described herein and consumers'

experiences with the defects to both Defendant and retailer.

## CLASS DEFINITIONS AND ALLEGATIONS

172.  Plaintiff, pursuant to Federal Rules of Civil Procedure

23(b)(2) and 23(b)(3), brings this action on behalf of the following

classes (collectively, the "Class," "Classes," and "Class Members"):

> **National Class:** All persons in the United States who
> purchased the Products.
>
> **Consumer Protection Multi-State Class:** All persons in
> the States of California, Florida, Illinois, Maryland,
> Massachusetts, Minnesota, Missouri, New Jersey, New York,
> Pennsylvania, Texas, and Washington who purchased the
> Products.[141]

---

[141] The States in the Consumer Protection Multi-State Class are limited to those
States with similar consumer protection laws under the facts of this case: California
(Cal. Bus. & Prof. Code § 17200, et seq.); Florida (Fla. Stat. § 501.201, et seq.);
Illinois (815 ILCS 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et seq.);
Michigan (Mich. Comp. Laws § 445.901, et seq.); Minnesota (Minn. Stat. § 325F.67,
et seq.); Missouri (Mo. Rev. Stat. 407.010, et seq.); New Jersey (N.J. Stat. § 56:8-1,
et seq.); New York (N.Y. Gen. Bus. Law § 349, et seq.); Pennsylvania (73 Pa. Stat.
Ann. §§ 201-1 et seq.); and Washington (Wash Rev. Code § 19.86.010, et seq.).

**Maryland Subclass:** All persons in the State of Maryland who purchased the Products within the state or from the state.

173.  Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Classes, the judge to whom the case is assigned and any immediate family members thereof.

174.  The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, tens of thousands of units of the Products to Class Members.

175.  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

    a. whether Defendant misrepresented material facts concerning the Products;

    b. whether Defendant misrepresented material facts concerning the Products in the marketing of every Product;

76

c.  whether Defendant's conduct was unfair and/or deceptive;

d.  whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the classes;

e.  whether Plaintiff and the Classes are entitled to equitable and/or injunctive relief;

f.  whether Defendant breached express warranties to Plaintiff and the Classes;

g.  whether Defendant breached implied warranties to Plaintiff and the Classes;

h.  whether Plaintiff and the classes have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

176.  Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the Classes, purchased Defendant's Products in reliance of Defendant's misrepresentations and

omissions. Plaintiff sustained damages from Defendant's wrongful conduct.

177.   Plaintiff will fairly and adequately protect the interests of the classes and has retained counsel that is experienced in litigating complex class actions. Plaintiff has no interests which conflict with those of the classes.

178.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of

78

single adjudication, economies of scale, and comprehensive supervision by a single court.

179.  The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

180.  The prosecution of separate actions by members of the classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

## CAUSES OF ACTION

### COUNT I
### Deceit and Fraudulent Concealment
### (On Behalf of the National Class and, alternatively, the Maryland Subclass

181.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

182.   Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Maryland Subclass.

183.   Defendant made false representations concerning the performance and quality of the Products, and the quality of the Defendant's brand. Further, Defendant concealed and suppressed material facts concerning the performance and quality of the Products, the quality of the Defendant's brand, the Products' capabilities and benefits, and the Products' defects. Defendant knew, or in the exercise of reasonable diligence should have known, of the defects and misrepresentations of the capabilities and benefits of the Products but failed to disclose these facts prior to or at the time it marketed Products and sold them to consumers. Defendant engaged in this concealment in order to increase sales of its Products and command a higher price for its Products.

184.   Plaintiff and Class Members had no reasonable way of knowing that Defendant's representations were false and misleading, or that Defendant had omitted to disclose highly important details relating to the Products' performance and the defects. Plaintiff and

Class Members did not and could not reasonably discover Defendant's deception on their own.

185.   Defendant had a duty to disclose the true performance of the Products because the scheme and its details were known and accessible only to Defendant; Defendant had superior knowledge and access to the relevant facts; and Defendant knew these facts were neither known to, nor reasonably discoverable by, Plaintiff and the Class Members.

