# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

ROBERT S. GARNER, on behalf of himself and all others similarly situated,

    Plaintiff,

v.

GLOBAL PLASMA SOLUTIONS, INC.,

    Defendant.

C.A. No. 21-665 (SB)

## DEFENDANT GLOBAL PLASMA SOLUTIONS, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

OF COUNSEL

MCGUIREWOODS LLP

Robert A. Muckenfuss (admitted *pro hac vice*)
Kelly A. Warlich (admitted *pro hac vice*)
Fifth Third Center
201 North Tryon Street, Suite 3000
Charlotte, North Carolina 28202
(704) 343-2052
rmuckenfuss@mcguirewoods.com

R. Trent Taylor (admitted *pro hac vice*)
S. Virginia Bondurant Price (admitted *pro hac vice*)
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
(804) 775-1000
rtaylor@mcguirewoods.com
vbondurantprice@mcguirewoods.com

*Attorneys for Global Plasma Solutions, Inc.*

November 27, 2023

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Adam W. Poff (No. 3990)
Tammy L. Mercer (No. 4957)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com
tmercer@ycst.com
swilson@ycst.com

*Attorneys for Global Plasma Solutions, Inc.*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................................. 1

ARGUMENT ................................................................................................................................... 1

I.     Plaintiff has failed to show a genuine dispute of fact as to falsity. ..................................... 1

    A.     Plaintiff has no evidence that GPS's technology produces harmful byproducts. .... 1

    B.     Plaintiff has no evidence that GPS's technology does not clean the air of the SARS-CoV-2 virus. ......................................................................................................... 3

    C.     Plaintiff has no evidence that GPS falsely represented its testing. ......................... 8

II.     Plaintiff has failed to present clear and convincing GPS knew its statements were false or was recklessly indifferent to their truth. .............................................................................. 8

III.     Plaintiff has failed to present clear and convincing evidence that GPS made the statements with the deliberate intent to deceive. ............................................................... 10

CONCLUSION ............................................................................................................................. 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*First Union Nat'l Bank v. Steele Software Sys. Corp.*,
　154 Md. App. 97 (2003) ..................................................................................................10

*Liptok v. Bank of Am.*,
　2016 U.S. Dist. LEXIS 146258 (M.D. Pa. Oct. 20, 2016) ........................................................6

*Nissan World, LLC v. Mkt. Scan Info. Sys.*,
　2014 U.S. Dist. LEXIS 59902 (D.N.J. Apr. 30, 2014) ..........................................................6, 8

*Pac-West Distrib. NV LLC v. AFAB Indus. Servs.*,
　2023 U.S. Dist. LEXIS 89469 (E.D. Pa. May 22, 2023) .........................................................10

*Smith v. Integral Consulting Servs.*,
　2016 U.S. Dist. LEXIS 114692 (D. Md. Aug. 26, 2016) ....................................................8, 10

*Trinity Indus. v. Greenlease Holding Co.*,
　903 F.3d 333 (3d Cir. 2018)..................................................................................................1

## INTRODUCTION

Plaintiff has failed to present any evidence, much less clear and convincing evidence, on which a reasonable jury could find that GPS committed fraud. Plaintiff misrepresents the evidence on which he relies and offers contradictory and untimely declarations by his experts in a desperate attempt to manufacture a genuine dispute of fact. At bottom, the evidence Plaintiff relies on does not support his contentions. GPS is entitled to summary judgment because Plaintiff has not come forward with clear and convincing evidence that GPS made a false statement, knew of the falsity or was recklessly indifferent to the truth, or had the deliberant intent to deceive.[1]

## ARGUMENT

Where, as here, "the clear and convincing evidence standard applies, the trial judge at summary judgment must inquire whether the evidence presented is such that a jury applying that evidentiary standard could find only for one side." *Trinity Indus. v. Greenlease Holding Co.*, 903 F.3d 333, 366 n.26 (3d Cir. 2018).