186.   Defendant still has not made full and adequate disclosures and continues to defraud consumers by concealing material information regarding the true performance of the Products.

187.   Plaintiff and Class Members were unaware of the omitted material facts and would not have purchased the Products had they known of the facts Defendant suppressed. Plaintiff's and Class Members' actions in purchasing the Products were justified. Defendant was in exclusive control of the material facts and such facts were not reasonably known to the public, Plaintiff, or Class Members.

188.   Plaintiff and Class Members relied to their detriment upon Defendant's representations, fraudulent misrepresentations, and material omissions regarding the quality of the Products, the Products'

effectiveness, and the Products' defects in deciding to purchase their devices.

189.   Plaintiff and Class Members sustained damage as a direct and proximate result of Defendant's deceit and fraudulent concealment. Among other damages, Plaintiff and Class Members did not receive the value of the premium price they paid for their Products. Plaintiff and Class Members would not have purchased Products – or would have purchased them at a much lower price – had they known of the Products' inability to safely and effectively cleanse the air of VOCs and the COVID-19 virus owing to the defects.

190.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Class Members' rights and well-being, to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II
## Breach of Express Warranty
## (On Behalf of the National Class and, alternatively, the Maryland Subclass)

191.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

192.  Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Maryland Subclass.

193.  Defendant created an express warranty within the meaning of the U.C.C. and the respective state statutes under which Plaintiff alternatively assert this claim.

194.  In particular, Plaintiff and Class Members, who purchased the Products received materially similar, if not identical, written warranties from the Defendant.

195.  At all relevant times, including prior to and at the time of their purchases of Products, Plaintiff and Class Members relied on Defendant's claims, promises, and representations. These promises were part of the basis of the bargain connected with these transactions for the sale of goods, and thus qualify as "express warranties" as defined by the U.C.C.

196.   Defendant breached its express warranty by:

   a. selling Plaintiff and Class Members Products that were

      unable to safely and effectively cleanse the air after

      representing that the Products use "the safest, most effective

      technology on the market" which "destroys VOCs" and "is

      effective against COVID-19" "without producing…harmful

      byproducts."

   b. Selling Plaintiff and Class Members Products that had

      representations that were supported by independent studies

      conducted in real world conditions;

   c. selling Plaintiff and Class Members Products containing

      defective materials responsible for the defects, which caused

      the Products to fail to function properly; and

   d. failing to adequately repair or replace Products affected by

      these defects.

197.   Defendant did not furnish an effective remedy to Plaintiff

and Class Members. Despite opportunities to honor the promises in its

express warranty, Defendant failed to provide Plaintiff and Class

Members with conforming Products free of defects and failed to repair

the Products to make them conform to the representations made at the time of sale.

198.   Plaintiff and Class Members experienced the defects within the warranty period. In breach of its express warranty, Defendant failed to inform Plaintiff and Class Members that the Products contained defective materials and workmanship and failed to replace or repair the defective Products.

199.   Defendant breached its express warranty that promised to replace or repair and correct manufacturing, materials or workmanship defects, and to provide Products conforming to the warranties. To date, Defendant has not replaced nor repaired or adjusted the Products, and has been unable to repair or adjust, the defects in the Products.

200.   Through advertisements, public statements, and other statements disseminated through print and online media, Defendant expressly warranted several attributes and qualities of the Products by representations as detailed above, such as:

   a. "[Products use] the safest, most effective technology on the market."

   b. "without producing…harmful byproducts."

c.  "[Product] is effective against COVID-19."

d.  "[Product] destroys VOCs."

e.  "[Product is] completely safe for humans and animals."

f.  "[Product has] no health concerns."

g.  "[Product is] a safe, effective solution."

h.  "[Product is] unlike many other solutions on the market, GPS NPBI technology is also safe for occupied spaces."

i.  "[Product] breaks down odors, gases and VOC's into harmless compounds."

j.  "[Product] is proven by independent laboratory testing."

201.  Class Members were exposed to and relied on the foregoing statements when they decided to buy the Products. Accordingly, Defendant's express warranties formed part of the basis of the bargain that was reached when Plaintiff and Class Members purchased their Products.