**I.  Plaintiff has failed to show a genuine dispute of fact as to falsity.**

    **A.  Plaintiff has no evidence that GPS's technology produces harmful byproducts.**

Plaintiff argues that GPS's products "create harmful byproducts including ozone," citing Dr. Sherman's and Mr. Offermann's declarations. D.I. 97, at 16. Dr. Sherman's declaration contradicts his unequivocal deposition testimony that he is not offering an opinion that GPS's technology creates harmful byproducts and he is not aware of any test showing the technology caused an increase in byproducts or other VOCs. D.I. 86-1, Ex. A at 60:14–63:3, 64:14–18. Thus, it is a sham affidavit that cannot create a genuine dispute of fact. Mr. Offermann's declaration also does not create a genuine dispute of fact as to whether GPS's technology produces harmful

---

[1] As set forth in GPS's forthcoming motion to strike Plaintiff's experts' declarations, the Court should disregard and strike the declarations as they are a sham and set forth untimely new opinions.

1

byproducts. Mr. Offermann's declaration refers to ozone testing that he performed on an iWave-R device and a FC24-AC device. D.I. 98, ¶ 9. Mr. Offermann measured 83 parts per billion (ppb) of ozone emitted one inch from an uninstalled iWave-R device. Decl. Kelly Warlich, Ex. 12 at 131:18–24; D.I. 86-3, Ex. O at 9. But testing on the iWave-R is irrelevant to whether the FC48 device purchased by Plaintiff produces ozone because unlike the FC48 device, which is and was certified under UL 2998 to emit less than 5 ppb of ozone, the iWave-R device was not certified under UL 2998.[2] D.I. 99-1, at 182:6–23; Warlich Decl. Ex. 12, at 143:22–144:23; D.I. 83, ¶ 29.

With respect to the FC24 device that was UL 2998 certified, Mr. Offermann measured 6.1 ppb of ozone emitted two inches from the uninstalled FC24 device. Warlich Decl. Ex. 12, at 131:18–132:1, 164:11–25. The accuracy of the instrument was the greater of 1.5 ppb or 2% of the reading such that the true value was as low as 4.6 ppb, which complies with UL 2998. *Id.* at 167:22–170:22. Both 6.1 ppb and 4.6 ppb are extremely low levels of ozone—indeed, the background level of ozone in the classroom where Mr. Offermann tested the iWave-R device was 5.8 ppb. *Id.* at 141:14. Plaintiff has no evidence that 6.1 ppb of ozone is harmful—Mr. Offermann testified that he relies on governmental air quality standards to determine safe concentration levels and for ozone, that level is 70 ppb. *Id.* at 147:1–10, 160:14–16.

The only other evidence Plaintiff cites to support that GPS's technology produces harmful byproducts is the deposition of GPS founder Charlie Waddell, which Plaintiff misrepresents. D.I. 97, at 16. Plaintiff's counsel questioned Waddell about a 2017 ozone test report on the DM48 device. D.I. 99-1, at 151:12–152:25; Warlich Decl. Ex. 13. The test reported 20 ppb of ozone, which exceeds the UL 2998 standard of 5 ppb, but Waddell testified the device was not designed

---

[2] GPS manufactures the iWave-R device for its client NuCalgon. D.I. 99-1, at 124:10–14, 133:9–12. GPS does not market the iWave-R device. *Id.* at 182:6–23.

to comply with UL 2998 in 2017. D.I. 99-1, at 152:14–25. Thus, Waddell's deposition testimony does not support that GPS's technology produces harmful byproducts. Plaintiff has failed to present clear and convincing evidence that GPS's technology produces harmful byproducts.