202.  Defendant breached these express warranties because the Products did not, in fact, use "the safest, most effective technology on the market" to "destroy[] VOCs" and prove "effective against COVID-19" "without producing…harmful byproducts." Defendant failed to

adequately repair or replace Plaintiff's and Class Members' Products when they reported that they suffered from the defects during the warranty period. Despite reasonable opportunities to honor the promises in its express warranties, Defendant failed to provide Plaintiff and Class Members with conforming, non-defective Products.

203. Defendant received timely notice of the breaches experienced by Plaintiff and Class Members. Defendant had exclusive knowledge of the defects before the Products were sold. Defendant also received notice of the defects by the large volume of complaints lodged by concerned citizens and consumers about the defects shortly after the product was publicly revealed. These complaints were received directly from consumers as well as from vendors who sold the Products who received the complaints and relayed them to Defendant.

204. Plaintiff and Class Members used their Products in a manner consistent with the Products' operating instructions. Plaintiff and Class Members performed their duties under the terms of the foregoing express warranties or have been excused from such performance as a result of Defendant's conduct described herein.

205.  Any attempt by Defendant to disclaim or limit its express warranties vis-à-vis consumers would be inappropriate under these circumstances. Any such asserted limitation is unconscionable and unenforceable because Defendant knowingly sold a defective product without informing consumers and because Defendant failed to honor their express promises.

206.  As a direct and proximate result of Defendant's breaches of express warranty, Plaintiff and Class Members have suffered economic damages, including costly repairs, loss of use, replacement costs, substantial loss in value and resale value of the Products, and other harm.

**COUNT III**
**Breach of the Implied Warranty of Merchantability**
**(On Behalf of the National Class and, alternatively, the**
**Maryland Subclass)**

207.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

208.  Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Maryland Subclass.

209.  Defendant is a "merchant" as defined under the U.C.C. and by the respective state statutes under which Plaintiff alternatively asserts this claim.

210.  The Products are "goods" as defined under the U.C.C. and by the respective state statutes under which Plaintiff alternatively brings this claim.

211.  Defendant impliedly warranted that the Products were of a merchantable quality. The law implies a warranty that the Products were merchantable in the relevant transactions. The Products, when sold and at all times thereafter, were not in merchantable condition due to the defects and other conditions as alleged above and are not fit for the ordinary purpose for which air treatment systems are used, e.g., to safely cleanse the air of VOCs and the COVID-19 virus.

212.  At the point of sale, the Products contained unseen manufacturing or materials defects whose manifestation renders the product ineffective. These defects in the Products existed when the Products left Defendant's possession and rendered them unfit for their ordinary and intended purpose. At all relevant times, including when the Products entered the stream of commerce and were purchased by

Plaintiff and Class Members, the Products were defective and not capable of functioning as advertised.

213.   Defendant breached the implied warranty of merchantability because the Products are not of a merchantable quality, but instead contained the defects. Had Plaintiff and Class Members known of the defects, they would not have purchased Defendant's Products, or would have paid less for them.

214.   Plaintiff and Class Members' interactions with Defendant suffice to create privity of contract between Plaintiff and Class Members, on the one hand, and Defendant, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and Class Members are intended third party beneficiaries of contracts (including implied warranties) between Defendant and the retailers who sell the Products. Defendant's warranties were designed for the benefit of consumers who purchased the Products.

215.   As a direct and proximate result of the breach of said warranties, Plaintiff and Class Members were injured and are entitled to damages.

216.  Defendant's attempts to disclaim or limit the implied warranty of merchantability vis-à-vis consumers are unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold a defective product without informing consumers about the defects.

217.  The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and the Class Members. Among other things, Plaintiff and members of the Class had no meaningful choice in determining these time limitations, terms which unreasonably favor Defendant. A gross disparity in bargaining power existed between Defendant and Class members, as only Defendant knew or should have known that the Products were defective at the time of sale and that the devices were not of merchantable quality.