> **B.     Plaintiff has no evidence that GPS's technology does not clean the air of the SARS-CoV-2 virus.**

None of the evidence offered by Plaintiff shows that GPS's technology does not clean the air of SARS-CoV-2. Plaintiff first argues that GPS had information showing that its technology is not effective against SARS-CoV-2, relying on Dr. Sherman. D.I. 97, at 16. Dr. Sherman states that many tests conducted by customers "showed poor performance and GPS should have been aware of them." D.I. 86-1, Ex. E at 22. Dr. Sherman cites 9 "tests," none of which show that the technology is not effective against SARS-CoV-2. *Id.* As an initial matter, none of these tests were on SARS-CoV-2. Warlich Decl. Exs. 1–10; *see also* D.I. 86-1, Ex. D at 146:11–17. Dr. Sherman testified that a technology may be ineffective against one contaminant but effective against another contaminant. D.I. 86-1, Ex. D at 30:17–31:2. Thus, tests on the efficacy of GPS's technology against different pathogens and contaminants such as the tests cited by Dr. Sherman are not relevant to efficacy against SARS-CoV-2. *Id.*; *see also* Decl. Kevin Boyle ¶ 5.

In addition, Dr. Sherman testified that not all tests are valid and accurate, and to determine whether a test is valid and accurate, it is important to know the instruments that were used and the experimental design and parameters. D.I. 99-2, at 21:4–25:15. Dr. Sherman does not know anything about the 9 "tests" he cites other than what is contained in the documents themselves. *Id.* at 140:4–18. Several of the "tests" he cites are email chains or other informal reports of testing that do not contain even the most basic information about the test, such as the instruments used, device set up, or ion density level. Warlich Decl. Exs. 2, 6, 7, 9. In addition, although Dr. Sherman acknowledges that GPS's devices are intended to have their effect in the occupied space and

3

therefore any testing needs to measure the effects in the occupied space, two of the tests only took measurements in the duct. *Id.* at Exs. 3, 9, 10; D.I. 99-2, at 141:2–18, 144:13–145:2. For these reasons, the tests do not show that GPS's technology is ineffective against SARS-CoV-2.

Plaintiff next argues that "[e]vidence dating back to 2017 shows that GPS' [sic] technology has limited effectiveness at cleaning the air." D.I. 97, at 16. Plaintiff cites Dr. Sherman's declaration, which states that GPS knew as early as 2017 that its technology was ineffective at removing particles based on testing by Blue Heaven Technologies on cigarette smoke and engine exhaust for which Dr. Sherman calculated a CADR of less than 1 cfm. D.I. 99, ¶ 26; D.I. 86-1, Ex E at 24. But Dr. Sherman does not dispute that even if the natural reduction of the smoke was only 1% and the test reduction was 99.99%, the CADR would only be 0.8158 cfm—still less than 1 cfm. D.I. 99-2, at 102:24–108:8; Warlich Decl. Ex. 16. Thus, Dr. Sherman's assertion that the CADR of less than 1 cfm for this test made GPS aware that its technology was ineffective at removing particles is entirely baseless. *See also* Boyle Decl. ¶ 17. And again, this test was not on SARS-CoV-2, the contaminant at issue in this case.

Plaintiff also argues that GPS's technology is not effective against SARS-CoV-2 "because of the structure of the respiratory droplet," again citing Dr. Sherman's declaration. D.I. 97, at 17. This is a new opinion that is untimely and should be excluded be pursuant to GPS's forthcoming motion to strike. Regardless, there are different mechanisms for reducing the concentration of the virus. D.I. 99-2, at 32:3–12. Although Dr. Sherman opines that inactivation is not plausible, he expressly states in his report that "virus removal via particle removal represents a plausible effect" of GPS's technology. D.I. 86-1, Ex. E at 11. Further, Dr. Sherman unequivocally testified that the mechanism by which the technology is effective does not matter. D.I. 99-2, at 88:13–89:6.