218.  Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

219.   Defendant was provided notice of these issues. Defendant had exclusive knowledge of the defects before the Products were sold. Defendant also received notice of the defects by the large volume of complaints lodged by concerned citizens and consumers about the defects. These complaints were received directly from consumers as well as from vendors who sold the Products who received the complaints and relayed them to Defendant.

220.   Additionally, Defendant was aware of these issues by the academic papers, news articles, and other medium which covered the deceptions and defects described herein.

221.   Prior to the filing of this Complaint, Plaintiff sent a pre-suit notice concerning the defects described herein and consumers' experiences with the defects to both Defendant and retailer.

222.   Defendant's breach of the implied warranty of merchantability damaged Plaintiff and Class Members in an amount to be determined at trial.

**COUNT IV**
**Violation of the Magnusson-Moss Warranty Act,**
**15 U.S.C. §§ 2301 et seq. ("MMWA")**
**(On Behalf of the National Class and, alternatively, the**
**Maryland Subclass)**

223.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

224.   Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Maryland Subclass.

225.   Plaintiff and Class Members are "consumers" within the meaning of the MMWA. 15 U.S.C. § 2301(3).

226.   The Products are "consumer products" within the meaning of the MMWA. 15 U.S.C. § 2301(1).

227.   Defendant is a "supplier" and "warrantor" within the meaning of the MMWA. 15 U.S.C. § 2301(4)-(5).

228.   Defendant's express warranties are written warranties within the meaning of Section 2301(6) of the MMWA. The Products' implied warranties are accounted for under Section 2301(7) of the MMWA. Defendant cannot disclaim implied warranties under the

MMWA because Defendant knowingly sold a defective product without informing consumers about the defects.

229.  The Products' implied warranties are covered by the MMWA, 15 U.S.C. § 2301(7).

230.  Defendant's express warranty is a "written warranty" within the meaning of 15 U.S.C. § 2301(6).

231.  As set forth herein, Defendant breached its warranties with Plaintiff and Class Members.

232.  The Products share common defects in that they are unable to effectively safely clean the air and otherwise fail to satisfy Defendant's advertising claims.

233.  Prior to the filing of this Complaint, Plaintiff sent a pre-suit notice concerning the defects described herein and consumers' experiences with the defects to both Defendant and retailer.

234.  Despite notice by Plaintiff and the Class Members to Defendant of the defective nature of the Products, Defendant did not replace or repair the defective Products. Instead, the costs of the defects were borne by consumers.

235.   As a direct and proximate result of Defendant's breach of implied and express warranties pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and Class Members have suffered damages in an amount to be proven at trial.

236.   The amount in controversy for the Plaintiff's and Class Members' individual claims meets or exceeds the sum of $25. The total amount in controversy of this action in sum exceeds $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

237.   Plaintiff and Class Members are entitled to recover damages as a result of Defendant's breach of warranties.

238.   Plaintiff and Class Members are also entitled to seek costs and expenses, including attorneys' fees, under the MMWA. 15 U.S.C. § 2310(d)(2).

## COUNT V
## Breach of the Implied Warranty of Fitness for a Particular Purpose
## (On Behalf of the National Class and, alternatively, the Maryland Subclass)

239.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

240.   Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Maryland Subclass.

241.   Defendant is a "merchant" as defined under the UCC.

242.   The Product are "goods" as defined under the UCC.

243.   Defendant engaged in a focused marketing campaign to consumers concerned about air quality from the COVID-19 pandemic and has reason to know that Plaintiff and Class Members purchased the Products for a particular purpose, e.g., to eliminate the COVID-19 virus and to remove VOCs and other toxic substances from the air in order to improve air quality that was reduced by the COVID-19 pandemic, and that Plaintiff relied on Defendant's skill or judgment to furnish devices that accomplished that purpose and others.

244.   Plaintiff did in fact rely on Defendant's skill or judgment to furnish devices that accomplished that purpose and others.

245.   Defendant breached the implied warranty of fitness because the Products were incapable of satisfying that purpose, among others, due to the defects and other conditions as alleged above.

246.  Plaintiff was harmed by Defendant's breach of the implied warranty of fitness by, inter alia, overpaying for the Products.