With respect to IBA's extensive testing on the efficacy of GPS's technology against SARS-

4

CoV-2, Plaintiff discusses only the very first surface test commissioned by GPS's customer Aviation Clean Air ("ACA"). D.I. 97, at 17. ACA sells a product designed for installation on airplanes that uses GPS's NPBI™ technology. D.I. 83, ¶ 18. Plaintiff argues that this first test is meaningless in real world conditions because the test chamber was the size of a shoebox. D.I. 97, at 17. The first test on the live SARS-CoV-2 virus was conducted in a small chamber to determine if GPS's technology had an impact on the virus before progressing to test the live virus in a large chamber, which is good scientific practice. D.I. 99-1, at 77:9–78:4. Plaintiff does not argue or show that GPS represented that this test was conducted in a large chamber. Moreover, Plaintiff ignores the tens of other tests on the virus that were conducted in a large chamber and demonstrated similar efficacy of 99%.[3] D.I. 83, ¶¶ 20–24; Decl. Alexis Sauer-Budge, Ph.D., Ex. 1 at 27–30.

Further, Plaintiff asserts that Waddell admitted that the 99.4% reduction observed after 30 minutes in the first ACA test was not achievable in real world conditions (D.I. 97, at 11), but this is not true. The June 2020 press release regarding this test made clear that it was a lab study designed to mimic aircraft conditions, stating "[i]n this laboratory study, [ACA] designed a test to mimic ionization conditions like that of a commercial aircraft's fuselage." D.I. 89, Ex. 31. Waddell merely repeated this fact, stating "the inactivation rate is linked to the ion density and time of exposure, but to achieve 27,000 ions/cc *in non-aviation applications where you don't have the high velocity air*, would be difficult and cost prohibitive." D.I. 89, Ex. 65, at GPSDE_0200026145. Simply put, the test was designed to mimic a specific real-world condition, not every conceivable real-world condition, and GPS never represented otherwise.

---

[3] Dr. Sherman's declaration asserts that ASHRAE Standard 241 does not permit testing on SARS-CoV-2 (D.I. 99, ¶ 25), but this is misleading and contradicts and his deposition testimony that Standard 241 encourages manufacturers to test against specific pathogens like SARS-CoV-2 to determine performance claims as to those pathogens. D.I. 86-1, Ex. D at 114:22–116:5.

In addition, Plaintiff argues that the first ACA test is meaningless because the 99.4% reduction observed after 30 minutes included natural decay. D.I. 97, at 17. But Plaintiff ignores subsequent testing demonstrating equivalent net reductions of over 99% that did not include natural decay. D.I. 99-1, at 93:15–21, 192:16–22, 194:21–25; D.I. 83, ¶¶ 20–24; Boyle Decl. ¶ 5; Sauer-Budge Decl. Ex. 1, at 27–30.[4]

Plaintiff also points to Dr. Sherman's CADR calculations as evidence that GPS's technology is not effective against the virus (D.I. 97, at 10), but as discussed in GPS's opening brief, neither Plaintiff nor his experts cite any authority to support that GPS should have calculated CADR to assess efficacy. D.I. 82, at 15. GPS's opening brief further pointed out that Dr. Sherman opines that a CADR of less than 5 cfm is not likely to have any appreciable impact on indoor air quality, and all of Dr. Sherman's (and Mr. Offermann's) CADR calculations for IBA's tests on SARS-CoV-2 well exceed 5 cfm, with some as high as 262 cfm. D.I. 82, at 15–16. Plaintiff does not offer any response to this argument and, thus, it is waived. *Nissan World, LLC v. Mkt. Scan Info. Sys.*, 2014 U.S. Dist. LEXIS 59902, at *31 (D.N.J. Apr. 30, 2014) ("Failing to raise an argument in opposition to a motion for summary judgment constitutes a waiver of that argument.").