247.  Plaintiff and Class Members' interactions with Defendant suffice to create privity of contract between Plaintiff and Class Members, on the one hand, and Defendant, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and Class Members are intended third party beneficiaries of contracts (including implied warranties) between Defendant and the distributors and retailers who sell the Products. Defendant's warranties were designed for the benefit of consumers who purchased the Products.

248.  As a direct and proximate result of the breach of said warranties, Plaintiff and Class Members were injured and are entitled to damages.

249.  Defendant's attempts to disclaim or limit the implied warranty of fitness vis-à-vis consumers are unconscionable and unenforceable. Specifically, Defendant's warranty limitations are unenforceable because Defendant knowingly sold a defective product without informing consumers about the defects.

250.   The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Plaintiff and members of the Classes. Among other things, Plaintiff and members of the Classes had no meaningful choice in determining these time limitations, terms which unreasonably favor Defendant. A gross disparity in bargaining power existed between Defendant and Class members, as only Defendant knew or should have known that the Products were defective at the time of sale and that the devices were not of merchantable quality.

251.   Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

252.   Defendant was provided notice of these issues by complaints lodged by consumers before or within a reasonable amount of time after the allegations of the defects became public.

253.   Prior to the filing of this Complaint, Plaintiff sent pre-suit notice concerning the defects and other consumers' experiences with the defects.

**COUNT VI**
**Violation of State Consumer Protection Statutes**
**(On Behalf of the Consumer Protection Statutes of Multi-State**
**Class)**

254.   Plaintiff repeats and realleges each and every allegation

contained in the foregoing paragraphs as if fully set forth herein.

255.   Plaintiff asserts this claim individually and on behalf of the

Consumer Protection Multi-State Class.

256.   The Consumer Protection Acts of the States in the Consumer

Protection Multi-State Class prohibit the use of unfair or deceptive

business practices in the conduct of trade or commerce.

257.   Defendant intended that Plaintiff and each of the other

members of the Consumer Protection Multi-State Class would rely upon

their deceptive conduct, and a reasonable person would in fact be misled

by its deceptive conduct.

258.   As a result of the Defendant's use or employment of unfair or

deceptive acts or business practices, Plaintiff, and each of the other

members of the Consumer Protection Multi-State Class, have sustained

damages in an amount to be proven at trial.

259.   In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT VII
## Violation of the Maryland Consumer Protection Act ("MCPA"), Md. Com. Law §§ 13-301, *et seq.* (On Behalf of the Maryland Subclass)

260.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

261.   Plaintiff asserts this claim individually and on behalf of the Maryland Subclass.

262.   This cause of action is brought pursuant to the Maryland Consumer Protection Act ("MCPA"). MD Code Ann. §§ 13-101, *et seq*. The express purpose of the MCPA is to "set certain minimum statewide standards for the protection of consumers across the State" because "consumer protection is one of the major issues which confront all levels of government, and that there has been mounting concern over the increase of deceptive practices in connection with sales of merchandise, real property, and services and the extension of credit. MD Code Ann. §§ 13-102.

263.   Plaintiff is a "consumer" as defined by the MCPA. MD Code Ann. §§ 13- 101(c)(1).

264.   Defendant's Products are "consumer goods" and "merchandise" within the meaning of the MCPA. MD Code Ann. §§ 13-101(d)(1)-(2),(f).

265.   Defendant is a "merchant" engaged in sales, advertising, and commerce within the meaning of the MCPA. MD Code Ann. §§ 13-101.

266.   The MCPA declares certain actions as unlawful "unfair or deceptive trade practices." MD Code Ann. §§ 13-102. Defendant's unfair or deceptive trade practice in violation of the MCPA includes making "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers"; representing that its "goods and services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have"; advertising consumer goods without the intent to sell them as advertised; and engaging in "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on

the same in connection" with the promotion or sale of its consumer goods and services. MD Code Ann. §§ 13-103.

267.  As set forth more thoroughly above, Defendant's claims are false, deceptive, and misleading to consumers because Defendant's Products do not safely clean the air of VOCs and the COVID-19 virus.