Having failed to show the falsity of any representation regarding the technology's effectiveness against SARS-CoV-2, Plaintiff instead devotes most of his opposition to claims regarding the performance of GPS's technology in conjunction with a MERV 8 filter. Plaintiff

---

[4] Plaintiff contends that the natural decay over the same time period is 99% such that the 99.4% reduction is only a small improvement over natural decay. D.I. 97, at 17. Plaintiff only offers inadmissible hearsay to support that the natural decay was 99%, which may not be considered on summary judgment. *Liptok v. Bank of Am.*, 2016 U.S. Dist. LEXIS 146258, at *29 (M.D. Pa. Oct. 20, 2016). In addition, net reduction is the amount of reduction of the surviving virus that remained after natural decay, not the difference between the gross reduction and the natural decay, as Plaintiff suggests. Warlich Decl. Ex. 12, at 111:6–18; D.I. 99-2, at 94:6-18. Thus, the net reduction could have exceeded 99.4%. D.I. 99-1, at 192:23–194:6.

did not rely on these claims in purchasing a GPS device and, in fact, there is no evidence that Plaintiff was even aware of these claims. Therefore, they are irrelevant to Plaintiff's fraud claim and GPS's motion. Regardless, GPS did not make false statements about the performance of its technology in conjunction with a MERV 8 filter.

A filter cleans the air by capturing contaminants as the air passes through it. D.I. 99-2, at 26:3-19. Filtration efficacy depends entirely on the size of the particles being filtered. *Id.* at 29:13–20. But there are different levels of filter efficacy—the higher the MERV number, the more effective the filter is at removing particles of smaller sizes, and the more particles the filter is capable of removing. *Id.* at 27:17–28:12. That is, a MERV 13 filter removes smaller particles and more particles than a MERV 8 filter. *Id.* Ionization improves the efficacy of filters by causing smaller particles to form larger particles, thereby making the particles easier to filter out of the air. *Id.* at 38:12–39:6; D.I. 100, 74:21–24. The testing conducted by Blue Heaven Technologies showed that by causing smaller particles to form larger particles, a MERV 8 filter with GPS's technology removed as many particles as a MERV 13 filter. D.I. 99-1, at 143:14–21; Boyle Decl. ¶ 25. Plaintiff takes issue with the fact that it took a MERV 8 filter with GPS's technology over 15 hours to remove the same number of particles that a MERV 13 filter removed in 34 minutes, stating that a bike may get you to Philadelphia but it is not a car. D.I. 97, at 17 n.19. But Plaintiff fails to recognize that a MERV 8 filter alone would have never removed as many particles as a MERV 13 filter—while you could ride a bike and eventually get to Philadelphia, a MERV 8 filter could never get to Philadelphia, i.e. achieve the same performance as a MERV 13 filter on its own over any period of time. *See* D.I. 99-2, at 27:17–28:12, 29:13–20.[5] In short, GPS did not make

---

[5] And importantly, GPS also did not advertise or otherwise represent that MERV 13 filters should be replaced with MERV 8 filters. Plaintiff only cites one representation regarding this testing, which states that one should "[i]ncrease the filtration in the unit to the maximum available" and

any false statements regarding the performance of its technology in conjunction with a MERV 8 filter and, regardless, these statements are irrelevant to Plaintiff's fraud claim and GPS's motion. Plaintiff has not come forward with clear and convincing evidence that GPS falsely represented its technology is effective against SARS-CoV-2.

### C. Plaintiff has no evidence that GPS falsely represented its testing.[6]

Plaintiff likewise has no evidence that IBA's testing was not independent. Plaintiff contends that the EPA caused GPS to change its representations regarding independent studies (D.I. 97, at 18), but none of the documents Plaintiff cites support his contention and he makes no effort to explain how they do. D.I. 97, at 18 n.20; D.I. 89, Exs. 69–71. The remaining documents that Plaintiff relies on to support that the IBA testing is not independent are inadmissible double hearsay that cannot be considered on GPS's motion, do not support the assertion made, and/or are wholly irrelevant to whether the IBA testing is independent. D.I. 97, at 17–18; D.I. 89, Ex. 9 (irrelevant and not supportive), Ex. 45 (double hearsay), Ex. 67 (irrelevant).