268.  Plaintiff has standing to pursue this claim because he has been injured by virtue of suffering a loss of money and/or property as a result of the wrongful conduct alleged herein. Plaintiff would not have purchased Defendant's Products (or paid a premium for them) had he known the truth concerning the Products' defects. As a direct result of Defendant's actions and omissions of material facts, Plaintiff and Maryland Subclass members did not obtain the value of the products for which they paid; were induced to make purchases that they otherwise would not have; and lost their ability to make informed and reasoned purchasing decisions.

269.  The damages suffered by Plaintiff and the Maryland Subclass were directly and proximately caused by the deceptive, misleading and unfair practices of Defendant as described above.

270.  Plaintiff and the Maryland Subclass make claims for actual damages, attorney's fees and costs. MD Code Ann. §§ 13-408.

## COUNT VIII
## Unjust Enrichment
## (On Behalf of the National Class and, alternatively, the Maryland Subclass)

271.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

272.  Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Maryland Subclass.

273.  At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiff and the Classes.

274.  The Products purchased by Plaintiff and the Class Members did not provide the promised performance and instead contained uniform defects.

275.  Plaintiff and Class Members conferred upon Defendant non-gratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing.

276.   Defendant accepted or retained the non-gratuitous benefits conferred by Plaintiff and Class Members, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiff and Class members were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

277.   At the time of Plaintiff and Class Members' purchases, Defendant knew of the Products' defects and true efficacy. Knowing that their representations were false, Defendant sold the Products to Plaintiff and Class Members at a premium price. Accordingly, Defendant continues to retain a benefit improperly obtained to the detriment of Plaintiff and Class Members.

278.   Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts had been known.

279. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class Members is unjust and inequitable, Defendant must pay restitution to Plaintiff and Class Members for their unjust enrichment, as ordered by the Court.

## RELIEF DEMANDED

280. WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

   a. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

   b. For an order declaring the Defendant's conduct violates the statutes and laws referenced herein;

   c. For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Classes for all causes of action;

   d. For an order requiring Defendant to immediately cease and desist from selling its misbranded Products in violation of

law; enjoining Defendant from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

e. For pre-judgment and post-judgment interest on all amounts awarded;

f. For an order awarding punitive damages;

g. For an order awarding attorneys' fees and expenses and costs of suit; and

h. Granting such other relief as the Court deems just and appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: May 7, 2021

Respectfully submitted,

**CHIMICLES SCHWARTZ KRINER &**
**DONALDSON-SMITH LLP**

*/s Robert J. Kriner, Jr.*
Robert J. Kriner, Jr. (Del. Bar No. 2546)
Scott M. Tucker (Del. Bar No. 4925)

106

Tiffany J. Cramer (Del. Bar No. 4998)
2711 Centerville Rd., Suite 201
Wilmington, DE 19808
Tel.: 302-656-2500
rjk@chimicles.com
smt@chimicles.com
tjc@chimicles.com

**OF COUNSEL:**

**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
Timothy N. Mathews
(*pro hac vice forthcoming*)
361 W. Lancaster Ave
Haverford, PA 19041
Tel.: 610-642-8500
tnm@chimicles.com

**REICH & BINSTOCK LLP**
Dennis C. Reich, Esq.
(*pro hac vice forthcoming*)
4265 San Felipe, Suite 1000
Houston, TX 77024
Phone: (713) 622-7271
Fax: (713) 623-8724
dreich@reichandbinstock.com

**THE MILLS LAW FIRM**
Michael A. Mills, Esq.
(*pro hac vice forthcoming*)
8811 Gaylord Drive
Suite 200
Houston, TX 77024
Phone: (832) 548-4414
Fax: (832) 327-7443
mickey@millsmediation.com

**THE KEETON FIRM LLC**
Steffan T. Keeton, Esq.
*(pro hac vice forthcoming)*
100 S Commons, Ste. 102
Pittsburgh, PA 15212
1-888-412-5291
stkeeton@keetonfirm.com

*Attorneys for Plaintiff and the Classes*