### II. Plaintiff has failed to present clear and convincing GPS knew its statements were false or was recklessly indifferent to their truth.

Plaintiff has not presented clear and convincing evidence that GPS knew its statements were false or was recklessly indifferent to their truth. *Smith v. Integral Consulting Servs.*, 2016 U.S. Dist. LEXIS 114692, at *30 (D. Md. Aug. 26, 2016) ("The defendant must know that his representation is false or be recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity."). Plaintiff asserts that GPS advertised that its technology was effective against SARS-CoV-2 before it had testing to support that claim. D.I. 97, at 4–5. None

---

consider ionization "[i]f MERV 13 Filters cannot be installed." D.I. 97, at 9; D.I. 89, Ex. 57, at GPSDE_0200130477.

[6] Plaintiff fails to respond to GPS's argument that he has no evidence that GPS made, or that he relied on, a representation that GPS's testing is independent and has thus waived the argument. D.I. 82, at 18; *Nissan World*, 2014 U.S. Dist. LEXIS 59902, at *31.

of the evidence Plaintiff relies on supports that assertion—instead, it corroborates Glenn Brinckman's and Kevin Boyle's declarations and Waddell's testimony that GPS did not make claims without supportive testing and they believed the IBA tests were accurate, reliable, and showed the impact of GPS's technology on SARS-CoV-2. D.I. 83, ¶ 27; D.I. 99-1, at 55:11–56:23, 62:10–24; Boyle Decl. ¶¶ 5, 21. For example, Plaintiff asserts that a GPS VP of Sales sent an email in January 2020 claiming the technology kills the coronavirus, but there is no recipient identified on the email and Plaintiff has no evidence that the email was ever sent. D.I. 97, at 4; D.I. 89, Ex. 15. In addition, Plaintiff asserts that Waddell "told everyone" that GPS's technology will kill the coronavirus without proof. D.I. 97, at 4. This is yet another blatant misrepresentation of the evidence. A third-party asked Waddell, "Do you know if GPS might help control the coronavirus. Would you be willing to get involved if others (Government, hospitals, etc.) were interested in such testing and do you think GPS has a chance killing this virus." D.I. 89, Ex. 17. Waddell replied that GPS's technology will kill the coronavirus, explaining why he believed it would be effective and he was willing to get involved and provide products for testing. *Id.*

Further, contrary to Plaintiff's assertion, GPS's sales VPs did not advertise SARS-CoV-2 efficacy in March 2020; instead, they stated that they did not have final testing on the virus. D.I. 89, Exs. 19, 21. In fact, Plaintiff acknowledges that GPS publicly announced in March 2020 that it was conducting testing on a human coronavirus and would test the COVID-19 virus upon availability, foreclosing Plaintiff's contention that GPS advertised efficacy against SARS-CoV-2 in March 2020 or before. D.I. 89, Ex. 20.[7] And although Plaintiff asserts that GPS had information showing its technology was not effective against SARS-CoV-2, as discussed above in section I.B,

---

[7] Nor did GPS "blitz[] sales messages linked with COVID-19 fears in marketing materials to customers." D.I. 97, at 5. Plaintiff cites a merely a draft internal email among individuals at Envelop Group that merely links to the March 2020 press release discussed above. D.I. 89, Ex. 23.

9

*supra*, Plaintiff does not provide any evidence supporting that assertion.

In short, even assuming Plaintiff could show falsity, Plaintiff has not presented any evidence from which a jury could find—by clear and convincing evidence—that GPS knew its statements were false or was recklessly indifferent to their truth. Instead, the evidence shows GPS believed its representations to be true based on extensive testing. *Smith*, 2016 U.S. Dist. LEXIS 114692, at *32 (granting summary judgment on plaintiff's fraud claim where the evidence showed defendant believed the statements to be true). Thus, GPS is entitled to summary judgment.

### III. Plaintiff has failed to present clear and convincing evidence that GPS made the statements with the deliberate intent to deceive.

For the same reasons that Plaintiff has failed to show GPS knew the statements were false or was recklessly indifferent to their truth, Plaintiff has failed to show that GPS made the statements with the deliberate intent to deceive.[8] Plaintiff posits that GPS ignored the truth to increase its profits, but this is unsupported speculation and "[a] possible motive for committing fraud"—such as the profit motive Plaintiff suggests—"does not prove fraudulent intent." *First Union Nat'l Bank v. Steele Software Sys. Corp.*, 154 Md. App. 97, 148 (2003). "While it is true that knowledge and intent may be inferred from circumstantial evidence, such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the knowledge or deceptive intent requirement." *Pac-West Distrib. NV LLC v. AFAB Indus. Servs.*, 2023 U.S. Dist. LEXIS 89469, at *26 (E.D. Pa. May 22, 2023). Plaintiff has not presented clear and convincing evidence of intent to deceive and, thus, GPS is entitled to summary judgment.

### CONCLUSION

GPS respectfully requests that the Court grant summary judgment in its favor.

---

[8] The cases Plaintiff cites are irrelevant to his fraud claim because they concern the *pleading* standard for claims under the PSLRA and the *preponderance of the evidence* standard under the Securities Exchange Act of 1934. D.I. 97, at 19–20.

| | |
|---|---|
| OF COUNSEL<br><br>MCGUIREWOODS LLP<br><br>Robert A. Muckenfuss (admitted *pro hac vice*)<br>Kelly A. Warlich (admitted *pro hac vice*)<br>Fifth Third Center<br>201 North Tryon Street, Suite 3000<br>Charlotte, North Carolina 28202<br>(704) 343-2052<br>rmuckenfuss@mcguirewoods.com<br><br>R. Trent Taylor (admitted *pro hac vice*)<br>S. Virginia Bondurant Price (admitted *pro hac vice*)<br>Gateway Plaza<br>800 East Canal Street<br>Richmond, Virginia 23219<br>(804) 775-1000<br>rtaylor@mcguirewoods.com<br>vbondurantprice@mcguirewoods.com<br><br>*Attorneys for Global Plasma Solutions, Inc.* | YOUNG CONAWAY STARGATT & TAYLOR, LLP<br><br>*/s/ Samantha G. Wilson*<br>Adam W. Poff (No. 3990)<br>Tammy L. Mercer (No. 4957)<br>Samantha G. Wilson (No. 5816)<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>(302) 571-6600<br>apoff@ycst.com<br>tmercer@ycst.com<br>swilson@ycst.com<br><br>*Attorneys for Global Plasma Solutions, Inc.* |

November 27, 2023

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that on November 27, 2023, a copy of the foregoing document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

    Brian E. Farnan
    Michael J. Farnan
    FARNAN LLP
    919 North Market Street, 12th Floor
    Wilmington, DE 19801
    bfarnan@farnanlaw.com
    mfarnan@farnanlaw.com

    Steffan T. Keeton
    THE KEETON FIRM LLC
    100 S. Commons, Ste. 102
    Pittsburgh, PA 15212
    stkeeton@keetonfirm.com

    Michael A. Mills
    THE MILLS LAW FIRM
    52 D Brian Hollow Ln
    Houston, TX 77027
    mickey@millsmediation.com

    Dennis C. Reich
    John Benjamin Black
    REICH & BINSTOCK LLP
    4265 San Felipe, Suite 1000
    Houston, Texas 77024
    dreich@reichandbinstock.com
    bblack@reichandbinstock.com

    *Attorneys for Plaintiff and the Classes*

YOUNG CONAWAY STARGATT
 & TAYLOR, LLP

*/s/ Samantha G. Wilson*
Adam W. Poff (No. 3990)
Tammy L. Mercer (No. 4957)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6642
apoff@ycst.com
tmercer@ycst.com
swilson@ycst.com

*Attorneys for Defendant*
*Global Plasma Solutions Inc.*

Dated: November 27, 2023