# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

ROBERT S. GARNER, on behalf of
himself and all others similarly situated,

        Plaintiff,

    v.

GLOBAL PLASMA SOLUTIONS, INC.,

        Defendant.

C.A. No. 21-665 (SB)

**PUBLIC VERSION -
Filed: September 12, 2024**

## DECLARATION OF KELLY A. WARLICH IN SUPPORT OF DEFENDANT GLOBAL PLASMA SOLUTIONS, INC.'S MOTION FOR ORDER TO SHOW CAUSE WHY PLAINTIFF SHOULD NOT BE FOUND IN VIOLATION OF THE STIPULATED PROTECTIVE ORDER[1]

OF COUNSEL

MCGUIREWOODS LLP

Robert A. Muckenfuss (admitted *pro hac vice*)
Kelly A. Warlich (admitted *pro hac vice*)
Fifth Third Center
201 North Tryon Street, Suite 3000
Charlotte, North Carolina 28202
(704) 343-2052
rmuckenfuss@mcguirewoods.com

R. Trent Taylor (admitted *pro hac vice*)
S. Virginia Bondurant Price (admitted *pro hac vice*)
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
(804) 775-1000
rtaylor@mcguirewoods.com
vbondurantprice@mcguirewoods.com

*Attorneys for Global Plasma Solutions, Inc.*

September 5, 2024

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Adam W. Poff (No. 3990)
Tammy L. Mercer (No. 4957)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com
tmercer@ycst.com
swilson@ycst.com

*Attorneys for Global Plasma Solutions, Inc.*

---

[1] The enclosed Declaration referenced in and in support of the Motion was inadvertently omitted from Defendant's August 30, 2024 filing (D.I. 134).

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ROBERT S. GARNER, on behalf of himself and all others similarly situated, | |
| Plaintiff, | C.A. No. 21-665 (SB) |
| v. | |
| GLOBAL PLASMA SOLUTIONS, INC., | |
| Defendant. | |

**DECLARATION OF KELLY A. WARLICH**

I, Kelly A. Warlich, hereby declare as follows:

1.      I am attorney at McGuireWoods LLP in its Charlotte, NC office.

2.      I am licensed to practice in the State of North Carolina, and I have been admitted *pro hac vice* in this matter and am counsel of record for Defendant Global Plasma Solutions, Inc. ("GPS").

3.      I submit this declaration in support of GPS's Motion for Order to Show Cause Why Plaintiff Should Not Be Found in Violation of the Stipulated Protective Order.

4.      Attached hereto as **Exhibit A** is a true and correct copy of Keith Fishlock's proposed Second Amended Class Action Complaint received from Fishlock's counsel on January 31, 2024.

5.      On February 9, 2024, counsel for Fishlock and Plaintiff Robert Garner sent me and my co-counsel copies of the exhibits to Fishlock's proposed Second Amended Class Action Complaint.  Save and except for Exhibits 1, 2, and 22, all of the exhibits to Fishlock's proposed Second Amended Class Action Complaint were documents produced by GPS in this litigation and

1

designated as Confidential or Highly Confidential – Attorney's Eyes Only pursuant to the Protective Order.

6.     On August 21, 2024, my co-counsel and I conferred with counsel for Garner and Fishlock by telephone regarding their use of Protected Material in the complaint filed in Georgia, a copy of which is filed at D.I. 132.

7.     Attached hereto as **Exhibit B** is a true and correct copy of email correspondence between GPS's counsel and counsel for Garner and Fishlock regarding their use of Protected Material in the complaint filed in Georgia.

8.     Attached hereto as **Exhibit C** is a true and correct copy of an email from counsel for Garner and Fishlock dated August 23, 2024.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on August 30, 2024, in New York, New York.


*Kelly A. Warlich*
_____
Kelly A. Warlich

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 5, 2024, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**

Brian E. Farnan
Michael J. Farnan
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE 19801
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

Steffan T. Keeton
THE KEETON FIRM LLC
100 S. Commons, Ste. 102
Pittsburgh, PA 15212
stkeeton@keetonfirm.com

Michael A. Mills
THE MILLS LAW FIRM
52 D Brian Hollow Ln
Houston, TX 77027
mickey@millsmediation.com

Dennis C. Reich
John Benjamin Black
REICH & BINSTOCK LLP
4265 San Felipe, Suite 1000
Houston, Texas 77024
dreich@reichandbinstock.com
bblack@reichandbinstock.com

*Attorneys for Plaintiff and the Classes*

YOUNG CONAWAY STARGATT
  & TAYLOR, LLP

*/s/ Samantha G. Wilson*
Adam W. Poff (No. 3990)
Tammy L. Mercer (No. 4957)
Samantha G. Wilson (No. 5816)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6642
apoff@ycst.com
tmercer@ycst.com
swilson@ycst.com

*Attorneys for Defendant*
*Global Plasma Solutions Inc.*

Dated: September 5, 2024

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Keith Fishlock, on behalf of himself and all others similarly situated, | C.A. NO. 23-522-SB |
| Plaintiff, | **The Hon. Stephanos Bibas** |
| v. | |
| GLOBAL PLASMA SOLUTIONS INC. and FALFURRIAS CAPITAL PARTNERS, LP, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

PARTIES ......................................................................................................................... 6

JURISDICTION AND VENUE ............................................................................................... 7

FACTUAL BACKGROUND .................................................................................................. 8

FACTS ........................................................................................................................... 34

    A.  THE MARKET FOR AIR TREATMENT SYSTEMS ..................................................... 34
    B.  GLOBAL PLASMA SOLUTIONS: THE COMPANY AND THE PRODUCTS ...................... 39
    C.  GLOBAL PLASMA SOLUTIONS REPRESENTS TO CONSUMERS THAT ITS PRODUCTS
        WILL IMPROVE AIR QUALITY WITHOUT HARMFUL SIDE EFFECTS ........................ 39
    D.  GLOBAL PLASMA SOLUTIONS' REPRESENTATIONS ARE FALSE, DECEPTIVE, AND
        MISLEADING ................................................................................................... 55
        *a.  Global Plasma Solutions' Representations to Consumers that the Products Are Superior to*
        *Other Air Treatment Systems Are False, Deceptive, and Misleading.* ........................................... 55
        *b.  Global Plasma Solutions' Representations to Consumers that Its Products' Claims Are*
        *Supported By Sound, Independent Testing and Can Achieve Quantified Toxin-Removal*
        *Benchmarks Are False, Deceptive, and Misleading.* ...................................................................... 57
        *c.  Global Plasma Solutions' Representations to Consumers that Its Products Are Effective*
        *Against COVID-19 Are False, Deceptive, and Misleading.* ............................................................ 60
    E.  PLAINTIFF AND CLASS MEMBERS RELIED ON GLOBAL PLASMA SOLUTIONS' FALSE
        REPRESENTATIONS ........................................................................................... 74
    F.  DEFENDANTS' CONCEALED THESE DECEPTIONS AND DEFECTS ............................ 91
    G.  FALFURRIAS AND GPS PARTICIPATED IN A CONSPIRACY TO DEFRAUD ............... 94

FACTS SPECIFIC TO PLAINTIFF ...................................................................................... 104

CLASS DEFINITIONS AND ALLEGATIONS ........................................................................ 106

CAUSES OF ACTION ...................................................................................................... 110

    COUNT I ............................................................................................................... 110
        *a.  Violation of 18 U.S.C. § 1962(c)* ........................................................................................... 110
        *b.  Violation of 18 U.S.C. § 1962(d)* ......................................................................................... 125
    COUNT II ............................................................................................................... 128
    DECEIT AND FRAUDULENT CONCEALMENT ....................................................... 128
    COUNT III .............................................................................................................. 131
    BREACH OF EXPRESS WARRANTY ..................................................................... 131
    COUNT IV .............................................................................................................. 136
    BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY .............................. 136
    COUNT V ............................................................................................................... 141
    BREACH OF THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE ...... 141
    COUNT VI .............................................................................................................. 144

Violation of State Consumer Protection Statutes.........................................144
COUNT VII..........................................................................................................145
Violation of the Delaware Consumer Fraud Act ("DCFA"), ...........................145
COUNT VIII ........................................................................................................148
Unjust Enrichment.............................................................................................148

**RELIEF DEMANDED** ...........................................................................................................**150**

**JURY DEMAND** .....................................................................................................................**152**

Plaintiff Keith Fishlock brings this action on behalf of himself and all others similarly situated against Defendants Global Plasma Solutions Inc. and Falfurrias Capital Partners, LP. Plaintiff makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## INTRODUCTION

1.     Falfurrias Capital Partners, LP and Global Plasma Solutions Inc. prey on people desperate to cleanse the air and protect themselves from ailments including the COVID-19 virus.

2.     Defendants represent that their Products[1] eliminate the COVID-19 virus, even though these Products do not.

3.     To further its deception – while also hiding significant defects in its Products – Defendants deceptively represents company-funded testing as "independent" while also using test conditions that are not representative of the real-world use of the Products.

---

[1] The Products included with this definition include all products that used Defendant's NPBI technology. Presently this includes the GPS-FC48-AC, GPS-FC24-AC, GPS-DM48-AC, GPS-FC-3-BAS, GPS-IMOD, GPS-IRIB-18, and GPS-IRIB-36.

1

4.    Defendants' "profits over people" scheme won them acclaim, publicity, and generated hundreds of millions of dollars in sales at the expense of the Plaintiff and Class Members across the country.

5.    "The worst thing that can happen is installing a product you believe is keeping you safe, but it's not."[2]  But that is precisely what Defendants are doing, instilling customers with a false sense of security through misleading claims.

6.    Further, Defendants overstate the Products' COVID-19 mitigation performance and uses methods that are "unvalidated"[3] and "under conditions that are not representative of actual application conditions."[4]

---

[2]Quote from Global Plasma Solutions Vice President of Sales David Archer. *Why Your Customers Should Care About Their Indoor Air Quality*  https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.

[3] Talia Wiener, *Parents Tell Montclair District: We're Worried New Air Cleaners Aren't' Safe*, MONTCLAIR LOCAL (April 22, 2001), https://www.montclairlocal.news/2021/04/22/parents-tell-montclair-district-were-worried-new-air-cleaners-arent-safe/.

[4] Ross Pomeroy, *Schools Are Spending Millions on Ionization Technology to Fight COVID and There's No Good Evidence It Works*, MASS LIVE (January 22, 2021), https://www.masslive.com/coronavirus/2021/01/schools-are-spending-millions-on-ionization-technology-to-fight-covid-and-theres-no-good-evidence-it-works.html.

7.   For example, in one instance, Defendants used a chamber the size of a shoebox to support its claim that its Products could kill COVID-19 for a home or school. In another instance, Defendants "blasted" the testing chambers with 27,000 ions per cubic centimeter – far in excess than concentrations achievable by its Products.

8.   When Defendants' Products have been independently tested in real world conditions, they consistently fail to achieve the results as represented by Defendants.

9.   COVID-19 has taken more than 1,200,000 American lives.

10.   In an effort to capture dollars from COVID-19 fear, Defendants market directly to consumers seeking protection and relief from the virus.

11.   This tactic is "enhanced" by Defendants' marketing which provides information to consumers on how to obtain government funding to purchase Defendants' Products.

12.   These "free money" purchases boost the Defendants' revenues by not only taking from tax funds but also shifting these precious dollars away from effective means of virus mitigation.

13.     However, as Defendants know, their Products suffer from defects which cause its Products to fail to meet its lofty representations. Thus, the Defendants' representations that the Products are a safe technology to cleanse the air of the COVID-19 virus is false, misleading, and designed to deceive consumers into paying a price premium and choosing its products over a competitor's product.

14.     In pursuit of "profits over people," Defendants' use many deceptive representations as described herein.

15.     For example, Defendants deceptively represented that the technology was installed in the White House for COVID mitigation: [5]

> A spokesperson for the company directed WIRED to research commissioned by the company showing the technology neutralized SARS-CoV-2 on surfaces and aerosols in lab settings, as well as case studies from customers including universities and the White House.

However, the technology was installed in 2018 – well before COVID-19 appeared.[6]

---

[5] Gregory Barber, *The Ionizer in Your School May Not Do Much to Fight Covid*, WIRED (March 26, 2021), https://www.wired.com/story/ionizer-school-not-fight-covid/.

[6] Additionally concerning, Defendant used the White House logo in its marketing to project legitimacy of its Products even though the White House logo may not be used for marketing purposes.

16.     On December 8, 2022, the White House's Office of Science and Technology determined that "[d]evices that use 'bipolar ionization' are NOT recommended at this time."[7]

17.     Defendants manufacture, market, sell, and distribute the Products using marketing and advertising campaigns specifically targeted to consumers that are aware and fearful of the COVID-19 virus.

18.     For example, in Defendant GPS' CEO Glenn Brinckman's words, "it's all about pathogens and coronavirus and COVID-19."[8]

19.     Plaintiff and those similarly situated ("Class Members") relied on Defendants' misrepresentations.

20.     Defendants' fraudulent, deceptive, and misleading conduct violated and continues to violate the consumer protection statutes of multiple states. Further, Defendants breached and continue to breach

---

[7] Erica Kimmerling, *Clean Indoor Air Benefits Everyone*, THE WHITE HOUSE (Dec. 8, 2022), https://www.whitehouse.gov/ostp/news-updates/2022/12/08/clean-indoor-air-benefits-everyone.
[8] Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.

their implied and express warranties regarding the Products. Additionally, Defendants have been and continues to be unjustly enriched. Accordingly, Plaintiff brings this action against Defendants on behalf of himself and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## PARTIES

21.    Plaintiff is a citizen of Delaware and domiciled therein.

22.    Defendant Global Plasma Solutions, Inc. is a Delaware corporation with its principal place of business located in Charlotte, NC. Defendant manufactures, markets, and distributes its products throughout the United States.

23.    Defendant Falfurrias Capital Partners, LP is a Delaware limited partnership with its principal place of business located in Charlotte, NC.

24.    Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who have knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

25.    Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual or ostensible scope of their authority.

## JURISDICTION AND VENUE

26.    This Court has personal jurisdiction over the Defendants because the Defendants are incorporated or otherwise organized in the State of Delaware; have consented to jurisdiction by registering to conduct business in this state; maintains sufficient contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through the promotion, sale, marketing and distribution of its Products in and from Delaware, which renders the exercise of jurisdiction by this Court proper and necessary as Defendants are "at home" in Delaware.

27.    This Court has subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides

7

for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs. In addition, this Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

28.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants are incorporated within this District and a substantial part of the events or omissions giving rise to the claims occurred within this District.

## FACTUAL BACKGROUND

29.    Defendants conspired to skyrocket sales by executing a fraudulent plan to deceive the public into buying their Products under the false belief that the Products safely and effectively eliminated COVID-19 in real world conditions.

30.    GPS was founded in 2008.

8

31.    In the fall of 2018, Falfurrias acquired 90% of GPS.

32.    ████████████████████████████████████

████████████████████████████

33.    ████████████████████████████████████

██████████

34.    ██████████████████████████████████[9]

35.    On December 18, 2020, Defendant Falfurrias received a $225MM dividend from Defendant GPS.

36.    From the moment COVID-19 arrived in the United States, Defendants saw a golden opportunity to grow their bank accounts by representing that their NPBI technology eliminated COVID-19.

37.    This shift in focus was summarized by one GPS employee as: "Pre-COVID, pathogen reduction was a part of our business but was only a small driver. Given the shift we are retooling our entire proposition to reflect the new market - independent testing of course being a critical aspect of this."[10]

---

[9] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 102, Ex. 12 at 46.
[10] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 4.

38. 

40.     Defendants' marketing of GPS emphasized NPBI's ability to kill COVID in real world conditions.

 a.  Defendants' primary message was that the NPBI technology – forming the basis of all of the Products – is effective at eliminating COVID-19.

 b.  For example, this chart compares the NPBI technology against other technologies:

---

[11] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 5.
[12] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 102, Ex. 12 at 47:1-5.

**% of SARS VIRUS CONTROLLED BASED ON TECHNOLOGY[1]**

| MERV Rating | Filter Only | Filter+UVC*** | Filter + Ionization*, ** |
|---|---|---|---|
| 6 | 6.2% | 10% | 34% |
| 7 | 7% | 12% | 61% |
| 8 | 11% | 19% | 84% |
| 10 | 12% | 35% | 89% |
| 13 | 46% | 84% | 98.8% |
| 15 | 71% | 97% | 99.0% |
| 16 | 76% | 98.80% | 99.90% |
| 17 (HEPA) | 99.90% | 99.99% | 99.999% |

*Ionization increases the filter efficiency 4-5 MERV levels – this column added by GPS
**Does not take into account ionization kills in the space and on surfaces
***UVC does not effectively kill airborne pathogens in high RH conditions[2]

2. ASHRAE Technical Paper on Airborne Infectious Diseases    1. 2009 EPA Tech Paper

c.  The GPS Website also states:

# Independent Testing

We put our needlepoint bipolar ionization (NPBI®) technology to the test: Third-party testing confirms it limits the spread of viruses.

d.  "NPBI creates additional peace of mind during this evolving pandemic."

e.  "Independent Testing Shows that GPS Technology Is Highly Effective at Neutralizing SARS-COV-2 and Other Pathogens"

f.  "Pathogens such as SARS-CoV2, the new strain of coronavirus that causes COVID-19, can reside on surfaces and be suspended in the air we breathe. NPBI technology is

11

designed to mitigate these harmful pathogens by safely

creating and releasing ions via a building's existing HVAC

system."

**Global Plasma Solutions Virtually Eliminates Static SARS-CoV-2
with Proprietary NPBI™ Technology**
*Global Plasma Solutions is the first air purification solution to test SARS-CoV-2, achieving a
99.4% reduction of the surface strain within 30 minutes*

g.

41.    These representations were rebroadcast throughout the GPS

distribution chain.

   a. For example: "The first Phase of controlled testing on the

      COVID 19 pathogen and had some fantastic results. The

      case study and results are attached. Tests were performed in

      a box chamber under a high density of ions and the

      deactivation ("kill") rates were extremely impressive. This

      first round proved what we suspected from the beginning,

      that we would be able to deactivate (Kill) the pathogen."[13]

   b. The same language appears in numerous other sales emails

      to customers, distributors, and sales representatives.

_____

[13] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 12.

42.     These representations were interpreted by the public in the same way: "[T]esting has been done to prove that NPBI kills COVID-19."[14]

43.     This was confirmed by Charles Waddell, GPS Founder and Chief Technology Officer: "in laymen's terms [this] means we kill it [COVID19]."[15]

44.     Defendants knew that representations that NPBI would eliminate COVID were incredibly valuable and made them essential to the customer's understanding of the Products.

45.     This caused GPS' sales to surge throughout the pandemic.

46.     Even from the early stages of COVID, Defendants tracked the virus and saw a golden opportunity to profit.

   a. From the moment it was feared that COVID-19 would land on the shores of the United States, Defendants aimed to exploit this opportunity.

   b. ███████████████████████████████████████ ███████████████████████████████████████.

---

[14] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 14.
[15] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 2.

c. 

d.

e.

f. Without any proof of the Products efficacy on "the coronavirus," Charles Waddell told everyone that "GPS' technology will kill the coronavirus."

g.

---

[16] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 16.

14

███████████████████████████████ We are

currently testing the COVID-19 Coronavirus and are having

positive results through the first 2 weeks of testing. Final

test results will not be available for another 3-4 weeks."[17]

This was not true.

h. On March 5, 2020, the VP of Sales for the Southeast Region,

was similarly advocating for COVID-19 effectiveness: "the

data that will have soon will be against the current COVID-

19[.]"[18]

i. On March 8, 2020, Charles Waddell, the CTO of GPS,

claimed that "one out of three emails [received] has the

coronavirus referenced in it, so I am waiting on the test

results anxiously."[19]

j. ████████████████████████████████

████████████████████████████████

---

[17] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 19.
[18] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 21.
[19] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 22.

███████████████████████████████████████

████████████████████████████████[20]

k. On March 9, 2020, the World Health Organization Director-General stated that "the threat of a pandemic has become very real."[21] That same day, GPS issued a press release entitled "Indoor Air Quality Technology Company Responds to Coronavirus."[22]

l. Two days later, WHO declared a global pandemic.[23]

m. By March 11, 2020, GPS was "overwhelmed with virus requests" in response to COVID-19 fears.[24]

n. ███████████████████████████████████

███████████████████████████████████████

████████████████

---

[20] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 23.
[21] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 24.
[22] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 25.
[23] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 26.
[24] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 27.



q. The next day, GPS distributed a press release claiming that NPBI "Virtually Eliminates Static SARS-CoV-2."[26] With the press release, a different VP of Sales told a customer, "We're the only technology to have been tested. Game changing efficacy of 99.4% in 30 minutes."

r. The often-repeated message from GPS was "NPBI is highly effective in neutralizing the SARS-CoV-2 pathogen."[27]

---

[25] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 30.
[26] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 31.
[27] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 37.

s.  Similarly, "As the world endeavors to safeguard building occupants from COVID-19, the disparity between NPBI technology and alternative filtration technology in managing the SARS-CoV-2 pathogen is especially noteworthy."[28]

t.  Consumers and distributors have interpreted GPS' messaging in a similar way: "NPBI technology eliminates COVID-19."[29]

u.  Further, Charles Waddell tells potential customers "Global Plasma Solutions (GPS) manufactures a wide variety of products that purify the air by reducing particles, controlling odors and killing pathogens, in the space."[30]

v.  [31]

---

[28] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 37.
[29] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 41.
[30] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 42.
[31] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 43.

w. COVID-19 related marketing became the company's primary focus and dominated almost every representation by the company. For example, a marketing document bearing the GPS logo states: "KEEP YOUR KIDS AND DRIVERS SAFE FROM COVID-19."[32]

x. Simply, representations of effectiveness against COVID-19 in real world conditions proved to be the dominant sales driver for GPS' Products.

47. COVID representations proved incredibly valuable to Defendants.



a. [redacted]

b. [redacted][33]

---

[32] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 44.
[33] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 33 (showing Net Sales of $20MM).



[34]

c.

d.

.[35]

e.

.[36]

---

[34] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 34
(████████████████████).
[35] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 38.
[36] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 38
(███████████████████████████████████).

f. 

g.

38

h. By January 2021, COVID-19 continued to be the dominating customer motivation to purchase GPS products. █████

48. The representations were broadcast through the distribution chain.

_____

[37] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 39.
[38] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 102, Ex. 12 at 120:1-15.

a. Defendants manufacture and distribute the Products under a series of tradenames.

b. They provide marketing materials and test information that is uniformly presented through the distribution network.

c.  Defendants' distribution of the Products is calculated to control the flow of sales in both residential and commercial spaces.[39]



---

[39] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 46.

d. The marketing and messaging for the Products originates with Defendants and is distributed for rebroadcasting throughout the entire distribution chain.

e. This produces a uniform message for every distributor and sales representative.

f. For example, these distributors and sales agents make similar representations which originate from GPS:



**HVAC-IAQ Technology Confirmed to Fight COVID-19**

As Director of Healthcare Strategic Accounts for Carrier West it is my privilege to inform you that history has been made! **Needlepoint Bipolar Air Ionization (NPBI) by Global Plasma Solutions (GPS)** is the first-and-only HVAC-IAQ technology of its kind to have undergone 3rd party independent laboratory testing with **results confirming it can inactivate 99.4% of SARS-CoV-2 viral particles within 30-minutes.** This testing was performed under strict laboratory protocol with actual SARS-CoV-2 virus material (not just a surrogate for the SARS-CoV-2 virus).

This is remarkable news for those of us who have been diligently working to create safer and healthier indoor environments in light of the current worldwide healthcare pandemic caused by the disease COVID-19. This is also great news for a general public currently undertaking initiatives to energize the economy by re-entering buildings and structures of all types across the country. Many of these individuals have fear and anxiety over walking into buildings for the first time and being exposed to others within such close proximity…I do as well.





24



g. In many instances, the June 2020 press release was included in sales quotes by distributors and sales agents.[40]

h. By rebroadcasting content provided by Defendants, all of the distribution points in the distribution chain merely act as radio towers to present Defendants' common message.

---

[40] *See, e.g.,* Exhibit 2.

i. 

j.

k.

.41

.42

.43

l. Simply, Defendants control the testing, marketing, messaging, and communication points throughout its entire distribution chain.

49. The "Virtually Eliminates" COVID test was a carefully constructed lie to boost Defendants' profits.

---

[41] *See, e.g.*, *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 49.

[42] *See Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 50 (at ¶5).

[43] *See, e.g.*, *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 51.

a. The laboratory tests were not completed in real world conditions.

b. 

c.

d. In fact, this test claiming a 99.4% reduction was conducted in a chamber the size of a shoebox.[46]

---

[44] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 65.
[45] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 66.
[46] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 102, Ex. 12 at 77:9-25.

e. 

f.

g.

h.

i.

j. This test was heralded as being the first test showing

effectiveness in killing the SARS-CoV-2 virus.[51]

---

[47] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 102, Ex. 12 at 79:6-12.

[48] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 102, Ex. 12 at 81:2-23.

[49] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 102, Ex. 12 at 81:24-82:22.

[50] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 102, Ex. 12 at 82:23-83:5.

[51] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 102, Ex. 12 at 109:2-6.

k. Due to these flaws, that representation is false.

50. Defendants' misrepresented NPBI's "independent" testing.

a. Defendants misrepresented that their tests were independent and showed that the NPBI technology was effective in real-world conditions.

b. Defendants wish to rely only upon testing for which they control the devices and protocols in question.

c. Further, Defendants routinely state NPBI technology is safe and effective while citing their own studies.

d. As one critic noted, "This is like asking Phillip Morris to share the health risks of cigarettes."[52]

e. The laboratory tests presented by Defendants were not independent.

f. Despite knowing that there were no independent lab tests, numerous marketing documents refer to independent testing.

---

[52] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 61.

g. For example, many promotional materials claim

"INDEPENDENT LABORATORY TEST RESULTS."[53]

h. Additional materials are labeled "Independent Testing by

EMSL, ALG & Innovative Bioanalysis."[54]

i. While GPS marketed that "Independent, Real World Testing

Shows that GPS Technology Is Safe and Effective," ███

████████████████████████████████████

████████████████████████████████████

███████[55]

j. ████████████████████████████████████

████████████████[56]

k. Despite this Kevin Boyle, VP of Marketing and Business

Development, told reporters that, "With proper airflow, the

NPBI device produces a constant flow of ions into the space

at a level that independent testing clearly documents control

---

[53] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 62.
[54] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 63.
[55] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 9.
[56] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 64.

of pathogens, particles and volatile organic compounds

(VOCs)."

l. 

m. The inconsistent testing and messaging created confusion

with customers.

n. 

o.

[57] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 67.
[58] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 68.
[59] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 45.



p.

[60]

---

[60] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 40.

q. GPS claimed that the technology was proven in real world conditions by independent testing despite knowing that both were false.

r. The importance of independent tests is emphasized in later testing attempts.

51. Defendants' claims about the Products are false and misleading.



---

[61] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 69.
[62] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 70.
[63] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 71.

52.    Based on these deceptions, Defendants handsomely profited.

53.    Just nine months after the start of the COVID-19 pandemic, Defendant Falfurrias received a $225MM dividend ███████████████████ ██████████████████████████████████████████████████████.

## **FACTS**

### **A. The Market for Air Treatment Systems**

54.    The COVID-19 pandemic caused demand for air treatment systems (ATS) to skyrocket.

55.    In 2020, the ATS market grew by 57% and is expected to have a double-digit growth rate in each of the next two years.[64]

56.    Market growth at these rates is unprecedented.

57.    For example, one air filter company CEO was so overwhelmed with orders that he had to turn customers away and stated, "I've been in this business for 20 years and this is the most

---

[64] *Air Purifier Sales Surge in the U.S. Amid the COVID-19 Pandemic*, VERIFY MARKETS (January 26, 2021), https://www.globenewswire.com/news-release/2021/01/26/2164712/0/en/Air-Purifier-Sales-Surge-in-the-U-S-Amid-the-COVID-19-Pandemic.html.

chaotic time I've ever had in the air filter business."[65]  In summary, he described the demand from customers as "like toilet paper in April [2020] times two."[66]

58.    As a result of COVID-19's airborne transmission, residential and commercial customers sought air treatment systems to ensure safety.

59.    COVID-19 has taken more than 1,200,000 American lives.

60.    Certain underlying medical conditions that are relatively common in the population produce a significantly increased risk of death when a person is infected with COVID-19.

---

[65] Will Feuer, *Airborne Transmission of Coronavirus Has Made High-End Air Filtration Systems More Popular Than 'Toilet Paper in April' As HVAC Systems Sell Out*, CNBC (October 15, 2020), https://www.cnbc.com/2020/10/15/airborne-transmission-of-coronavirus-has-made-high-end-air-filtration-systems-more-popular-than-toilet-paper-in-april.html.
[66] *Id.* (referring to the demand for toilet paper during the onset of the pandemic that led to shortages, fights, and arrests as consumers battled for toilet paper).

61.     For example, one common underlying condition is age. Compared to the CDC reference group, adults aged 30-39 are 45x more likely to die from COVID and 10x more likely to be hospitalized.[67]

62.     With each successive age group, these numbers increase drastically until hitting frightening numbers for people aged 65 and above:

| Age Range | Death | Hospitalization |
|-----------|-------|-----------------|
| 65-74 | 1300x | 40x |
| 75-84 | 3200x | 65x |
| 85+ | 8700x | 95x |

63.     To protect people, locations that have high amounts of "foot traffic" in an indoor setting have invested in safety precautions to mitigate the spread of COVID-19.

64.     The feeling of safety and security is pivotal to the public. As a result, there is strong demand for goods and procedures that "may make people feel safer without actually being substantially safer."[68]

_____

[67] Center for Disease Control, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (updated April 16, 2021).
[68] Lindsay Christians, *Cold Comfort: With Winter On Its Way, Madison Restaurants Scramble To Stay Alive*, THE CAPITAL TIMES (November 7, 2020), https://madison.com/ct/entertainment/dining/cold-comfort-with-winter-on-its-way-madison-restaurants-scramble-to-stay-alive/article_2fdc210d-f78e-55cb-a251-96fc41516a1e.html.

65.    Installation of air treatment systems has been one of the most popular mitigation efforts.

66.    Because of the strong likelihood of death for the elderly population, senior living facilities have invested heavily in air treatment systems.

67.    Because of the strong likelihood of children acting as super spreaders,[69] schools from coast to coast invested heavily in air treatment systems to protect not only the students and school staff but also their friends and family.

68.    Because of the strong desire to celebrate their faith in person, religious organizations throughout the country invested in air treatment systems to allow congregations to worship safely.

69.    In addition to these public areas, similar concerns caused demand and interest to swell with residential owners.

---

[69] MGH News and Public Affairs, *Children's Role In Spread Of Virus Bigger Than Thought*, THE HARVARD GAZETTE (August 20, 2020), https://news.harvard.edu/gazette/story/2020/08/looking-at-children-as-the-silent-spreaders-of-sars-cov-2/.

70.     One survey found that the COVID-19 pandemic caused a 54% increase in consumer focus for indoor air quality in their homes.[70]

71.     The Wall Street Journal labeled clean air as the next luxury apartment perk, and Elisa Orlanski Ours, Chief Planning and Design Officer for Corcoran Sunshine, stated, "Air quality is now front of mind for our buyers."[71]

72.     Throughout every business sector and every home, demand for clean air and the equipment that creates the perception of clean air is growing exponentially.

73.     To harness this demand, companies, like Global Plasma Solutions, have increased marketing efforts and product lines.

---

[70] *New Survey Reveals Increased Concern for Air Quality and Safety in Homes*, PR NEWSWIRE (October 28, 2020), https://www.prnewswire.com/news-releases/new-survey-reveals-increased-concern-for-air-quality-and-safety-in-homes-301162159.html.
[71] Katy McLaughlin, *CLEAN AIR: THE NEXT LUXURY APARTMENT PERK*, WALL STREET JOURNAL (December 9, 2020), http://www.wsj.com/articles/clean-air-the-next-luxury-apartment-perk-11607526064.

**B. Global Plasma Solutions: The Company and the Products**

74.    Global Plasma Solutions was founded in 2008. The

company's previous focus was providing energy savings solutions.

75.    However, when the COVID-19 pandemic hit, the company's

focus shifted, and in CEO Glenn Brinckman's words, "it's all about

pathogens and coronavirus and COVID-19."[72]

76.    The backbone of Global Plasma Solutions' product line is its

patented Needlepoint Bipolar Ionization technology (NPBI).

77.    NPBI is used in all seven of Defendant's Products.

**C. Global Plasma Solutions Represents to Consumers that Its Products Will Improve Air Quality Without Harmful Side Effects**

78.    In marketing the Products, Defendants make numerous

representations regarding the performance and abilities of the Products

and the benefits purchasers should expect to gain therefrom.

---

[72] Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.

79.    This uniform, widespread marketing campaign is coordinated to present universal representations concerning the effectiveness of Defendants' Products and the NPBI technology.

80.    These representations fall into a few broad categories:

a.    Representations that the Products are superior to other air treatment system technologies;

b.    Representations that the Products produce cleaner air;

c.    Representations that the Products are capable of achieving quantified toxin-removal benchmarks (for example, that its technology can reduce SARS-CoV-2 by 98.33% within 60 minutes);

d.    Representations that Defendants' assertions about the Products are based on "independent testing;"

e.    Representations that attempt to capitalize on the COVID-19 pandemic.

81.    These representations are false, misleading, and deceptive:

| Representation Category | False, Misleading, and Deceptive |
|---|---|
| Products are superior to other air treatment system technologies | Comparisons to other technologies are based on the other misrepresentations herein. |
| Products produce cleaner air | Independent studies show that the Products are not effective at cleaning the air in real world conditions. |
| Products are capable of achieving quantified toxin-removal benchmarks (for example, that its technology can reduce SARS-CoV-2 by 98.33% within 60 minutes) | These benchmarks fail to be replicated in real world environments. |
| Defendants' assertions about the Products are based on "independent testing" | Defendants' testing is fundamentally flawed and biased because these company-funded studies are not "independent." Further, Defendants' test results are not replicated in real world conditions because Defendants' tests are carefully constructed in order to achieve the outcomes Defendants desire. |
| Attempts to capitalize on the COVID-19 pandemic | Through a coordinated campaign to profit from COVID-19 fear, Defendants overstate the efficacy of its Products' ability to eliminate COVID-19. |

82.    These representations were promulgated to the public through GPS' website, social media, YouTube videos, testimonials, third party publications, and other media. Below is a non-exhaustive

selection of the representations made by Global Plasma Solutions concerning its NBPI Products.

83.   Defendants represent that their Products are <u>superior to other air treatment system technologies</u>.[73]

    a.  "That's why GPS is committed to science and ongoing research to ensure we have **the safest**, **most effective technology on the market**." Charles Waddell, GPS' Founder and Chief Technology Officer.[74]

    b.  "Most important, **unlike many other solutions on the market, GPS NPBI technology is also safe for occupied spaces**."[75]

---

[73] Emphasis added throughout.

[74] Global Plasma Solutions, *The Future of Indoor Air Quality Is Now*, https://globalplasmasolutions.com/articles/the-future-of-indoor-air-quality-is-now.

[75] Global Plasma Solutions, *PROJECT SPOTLIGHT: Boston Children's Hospital*, https://globalplasmasolutions.com/articles/project-spotlight-boston-childrens-hospital.

c.  In a podcast interview, shared on the Global Plasma
Solutions' official Facebook page on June 15, 2020, Founder
and CTO, Charlie Waddell states:[76]

i.  "You know, half the filters and UV lights are what I
consider passive devices, they sit there and they wait
for stuff to come to them. **Our technology NPBI is
actually going out into the space and seeking out
these contaminants within the space. So that's
really solving the problems as we see them today.**
Where you have people talking coughing, sneezing,
generating the actual contaminants in the space. So I
would rather see a technology actively coming out into
the space to treat those contaminants versus waiting
for them to come back to the air handler to be reactive
versus proactive."[77]

---

[76] Global Plasma Solutions' Official Facebook Page, June 15, 2020,
https://www.facebook.com/globalplasmasolutions/posts/190279179097329.
[77] *Id.* at approximately the 4:00 minute mark.

d. In a presentation entitled "How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization" by Charlie Waddell, Defendant GPS' Founder and CTO:[78]

**% of SARS VIRUS CONTROLLED BASED ON TECHNOLOGY[1]**

| MERV Rating | Filter Only | Filter+UVC*** | Filter + Ionization*, ** |
|---|---|---|---|
| 6 | 6.2% | 10% | 34% |
| 7 | 7% | 12% | 61% |
| 8 | 11% | 19% | 84% |
| 10 | 12% | 35% | 89% |
| 13 | 46% | 84% | 97% |
| 15 | 71% | 97% | 99% |
| 16 | 76% | 98.80% | 99.90% |
| 17 (HEPA) | 99.90% | 99.99% | 99.999% |

*Ionization increases the filter efficiency 4-5 MERV levels – this column added by GPS
**Does not take into account ionization kills in the space and on surfaces
***UVC does not effectively kill airborne pathogens in high RH conditions[2]

---

[78] Global Plasma Solutions Presentation (conducted by Charlie Waddell), <u>How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization</u>, <u>https://www.total-mechanical.com/wp-content/uploads/2020/09/How-to-Make-Your-HVAC-Pandemic-Ready.pdf</u>.

e. In a sales presentation from September 1, 2020, Defendants compare their technology vs. competitor technologies:[79]



| | GPS NPBI™ | Other BPI | Corona Discharge | HEPA Filters | Carbon Filters | Ultraviolet (UV) | UV-PCO |
|---|---|---|---|---|---|---|---|
| No Harmful Byproducts | ● | | | ● | ● | | |
| Reduces Airborne Particles | ● | ● | ● | ● | | | |
| Reduces VOCs | ● | ● | ● | | ● | | ● |
| Reduces Pathogens | ● | ● | ● | ● | ● | ● | ● |
| Reduces Energy Cost | ● | ● | ● | | | | |
| Treats In-Room Air | ● | ● | ● | | | | |
| No Replacement Parts | ● | | | | | | |
| No Maintenance | ● | | | | | | |
| Simple To Install | ● | | | | | | |
| Low Total Cost | ● | ● | | | | | |

84. Defendants represent that the Products produce cleaner air.[80]

a. "**CLEANER AIR**, NATURALLY"[81]

---

[79] Global Plasma Solutions Sales Presentation, Better Air through Science, September 1, 2020, https://www.sde.idaho.gov/communications/files/public-records-requests/GPS-Presentation.pdf (slide 13).

[80] Emphasis added throughout.

[81] Global Plasma Solutions, How It Works, https://globalplasmasolutions.com/how-it-works (last visited May 5, 2021).

b. "Through our needlepoint bipolar ionization or NPBI®
   technology, **we deliver clean indoor air** ."[82]

c. "NPBI is a proactive approach to **cleaner air**."[83]

d. "This instantly results **in cleaner indoor air** and a safer
   environment."[84]

e. GPS products provide an affordable, effective and low-
   maintenance **solution for cleaner air**.[85]

f. "AN ENGINEERED SOLUTION FOR **CLEANER, SAFER
   INDOOR AIR**"[86]

g. "The combined effect is air that is **cleaner and safer** to
   breathe."[87]

---

[82] *Id.*

[83] Global Plasma Solutions, *The American Rescue Plan Can Help Schools Reopen Safely*, https://globalplasmasolutions.com/articles/the-american-rescue-plan-can-help-schools-reopen-safely-with-air-purification-technology.

[84] *Id.*

[85] *Id.*

[86] Global Plasma Solutions, *Why Your Customers Should Care About Their Indoor Air Quality*, https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.

[87] Global Plasma Solutions, *PROJECT SPOTLIGHT The Learning Experience*, https://globalplasmasolutions.com/articles/project-spotlight-the-learning-experience.

h. In March 2021, Global Plasma Solutions appointed Edward

Sobek as the company's first Chief Science Officer. In the

press release announcing his arrival, Mr. Sobek states: [88]

    ii. "What is most compelling about NPBI is its ability to

        **clean air and surfaces** in the occupied space."

    iii. "This technology can help create **healthy**

        **environments** at home, at work, at school and

        beyond. I welcome the opportunity to further GPS' goal

        of improving indoor air quality for all."[89]

i. "Our patented needlepoint bipolar ionization (NPBI®)

  technology is a **proactive approach to cleaner air**."[90]

85. Defendants represent that the Products <u>can achieve toxin-</u>

<u>removal benchmarks</u>.[91]

---

[88] Global Plasma Solutions, *Global Plasma Solutions® Appoints Edward Sobek as Chief Science Officer*, March 2, 2021, https://globalplasmasolutions.com/articles/indoor-air-quality-solutions-leader-global-plasma-solutions-appoints-edward-sobek-as-chief-science-officer (emphasis added).
[89] *Id.*
[90] Global Plasma Solutions, *The Japanese Industrial Standard for Ion Measurement*, https://globalplasmasolutions.com/articles/the-japanese-industrial-standard-for-ion-measurement.
[91] Emphasis added throughout.

a. "**Within 24 hours of installation**, NPBI technology **effectively neutralized odors from all sources** entering these buildings."[92]

b. For example, the following tables appear on both the Defendant GPS' "Independent Testing" and "Pathogen Reduction" pages:

i.

| Pathogen | Time in Chamber | Testing Methodology | Rate of Reduction |
| --- | --- | --- | --- |
| SARS-CoV-2 | 60 minutes | In-Air | **98.33%** |
| SARS-CoV-2 | 60 minutes | Surface | **99.98%** |

ii.

| Pathogen | Time in Chamber | Rate of Reduction |
| --- | --- | --- |
| Tuberculosis | 60 minutes | **69.1%** |
| MRSA | 30 minutes | **96.2%** |
| Staphylococcus | 30 minutes | **96.2%** |
| E. coli | 15 minutes | **99.7%** |

iii.

| Pathogen | Time in Chamber | Rate of Reduction |
| --- | --- | --- |
| Norovirus' | 30 minutes | **93.5%** |
| Human Coronavirus 229E* | 60 minutes | **99.0%** |
| Legionella | 30 minutes | **99.7%** |
| Clostridium Difficile | 30 minutes | **88.9%** |

---

[92] Global Plasma Solutions, *Project Spotlight: Edmonton International Airport*, https://globalplasmasolutions.com/articles/project-spotlight-edmonton-international-airport.

    c. "The air purification system was able to target and reduce pathogens and odors **within just 24 hours of installation**."[93]

    d. "The GPS-iMOD **drastically reduced the exhaust fume odors within 24 hours** and **reduced the particles in the space by up to 85%**."[94]

86.    Defendants represent that <u>their assertions about the Products are based on "independent testing."</u>[95]

    a. "This process is **proven by independent laboratory testing** to be both safe and effective."[96]

---

[93] Global Plasma Solutions, *PROJECT SPOTLIGHT: Clean Room Applications*, https://globalplasmasolutions.com/articles/project-spotlight-clean-room-applications.

[94] Global Plasma Solutions, *PROJECT SPOTLIGHT The University of Maryland, Baltimore*, https://globalplasmasolutions.com/uploads/customer-resources/Resource-Library/Case-Studies/University-of-Maryland-Case-Study.pdf (emphasis in original).

[95] Emphasis added throughout.

[96] Global Plasma Solutions, <u>Pathogen Reduction</u>, https://globalplasmasolutions.com/pathogen-reduction (last visited May 5, 2021).

b. In a presentation entitled "How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization" by Charlie Waddell, Defendant GPS' Founder and CTO:[97]

### Independent Testing by World Renowned EMSL & ATS Labs

c. On its website, under the "Independent Testing" page:[98]

## Independent Testing

We put our needlepoint bipolar ionization (NPBI®) technology to the test: Third-party testing confirms it limits the spread of viruses.

i.

PERFORMANCE VALIDATION

### Third-party testing confirms: GPS gets the job done

Our results-driven technology fights pathogens and limits the spread of viruses.

ii.

---

[97] Global Plasma Solutions Presentation (conducted by Charlie Waddell), How to Make your HVAC System Pandemic Ready using Needlepoint Bipolar Ionization, https://www.total-mechanical.com/wp-content/uploads/2020/09/How-to-Make-Your-HVAC-Pandemic-Ready.pdf.
[98] Global Plasma Solutions, Independent Testing, https://globalplasmasolutions.com/independent-testing (last visited May 5, 2021).

87.    Defendants' representations concerning the <u>COVID-19</u>

<u>pandemic</u>.[99]

    a.  "While the **COVID-19 pandemic** has inspired virtually

every industry to take steps toward ensuring cleaner, safer

indoor air, Global Plasma Solutions (GPS) began tackling air

purification long before the coronavirus emerged."[100]

    b.  "**COVID-19 is top of mind**, of course, including the

different mutations of the virus we're seeing come into the

United States," Waddell said. "**NPBI creates additional**

**peace of mind during this evolving pandemic**."[101]

    c.  "**This pandemic may be the first most of us have seen,**

**but it won't be the last**, and we need to be prepared.

That's why GPS is committed to science and ongoing

---

[99] Emphasis added throughout.

[100] Global Plasma Solutions, *Project Spotlight: Edmonton International Airport*, https://globalplasmasolutions.com/articles/project-spotlight-edmonton-international-airport.

[101] Global Plasma Solutions, *The Future of Indoor Air Quality Is Now*, https://globalplasmasolutions.com/articles/the-future-of-indoor-air-quality-is-now.

research to ensure we have the safest, most effective technology on the market."[102]

d. "Pathogens such as SARS-CoV2, **the new strain of coronavirus that causes COVID-19**, can reside on surfaces and be suspended in the air we breathe. NPBI technology is **designed to mitigate these harmful pathogens by safely creating and releasing ions** via a building's existing HVAC system."[103]

e. "In the case of **SARS-CoV2** and other pathogens, contact with positive and negative ions has microbicidal effects, ultimately disrupting their surface proteins and rendering them inactive. Independent laboratory studies have shown **that NPBI technology limits the spread of viruses such as SARS-CoV2**, MRSA and E. coli."[104]

---

[102] *Id.*

[103] Global Plasma Solutions, *Why Better Indoor Air Quality May Be the Key to Safer Indoor Events*, https://globalplasmasolutions.com/articles/why-better-indoor-air-quality-may-be-the-key-to-safer-indoor-events.

[104] *Id.*

f. "In addition, when ions come into contact with pathogens, such as the **SARS-CoV-2 virus that causes COVID-19**, they disrupt the pathogens' surface proteins. This, in turn, renders them inactive."[105]

| Pathogen | Time in Chamber | Rate of Reduction | Test Agency |
|---|---|---|---|
| SARS-CoV-2 | 30 minutes | **99.9%** | Innovative Bioanalysis |

g. [106]

h. "Imagine an individual with **COVID-19** walks into a room in your office building. With the smallest of actions – like a cough or a sneeze – harmful pathogens have been released into the air. From that moment forward, anyone who walks into the room is exposed to the virus. These scenarios happen countless times each day, and historically there have not been solutions to address the problem. That's where NPBI comes in." Charlie Waddell, GPS Founder and CTO.[107]

---

[105] *Id.*

[106] Archived version of Defendant's website from October 24, 2020, https://web.archive.org/web/20201024175828/https://globalplasmasolutions.com/pathogen-reduction.

[107] Charlie Waddell, *The Future of IAQ Lies in Needlepoint Bipolar Ionization*, HVAC INSIDER & REFRIGERATION (July 7, 2020), https://hvacinsider.com/the-future-of-iaq-lies-in-needlepoint-bipolar-ionization/.

i. "Though **a proven tool in the fight against COVID-19**, NPBI is just one critical measure in a comprehensive approach to improving IAQ and providing cleaner, safer indoor air."[108]

j. "…announced today industry-leading ionization testing results, demonstrating a **99.4% reduction rate on a SARS-CoV-2 (COVID-19)** surface strain within 30 minutes, the **first instance in which an air purification company has effectively neutralized SARS-CoV-2.**"[109]



k.

---

[108] Global Plasma Solutions, *Why Your Customers Should Care About Their Indoor Air Quality*, https://globalplasmasolutions.com/articles/why-your-customers-should-care-about-their-indoor-air-quality.

[109] Global Plasma Solutions, *GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology*, June 10, 2020, https://globalplasmasolutions.com/articles/gps-virtually-eliminates-static-sars-cov-2-with-proprietary-npbi-technology.

88.    Global Plasma Solutions' representations were largely repeated uncritically by news outlets, publications, press releases, social media, and other forms of media.

89.    Global Plasma Solutions' representations were used in the marketing efforts of its sellers, distributors, and other agents.

90.    But these representations failed to hold up when they were examined by independent academic studies and industry watchdogs.

### D. Global Plasma Solutions' Representations Are False, Deceptive, and Misleading

#### a. Global Plasma Solutions' Representations to Consumers that the Products Are Superior to Other Air Treatment Systems Are False, Deceptive, and Misleading.

91.    As outlined above, Defendants represent NBPI as the safest, most effective technology on the market.

92.    These statements are not mere puffery because Defendants present direct comparisons to other technologies throughout its uniform, wide scale marketing campaign.

93.    For example, the following table is used multiple times in GPS' marketing literature:

| GPS NEEDLEPOINT BIPOLAR IONIZATION VS. OTHERS | GPS NPBI™ | Other BPI | Corona Discharge | HEPA Filters | Carbon Filters | Ultraviolet (UV) | UV-PCO |
|---|---|---|---|---|---|---|---|
| No Harmful Byproducts | ● | | | ● | ● | | |
| Reduces Airborne Particles | ● | ● | ● | ● | | | |
| Reduces VOCs | ● | ● | ● | | ● | | ● |
| Reduces Pathogens | ● | ● | ● | ● | ● | ● | ● |
| Reduces Energy Cost | ● | ● | ● | | | | |
| Treats In-Room Air | ● | ● | ● | | | | |
| No Replacement Parts | ● | | | | | | |
| No Maintenance | ● | | | | | | |
| Simple To Install | ● | | | | | | |
| Low Total Cost | ● | ● | | | | | |

94. These statements are made by the Defendants in order to siphon sales from the competitors that use other technologies to clean the air.

95. If the statements were true and accurately represented, then Defendants' "superior technology" representations might be within the bounds of the law.

96. However, many of Defendants' representations are false, misleading, and deceptive.

97. When NPBI is compared to other technologies, "[existing] proven measures that should be taken to address airborne transmission risk include properly sized and maintained ventilation (mechanical and natural), mechanical filtration (including portable HEPA filter units),

and germicidal ultraviolet light systems. Such measures are practical and often can be easily implemented; many are not costly…."[110]

98.     As described in greater detail below, many of these comparisons are false, misleading, and deceptive, and solely created to induce sales of the Products.

**b. Global Plasma Solutions' Representations to Consumers that Its Products' Claims Are Supported By Sound, Independent Testing and Can Achieve Quantified Toxin-Removal Benchmarks Are False, Deceptive, and Misleading.**

99.     The Products fail to clean the air at the rates as claimed by its "independent testing."

100.   For example, in an attempt to improve cleanliness and efficiency, Boeing conducted a technical assessment of air ionization technologies.[111]

101.   One of the tested technologies was NPBI.

---

[110] Drs. Marwa Zaatari and Marcel Harmon, *Open Letter to address the use of Electronic Air Cleaning Equipment in Buildings*, April 12, 2021, https://medium.com/open-letter-to-address-the-use-of-electronic-air/no-to-ionizers-plasma-uvpco-bc1570b2fb9b (this letter is supported by 11 other doctors).
[111] Boeing, *Use of Bipolar Ionization for Disinfection within Airplanes*, https://www.boeing.com/confident-travel/research/use-of-bipolar-ionization-for-disinfection-within-airplanes.html (2021).

102.   The test results in the Huntsville location found "minimal reductions in viral inactivation."[112]

103.   The test also found only "minimal reductions in surface bacteria viability by bipolar ionization."[113]

104.   Further, the Huntsville test found "no reductions in Staphylococcus aureus, Pseudomonas aeruginosa, Enterococcus faecalis, and Enterobacter cloacae with <20.6% or <0.1 log10 reduction over a 60 minute exposure duration."[114]

105.   The "New 787-10 Ground Testing" found the reductions in Escherichia coli and MS2 Bacteriophage to be far lower than needed for cabin disinfection.[115]

106.   At the end of the assessment, Boeing found:[116]

---

[112] *Id.* at 16.
[113] *Id.*
[114] *Id.*
[115] *Id.* at 20-21.
[116] *Id.* at 22.

The use of air ionization in an airplane remains inconclusive as a methodology for deployment during the SARS-CoV-2 virus pandemic. Boeing's limited testing was unable to replicate supplier results in terms of antimicrobial effectiveness. The systems were unable to properly deliver and maintain the necessary ion levels in the airplane to achieve disinfection. Similarly, laboratory-based tests did not show proper rates of disinfection with higher ion concentrations. It is pertinent to be able to demonstrate effective performance in an airplane environment given aircraft installation constraints.

107.   In summary, "Boeing's current position is that air ionization has not shown significant disinfection effectiveness for further inclusion in the Confident Travel Initiative Program."[117]

108.   Boeing's results and conclusions stand in stark contrast to Defendant's statements concerning NPBI's effectiveness in an airplane environment:[118]

In the laboratory, a test was conducted to mimic ionization conditions like that of a commercial aircraft's fuselage. Based on viral titrations, it was determined that at 10 minutes, 84.2% of the virus was inactivated. At 15 minutes, 92.6% of the virus was inactivated, and at 30 minutes, 99.4% of the virus was inactivated.

---

[117] *Id.*

[118] *Global Plasma Solutions (GPS) Launches Needlepoint Bipolar Ionization To Virtually Eliminate Static SARS-CoV-2 with Proprietary NPBI™ Technology*, PR NEWSWIRE (September 15, 2020), https://www.prnewswire.com/in/news-releases/global-plasma-solutions-gps-launches-needlepoint-bipolar-ionization-to-virtually-eliminate-static-sars-cov-2-with-proprietary-npbi-tm-technology-860417185.html.

### c. Global Plasma Solutions' Representations to Consumers that Its Products Are Effective Against COVID-19 Are False, Deceptive, and Misleading.

109.  From the early days of COVID-19, Defendants viewed the pandemic as a potential windfall for their technology and Products.

110.  Two days before the World Health Organization increased the status of COVID-19 from an epidemic to a pandemic,[119] Global Plasma Solutions issued a press release in an attempt to capture the new burgeoning market.[120]

111.  The press release – entitled "Indoor Air Quality Technology Company Responds to Coronavirus" – was a flag-planting moment for Global Plasma Solutions. From the point onward, the company's focus shifted and became "all about pathogens and coronavirus and Covid-19."[121]

---

[119] Kathy Katella, *Our Pandemic Year—A COVID-19 Timeline*, YALE MEDICINE (March 9, 2021), https://www.yalemedicine.org/news/covid-timeline.

[120] Global Plasma Solutions, *Indoor Air Quality Technology Company Responds to Coronavirus*, March 9, 2020, https://globalplasmasolutions.com/articles/indoor-air-quality-technology-company-responds-to-coronavirus.

[121] Quoting CEO Glenn Brinckman. Ashley Fahey, *Add Air Quality to The Growing List of Items Landlords Should Consider Before Workers*

112.  On June 10, 2020, a date where COVID-19 killed 860 Americans, Defendant published a press release entitled "GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology."[122]

113.  In this press release, Defendants "announced today industry-leading ionization testing results, demonstrating a 99.4% reduction rate on a SARS-CoV-2 (COVID-19) surface strain within 30 minutes, the first instance in which an air purification company has effectively neutralized SARS-CoV-2."[123]

114.  In that same release, Global Plasma Solutions' founder and CTO declared, "The testing results we achieved through our proprietary needlepoint bipolar ionization technology clearly demonstrate that Global Plasma Solutions is the gold standard in air purification."

---

*Return to The Office*, CHARLOTTE BUSINESS JOURNAL (May 6, 2020), https://www.bizjournals.com/charlotte/news/2020/05/06/add-air-quality-to-the-growing-list-of-items.html?iana=hpmvp_clt_news_headline.

[122] Global Plasma Solutions, *GPS Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI Technology*, June 10, 2020, https://globalplasmasolutions.com/articles/gps-virtually-eliminates-static-sars-cov-2-with-proprietary-npbi-technology.

[123] *Id.*

115.   Building from the themes in its press releases, Defendants describe the Products as "proven tool[s] in the fight against COVID-19."[124]

116.   This "proof" comes from "[i]ndependent laboratory studies [that] have shown that NPBI technology limits the spread of viruses such as SARS-CoV2."[125]

117.   These results are summarized into a simple table:

| Pathogen | Time in Chamber | Testing Methodology | Rate of Reduction | Test Agency |
|---|---|---|---|---|
| SARS-CoV-2 | 60 minutes | In-Air | **98.33%** | Innovative Bioanaylsis |
| SARS-CoV-2 | 60 minutes | Surface | **99.98%** | Innovative Bioanaylsis |

118.   The results and Defendant's statements are interpreted in a similar fashion by consumers and the general public.

---

[124] *Id.*

[125] Global Plasma Solutions, *Why Better Indoor Air Quality May Be the Key to Safer Indoor Events*, https://globalplasmasolutions.com/articles/why-better-indoor-air-quality-may-be-the-key-to-safer-indoor-events.

a. 

b. "We've done our homework on this. It's the only company
that we found that claimed that they could kill the COVID-
19 virus."[126]

**Charlotte City Club Installs Ion System that
Claims to Kill COVID-19**

c.                                                                    [127]

---

[126] Dana Winter, *Faith Academy Gets New Technology Killing COVID-
19 In The Air*, WKRG (July 22, 2020), https://www.wkrg.com/local-
news/faith-academy-gets-new-technology-killing-covid-19-in-the-air/.
[127]Rob Thomas, *Charlotte City Club Installs Ion System that Claims to
Kill COVID-19*, CLUB AND RESORT BUSINESS (July 14, 2020),
https://clubandresortbusiness.com/charlotte-city-club-installs-ion-
system-that-claims-to-kill-covid-19/.

d. "The Indiana Welcome Center is installing a state-of-the-art bipolar ionization system to kill COVID-19…Third-party testing has shown the system kills 99.47% of SARS-CoV-2, the disease that causes COVID-19, within 30 minutes, Project Manager Doug Lavin said. "It's like having Purell and hand sanitizer in the air," he said. "It starts killing viruses in the air and on surfaces immediately. It has a 75% kill rate within five minutes, an 85% kill rate within 10 minutes, and a 92% kill rate within 15 minutes. Within half an hour, the kill rate is 99.47%."[128]

e. "In September, Abiding Savior Lutheran Church and School will have an air purification system installed to assist in mitigating Covid-19 and other viruses, allergens and bacteria. "The installation of this air purification system will help keep our air healthier and surfaces cleaner in an environmentally friendly way. Not only has testing proven

---

[128] Joseph S. Pete, *Indiana Welcome Center Installs Bipolar Ionization System To Kill COVID-19*, NORTHWEST INDIANA TIMES (July 23, 2020), https://www.nwitimes.com/business/local/indiana-welcome-center-installs-bipolar-ionization-system-to-kill-covid-19/article_f88835a1-2d72-56a6-acff-f6653178cb54.html.

remarkable results in the killing of SARS-Cov-2, but it will
also help our students who struggle with seasonal allergies,"
said Brian Ryherd, Principal of Abiding Savior Lutheran
School. Global Plasma Solutions is the first air purification
solution to test SARS-CoV-2, achieving a 99.4% reduction of
the surface strain within 30 minutes. See detailed
information below [reproduces Defendant's June 10, 2020
Press Release]."[129]

119.   This interpretation was consistent with Defendants' intent.
As GPS' Founder and CTO Charles Waddell admits, "in laymen's terms
[this] means we kill it."[130]

120.   Defendants' representations concerning COVID-19 were
largely repeated uncritically by news outlets, publications, press
releases, social media, and other forms of media.

121.   But these representations failed to hold up when scrutinized
by the nation's top engineering and environmental experts.

---

[129] Abiding Savior Lutheran School, *Keeping Our Students* Healthy,
July 24, 2020, https://www.aslsonline.org/news/2020/7/24/keeping-our-students-healthy.
[130] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 89, Ex. 2.

122.   "The consistent message from experts is to avoid being too creative with airborne solutions. Stay away from worthless — or even dangerous — add-ons to filtration like bipolar ionization...."[131]

123.   Needlepoint bipolar ionization is "an emerging technology" with "little research [ ] available that evaluates it outside of lab conditions."[132] Further, "as typical of newer technologies, the evidence for safety and effectiveness is less documented than for more established ones...."

124.   With minimal evidence to support the technology, any representation that it is effective against COVID-19 must be based with solid science and consistent with real world application.

125.   However, the scientific community has concluded that this technology – and the testing methods used by Defendants – lack the foundation to support these lofty representations.

---

[131] Drs. Alex Huffman, Delphine Farmer, and Marina Vance, *Opinion: We Need Safer Air In Colorado's Schools — But Let's Be Careful How We Get There*, THE COLORADO SUN (April 23, 2021), https://coloradosun.com/2021/04/23/safer-air-schools-opinion/.
[132] United States Environmental Protection Agency, *Air Cleaners, HVAC Filters, and Coronavirus (COVID-19)*, March 22, 2021, https://www.epa.gov/coronavirus/air-cleaners-hvac-filters-and-coronavirus-covid-19.

126.   For example, Dr. F. James Lo, an assistant professor of engineering at Drexel University states that ionization technology will "clean the air only when it [passes] through the purifier, which means it helps very little in terms of person-to-person localized virus transmission."[133]

127.   Similarly, an engineering professor from the University of North Carolina Chapel Hill believes that "[a] cheap portable HEPA filter would work many times better and have fewer side effects (possibly ozone or other unwanted chemistry)."[134]

128.   Defendants' use of company-funded, specialized studies are not independent as represented by Global Plasma Solutions.

---

[133] Jason Abbruzzese, Denise Chow and Vaughn Hillyard, *Can Air Filtration Stop Coronavirus At A Trump Rally In Phoenix? Experts Doubt It.*, NBC NEWS (June 22, 2020), https://www.nbcnews.com/tech/tech-news/trump-rally-phoenix-boasts-coronavirus-protections-experts-are-skeptical-n1231910.
[134] Lauren Weber and Christina Jewett, *As Schools Spend Millions on Air Purifiers, Experts Warn of Overblown Claims and Harm to Children*, KAISER HEALTH NETWORK (May 3, 2021), https://khn.org/news/article/as-schools-spend-millions-on-air-purifiers-experts-warn-of-overblown-claims-and-harm-to-children/.

129.  Further, the studies are designed to support Defendants' deceptive, misleading, and false lofty representations and are not applicable to real world conditions.

130.  In other words, in a real-world application, ionization is not effective against COVID-19 transmission.

131.  Defendants' representations are not only false and misleading but also the Defendants misrepresent the validity of its testing that builds the foundations for the representations.

132.  Dr. Monica Mazurek, a professor in civil and environmental engineering at Rutgers University, describes the Defendants' COVID-19 representations as "unvalidated" and the tests presented by Defendants are under unmonitored conditions.[135]

133.  Further, she outlines her specific concerns, "Where is the data? Where are the facts? Where are the monitoring data?"[136]

---

[135] Talia Wiener, *Parents Tell Montclair District: We're Worried New Air Cleaners Aren't' Safe*, Montclair Local (April 22, 2001), https://www.montclairlocal.news/2021/04/22/parents-tell-montclair-district-were-worried-new-air-cleaners-arent-safe/.
[136] *Id.*

134.   Simply, the Products "do not prevent exposure and transmission of COVID-19."[137]

135.   Dr. Sarah F. Evans, an Assistant Professor in the Department of Environmental Medicine and Public Health and a member of the Institute for Exposomic Research at the Icahn School of Medicine at Mount Sinai, also has concerns about Defendants' COVID-19 representations.[138]

136.   After review, Dr. Evans and her "team of pediatricians, scientists, occupational medicine doctors and industrial hygienists have concerns about the safety and efficacy of emerging air cleaning," and ultimately recommended against the Products being used in schools.[139]

137.   The National Air Filtration Association website states, "There is no direct scientific evidence of benefit, but some reduced exposure can reasonably be inferred based on the ability of some filters to remove particles that contain a SARS-CoV-2 virus."[140]

---

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] National Air Filtration Association, *COVID-19 (Corona Virus) and Air Filtration Frequently Asked Questions (FAQs)*, https://www.nafahq.org/covid-19-corona-virus-and-air-filtration-frequently-asked-questions-faqs/.

138.   However, mere inferences are insufficient to support the prominent representations made by Defendants.

139.   Dr. William Bahnfleth, a professor of architectural engineering at Pennsylvania State University also doubts the soundness of the testing methods implemented. He believes that "[m]uch of the proof of their performance is in the form of laboratory studies commissioned by manufacturers that are often performed under conditions that are not representative of actual application conditions."[141]

140.   In response to these commissioned studies, Dr. Bahnfleth wrote, "Many in the scientific community are skeptical."[142]

141.   Dr. Amesh Adalja, a senior scholar at the Johns Hopkins University Center for Health Security, warns that untested

---

[141] Ross Pomeroy, *Schools Are Spending Millions on Ionization Technology to Fight COVID and There's No Good Evidence It Works*, MASS LIVE (January 22, 2021), https://www.masslive.com/coronavirus/2021/01/schools-are-spending-millions-on-ionization-technology-to-fight-covid-and-theres-no-good-evidence-it-works.html.

[142] Jason Abbruzzese, Denise Chow and Vaughn Hillyard, *Can Air Filtration Stop Coronavirus At A Trump Rally In Phoenix? Experts Doubt It.*, NBC NEWS (June 22, 2020), https://www.nbcnews.com/tech/tech-news/trump-rally-phoenix-boasts-coronavirus-protections-experts-are-skeptical-n1231910.

representations that air treatment systems can stop the spread of

COVID will give people "a false sense of security."[143]

142.  "Paula Olsiewski, a contributing scholar at the Johns

Hopkins Center for Health Security, said she has not seen any studies

that show ionization is effective in real world conditions."[144]

143.  When additional details about Defendants' testing methods

were revealed, this "false sense of security" generated significant public

concern.

144.  One review of Defendants' testing methods and

representations was summarized:[145]

> Last summer, Global Plasma Solutions wanted to test
> whether the company's air-purifying devices could kill Covid-
> 19 virus particles, but **could find only a lab using a
> chamber the size of a shoebox** for its trials. In the
> company-funded study, the virus was blasted with 27,000 ions
> per cubic centimeter. The company said it found a 99%
> reduction of virus. The report **doesn't say how this
> reduction was measured**, and in September, the company's

---

[143] *Id.*

[144] https://www.govtech.com/education/k-12/fort-worth-schools-spent-millions-on-air-cleaners-but-do-they-work

[145] Lauren Weber and Christina Jewett, *As Schools Spend Millions on Air Purifiers, Experts Warn of Overblown Claims and Harm to Children*, KAISER HEALTH NETWORK (May 3, 2021), https://khn.org/news/article/as-schools-spend-millions-on-air-purifiers-experts-warn-of-overblown-claims-and-harm-to-children/(emphasis added).

founder incidentally mentioned that **the devices being offered for sale would actually deliver a lot less ion power -- 13 times less -- into a full-sized room**.

145.   Further, one testing flaw was described as "[Global Plasma Solutions] nonetheless used the shoebox results in marketing its device heavily to schools as something that could combat Covid in classrooms far, far larger than a shoebox."[146]

146.   Glenn Morrison, an engineering professor at the University of North Carolina Chapel Hill, believes that the Products' COVID-19 reductions would not be very effective under normal building conditions, outside a test chamber.[147]

147.   Defendants' funding of its own studies not only flies in opposition to Defendants' testing representations but also presents a clear conflict.

148.   Relying on company-funded studies, as one concerned parent stated, "is like only listening to advice from Philip Morris as to whether smoking is safe or not."[148]

---

[146] *Id.*

[147] *Id.*

[148] *Id.*

149.  When Defendants' Products are tested in real world conditions, they fail to meet their marketed "independent testing" results.

150.  When Boeing tested the technology – under real world conditions – to see if it could be successfully implemented in its aircraft, it found:[149]

    a.  "Use of air ionization in an airplane remains **inconclusive** as a methodology for **deployment during the SARS-CoV-2 virus pandemic**."

    b.  "Testing was **unable to replicate supplier results** in terms of antimicrobial effectiveness."

    c.  "The systems were **unable to properly deliver and maintain** the necessary ion levels in the airplane to achieve disinfection."

    d.  "Similarly, laboratory-based tests **did not show proper rates of disinfection** with higher ion concentrations."

---

[149] Boeing, *Use of Bipolar Ionization for Disinfection within Airplanes*, https://www.boeing.com/confident-travel/research/use-of-bipolar-ionization-for-disinfection-within-airplanes.html (2021).

151. 

### E. Plaintiff and Class Members Relied on Global Plasma Solutions' False Representations

152.  Defendants' misrepresentations and false statements were woven into an extensive and long-term advertising campaign conducted during the statutory period and accelerating during the COVID-19 pandemic. ▮▮▮▮▮▮▮▮▮▮▮▮▮ to spread the misrepresentations and material omissions about the Products through their own website, social media, YouTube, interviews with traditional media, and other mediums.

153.  Defendants and their founders, executives, partners, and employees authored these false and misleading representations and

propagated them through various outlets, including through third party publications who repeated the claims without question. Defendants' intent was to generate substantial publicity in light of the COVID-19 pandemic that would attract customers and construct a veneer of credibility around their falsehoods. They largely succeeded.

154.   When questions about NPBI's efficacy were published, Defendants responded by filing lawsuits.[150]

155.   These misleading advertisements and representations were viewed by millions of people and drove sales of the Products throughout the country. The misleading representations grew like a virus because many purchasers were struggling small businesses which "boasted" about COVID-19-fighting investments in order to make customers feel safe.

156.   Purchasers of the Products relied specifically on the representations of the testing made in the June 2020 press release:

---

[150] *See Global Plasma Solutions, Inc.  v. IEE Indoor Environmental Engineering*, 3:21-cv-02884-TSH (N.D. Ca. 2021); *Global Plasma Solutions, Inc. v. D Zine Partners, LLC and Marwa Zaatari*, 3:21-cv-00884-D (N.D. Tx. 2021);  *Global Plasma Solutions, Inc.  v. IEE Indoor Environmental Engineering*, 1:21-cv-01059-MHC (N.D. Ga. 2021).



# CareSouth Carolina installs GPS NPBI Technology to purify air in locations

JULY 16TH 2020

To help protect against the spread of COVID-19 in its offices, CareSouth Carolina has announced the installation of Global Plasma Solutions' Proprietary NPBI™ Technology in many of its locations across its five-county service area.

These "air scrubbers," as they are referred to, have been installed at CareSouth Carolina's Hartsville Medical Center, Corporate offices, Call center, Bishopville Medical Center, Bishopville Pediatric Dental office, the Rosa Lee Gerald Center in Society Hill, Special Programs administrative offices, Bennettsville Main Medical Center, all of its mobile units and the McColl Health & Wellness Center.

"Having these air scrubbers installed at a time when the coronavirus seems to be surging in South Carolina is a significant addition to all of the safety measures taking place at CareSouth Carolina," CareSouth Carolina CEO Ann Lewis said. "Keeping our patients and staff safe is our major priority during this pandemic. This new equipment provides an added degree of security."

These air scrubbers showed a 99.4 percent reduction rate on a SARS-CoV-2 (COVID-19) surface strain within 30 minutes during ionization testing. This is the first instance in which an air purification company has effectively neutralized SARS-CoV-2. Following initial testing of coronavirus 229E in March 2020, Global Plasma Solutions utilized its proprietary needlepoint bipolar ionization to inactivate

**Studio Air Quality:**
**Through Augusta Sanitization. Ionization kits were installed in our air units last year. This air purification system demonstrates a 99.4% reduction rate on all viruses including SARS-CoV-2 (COVID-19).**







157.  Facebook and other social media provided a common forum

for the distribution of these "COVID safety announcement" posts which

largely re-broadcast Defendants' representations:



**The Extreme Studio** is at **The Extreme Studio**.
January 23 · Basehor, KS · 🌐

We are so excited that we now have this Needlepoint Bipolar Ionization System at The Extreme Studio. This system mitigates airborne and surface pathogens including Covid 19. We are the only studio/gym in town offering this system!!



**modernebarn** · Follow
Moderne Barn

275 likes

**modernebarn** ATTN CUSTOMERS! Many of you are still not aware Moderne Barn installed a state of the art air purification system. GPS Needlepoint Bipolar Ionization @gps_dr improves indoor air quality by eliminating airborne particulates, pathogens and odor causing VOCs. This patented technology has been integrated with our HVAC system and is fully operational throughout the restaurant. We are committed to providing a safe environment while continuing to follow all protocols to ensure everyone's safety. 🤎

View all 25 comments

**St. Catherine University**
@StKate

As plans for our safe return to campus continue, St. Kate's is the first educational institution in #Minnesota to install the **NeedlePoint BiPolar** Ionizing units that kills viruses like #COVID19, flu, tuberculosis, and more.
minnesota.cbslocal.com/2020/06/23/dev...

#mystkates #leadandinfluence

Device On Good Day Cafe's HVAC System Purifies Air Amid COVID-19 Pandemic
minnesota.cbslocal.com

79

**Don Carter Lanes**
Mar 5 · 🌐

We just made the air cleaner for our bowlers and our staff. GPS Needlepoint Bipolar Ionization Air Filters. This technology will make our indoor air CLEANER & SAFER! The video link below explains how the filters work.
http://bit.ly/815BowlingCentersAirFilters



👍❤️😮 13                                        3 Shares

👍 Like          💬 Comment          ↗ Share



**barre3 (Edina)**
7h · 🌐

Breathe fresh, breathe happy 😊

Did you know that we upgraded and installed a new air filtration system from Global Plasma Solutions back in June 2020?! It's here to stay, so whether you are joining us in studio or you plan to return in the future- we are making sure to keep you safe, healthy and our air as clean as possible!

GPS Needlepoint Bipolar Ionization improves indoor air quality by eliminating airborne particulates, pathogens and odor causing VOCs. This patented technology has been integrated with our HVAC system. Swipe to read more!

📷 @kristendyer
#barre3edina #airfiltration #cleanair #globalplasmasolutions



158.  Moreover, many of Defendants' images and diagrams are reproduced in these posts:



**Summit Salon Studios**
Feb 25 · 🌐

We've partnered with GPS: A PROVEN PROCESS TO CLEAN THE AIR

Pollutants, dust, dander, pollen, smoke and even pathogens such as mold, viruses and bacteria all can be suspended in the air we breathe, even when you don't see them.

Their patented needlepoint bipolar ionization technology safely creates and releases ions into the airstream using your existing HVAC system as the delivery method.
#globalplasmasolutions #cleanairsalon #cleanair #summitsalonstudios #fortcollinshairstylist #northerncoloradohairstylist #timnathhairstylist #greeleyhairstylist #lovelandhairstylist #wellingtonhairstylist #staysafe #covidprecautions #goingaboveandbeyond





**Renaissance Square**
Jan 14 · 🌐

Ownership at Renaissance Square is investing in tenants' health and wellness!  Our valued service partner @sunmechanicalcontracting is in the final stages of installing Global Plasmas Solutions (@gps_dr) Needlepoint Bipolar Ionization System to safely clean the indoor air at Ren Square!  This remarkable project is one of several enhancements at Ren Square to provide cleaner air, naturally! #globalplasmasolutions #sunmechanicalcontracting #rensquarephx #DTPHX #healthandwellness #hvac #leeandassociatesaz



👍 2

👍 Like        💬 Comment        ↪ Share

82

159.  Plaintiff was familiar with Defendants' representations regarding the superiority of its NPBI technology over other technologies for creating a clean air environment and the effective destruction of COVID-19. This was a critical selling point for Plaintiff, as Plaintiff hoped to purchase the most effective air treatment system available. And this was core theme in Defendants' advertising.

160.  Defendants' marketing focusing on the superiority of its technology even led to organizations and businesses creating fundraisers to purchase Defendants' Products. For example:





161.   The Class Members also relied on various other misrepresentations and material omissions made by Defendants in purchasing the Products. Many Class Members were impressed by Defendants' claims that the Products are capable of achieving quantified benchmarks (for example, that its technology can reduce COVID-19 by 98.33% within 60 minutes), which were typically communicated in text, tables, and graphs. But these claims are misleading as they are the results of controlled test conditions and have little relevance to the capabilities of the Products when operating in the real world.

162.   Defendants' claims were bolstered by Defendants' assertion it was communicating the results of "independent testing," and many Class Members found this compelling. But it is now clear that these tests were anything but independent tests as they were critically flawed and funded by Defendants.

163.  Additionally, this is confirmed by the independent testing conducted by professors at the Illinois Institute of Technology, Portland State University, and Colorado State University.[151]

164.  Defendants' messaging to consumers included detailed information concerning the CARES ACT.

165.  For example, on its website, it has an entire page dedicated to the topic:[152]

## How to Channel the CARES Act into Cleaner, Safer Indoor Air

166.  On this page, Defendants provide the roadmap for purchasers to obtain government funding to purchase its Products. For example: [153]

---

[151] *See* Yicheng Zeng, Prashik Manwatkar, Aurélie Laguerre, Marina Beke, Insung Kang, Akram S. Ali, Delphine K. Farmer, Elliott T. Gall, Mohammad Heidarinejad, Brent Stephens, *Evaluating A Commercially Available In-Duct Bipolar Ionization Device For Pollutant Removal And Potential Byproduct Formation*, BUILDING AND ENVIRONMENT, Volume 195, 2021, 107750, ISSN 0360-1323, https://doi.org/10.1016/j.buildenv.2021.107750.

[152] Global Plasma Solutions, *How to Channel the CARES Act into Cleaner, Safer Indoor Air*, https://globalplasmasolutions.com/articles/how-to-channel-the-cares-act-into-cleaner-safer-indoor-air.

[153] *Id.* (emphasis added). *See also, e.g.,* Exhibits 22 and 23.

85

a. "Your company may be able to **tap into federal funds** to improve indoor air quality and fight pathogens such as COVID-19. Several provisions outlined in new legislation allow schools and universities, health care providers and small businesses **to tackle air quality improvement projects with minimal financial impact**."

b. "Small Businesses: As payments from the second round of the Paycheck Protection Program (PPP) begin rolling out, small businesses can apply funds to utility expenses and other related costs as a result of the COVID-19 pandemic."

167. Purchasers relied upon these representations that they were obtaining a product that would not only make the air cleaner but also eliminate the COVID-19 virus. For example, numerous purchasers used CARES ACT funds to pay for the Products:





168. One critical factor for Plaintiff and Class Members' decision to purchase the Products was the belief that it could safely protect them from COVID-19, and that the representations made by Defendants were based on sound, scientific studies.

169.  Defendants amplified their deceptions in many venues over a multi-year period with the intent to instill in consumers the belief that the Products were vastly superior to existing technology and capable of providing safe, clean air that lowers, removes, and eradicates the COVID-19 virus. Plaintiff and the Class Members saw these claims and relied on them in purchasing the Products, believing that they were buying the best air treatment systems available when in fact they were purchasing systems that are largely ineffective.

170.  Now that the truth has been revealed, the Products are routinely sold for pennies on the dollar. For example:



Sold Jan 3, 2024
**Global Plasma Solutions GPS-FC24-AC Air Ionization System**
Brand New
**$92.00**
+$33.50 shipping          kep.-56 (8) 100%
View similar active items
Sell one like this



Sold Dec 29, 2023
**Global Plasma Solutions GPS-FC24-AC Air Ionization System**
Pre-Owned
~~**$75.50**~~
Free shipping               americanhvac1 (1,075) 100%
View similar active items
Sell one like this



**Sold Nov 11, 2023**

**GPS-FC24-AC Bipolar Ionization System (Air Purifier)**

Brand New

**$75.00**
1 bid
+$57.65 shipping

michaepetrogeorg-0 (142) 100%

View similar active items
Sell one like this



**Sold Oct 31, 2023**

**G.P.S GPS-FC24-AC Auto Cleaning Ionization System**

Pre-Owned

★★★★☆ 1 product rating

**$68.00**
+$5.50 shipping
Free returns

details_and_more (1,061) 99.4%

View similar active items
Sell one like this



Sold Jan 10, 2024

**NGPS-FC48-AC 4,800 CFM, Whole House Air Purifier**

Pre-Owned

**$85.00**
+$25.45 shipping

View similar active items
Sell one like this

here-and-there_parts (13) 100%



Sold Jan 10, 2024

**New GPS-FC48-AC 4,800 CFM Auto-Cleaning Needlepoint Bipolar Ionization System**

New – Open box
★★★★★ 2 product ratings

~~**$125.00**~~
+$57.65 shipping

View similar active items
Sell one like this

here-and-there_parts (13) 100%



Sold Jan 10, 2024

**New GPS-FC48-AC 4,800 CFM, Whole House Air Purifier, installs in furnace**

Brand New
★★★★★ 2 product ratings

**$150.00**
Free shipping

View similar active items
Sell one like this

warmingsystemsinc (5,981) 100%

### AUTO-CLEANING IONIZATION SYSTEM - $100 (Merrimack)





| condition: **new** |
| make / manufacturer: **Global Plasma Solutions** |
| model name / number: **FC24-AC** |

GPS-FC24™-AC (NEW in box) Order from MFG $600-$700
PRODUCT DESCRIPTION
Auto-cleaning, lightweight needlepoint bipolar ionization (NPBI™) system that handles up to 2,400 CFM or 6 tons. Designed for multiple mounting options including fan inlet, interior duct walls or floors.

90

**F. Defendants' Concealed these Deceptions and Defects**

171.  Defendants designed, manufactured, marketed, and sold the Products throughout the United States while knowingly concealing these defects and deceptions.

172.  As described by independent testing sources, the Products are incapable of performing as marketed. The Products are not able to "safely" clean the air of the COVID-19 virus. Consequentially, Defendants' claims regarding the performance, capabilities, and therapeutic benefits of the Products are false, deceptive, and misleading.

173.  During the Class Period, Defendant actively concealed the defects in the Products.

174.  Defendants knew that the Products failed to safely clean the air of COVID-19 because, in part, it was shown to be ineffective in internal testing that was suppressed by Defendants.

175.  When scientists refuted Defendants' claims, Defendants implemented a coordinated litigation campaign to silence the truth.

176.  As part of this coordinated campaign, Defendants sued academic journals that published academic articles that exposed Defendants' deceptions in an attempt to further conceal the truth.

177.  After the pandemic ended and demand for Defendants' Products evaporated, Defendants settled the majority of the cases they filed against scientists attempting to reveal the truth.[154]

178.  When testing of the Products resulted in negative outcomes, Defendants suppressed or altered the results.

179.  The concealment of tests showing the Products' ineffectiveness were suppressed by decision makers high in the company.

180.  To further the deception, Defendants staged tests with altered devices that were knowingly staged in conditions that could not be replicated in real world conditions.

---

[154] *Global Plasma Solutions, Inc. v. IEE Indoor Environmental Engineering.* 4:21-cv-02884 (N.D. Cal.), ECF No. 81; GPS, *GLOBAL PLASMA SOLUTIONS, INC.'S LAWSUIT AGAINST DR. MARWA ZAATARI, D ZINE PARTNERS LLC, AND ENVERID SYSTEMS INC. COMES TO A RESOLUTION* (Mar. 23, 2023), https://gpsair.com/articles/global-plasma-solutions-inc-s-lawsuit-against-dr-marwa-zaatari-d-zine-partners-llc-and-enverid-systems-inc-comes-to-a-resolution.

181.   Defendants' claims were material to Plaintiff and the Class Members but Defendants did not disclose to purchasers of the Products that the devices were defective and unable to fulfill many of Defendants' advertising claims. As a result, Plaintiff and the Class Members purchased devices that they would not have otherwise purchased or for which they would have paid less. Many Class Members relied on Defendant's assertions that the Products were capable of producing specific outcomes—e.g., creating a safe environment by safely eradicating the COVID-19 virus —and received devices that were unfit for the purposes for which they were purchased.

182.   Defendants intended to deceive consumers in order to increase their revenues and profits.

183.   Defendants' suppression of the truth led to exponential growth in revenues and profits.

184.   Defendants' "profits over people" scheme won the company acclaim, publicity, and generated hundreds of millions of dollars in sales at the expense of the Plaintiff and Class Members throughout the country and in violation of all applicable laws referenced herein.

## G. Falfurrias and GPS Participated in a Conspiracy to Defraud

185.  In the fall of 2018, Falfurrias acquired 90% of GPS.[155]

    a. 

    b. Immediately after the purchase, Falfurrias moved GPS from Savannah, Georgia to Charlotte, North Carolina where Falfurrias is headquartered.[157]

    c. Additionally, Falfurrias replaced GPS founder Charles Waddell with its handpicked CEO Glenn Brinckmann.[158]

    d. According to Falfurrias' Managing Partner, Ed McMahan, Brinckmann was selected to "help Global Plasma Solutions maximize its growth potential."[159]

---

[155] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 102, Ex. 12 at 41-42.

[156] *Id.*

[157] *Charlotte investment firm buys air purification tech company*, WRALTECHWIRE (Oct. 5, 2018), https://wraltechwire.com/2018/10/05/charlotte-investment-firm-buys-air-purification-tech-company/

[158] *Id.*

[159] *Id.*

e.  Brinckmann was not the only key employee directed by Falfurrias. Falfurrias also placed one of its partners – Ken Walker - as the Executive Chairman ("Chairman of the Board") for GPS. Additionally, Blake Frawley was named GPS' VP of Finance. [160]

f.  ███████████████████████████████████████
    █████████████████████████████ [161]

g.  GPS Founder Charles Waddell was "delighted to have a new strategic partner with Falfurrias Capital's operational resources and network[.]"[162]

h.  ████████████████████████████████████████████
    ████████████████████████████████████████.[163]

186.  ██████████████████████████████████████



██████████████████████████████████████████████

---

[160] FALFURRIAS CAPITAL, *GPS Air*, https://falfurriascapital.com/portfolio/gps-air/.

[161] Exhibit 4 at GPSDE_0200036083.

[162] FALFURRIAS CAPITAL, *Falfurrias Capital Partners Invests in Global Plasma Solutions*, https://falfurriascapital.com/falfurrias-capital-partners-invests-in-global-plasma-solutions/.

[163] *Garner v. Global Plasma Solutions*, 1:21-cv-00665-SB, D.I. 102, Ex. 12 at 50.

187.  Defendants conspired to "grow the company in ways it couldn't have before."[164]

188. 

189.

190.

191.

[164] MCGUIREWOODS, *Up-and-Coming Women in PE to Know: Katie-Rose Higgins*, https://www.mcguirewoods.com/client-resources/alerts/2020/7/up-and-coming-women-in-pe-katie-rose-higgins/.
[165] FALFURRIAS CAPITAL, *Falfurrias Capital Partners Invests in Global Plasma Solutions*, https://falfurriascapital.com/falfurrias-capital-partners-invests-in-global-plasma-solutions/.
[166] Exhibit 3.
[167] ███████████████████████████████████████ Exhibit 5 [referencing COVID-19 press release from March 2020].



---

[168] *See, e.g.,* Exhibit 24.
[169] *See, e.g.,* Exhibit 21.
[170] Exhibit 12.
[171] *See, e.g.,* Exhibit 20.



---

[172] Exhibit 7 at GPSDE_0200121129.

[173] *See, e.g.,* Exhibits 14 and 15.

[174] *See, e.g.,* Exhibit 6 ("[Brinckman] advised CW to send a quick note to our sales team to share with their reps when they get an latest research paper for IIT. CW, Kevin and [Ken Walker] are meeting tomorrow to start to formulate our inquiry regarding the response.").

[175] *See, e.g.,* Exhibit 16.



202.  As part of this scheme, Defendants taught purchasers how they could use government funding provided under the CARES ACT to cover the costs of the Products.

203.  Simply put, Defendants' scheme  misrepresented the technologies effectiveness, educated the consumer how they could get it for "free," and funneled government funds into their accounts.

204.  ████████████████████████████████████

    a.  For example, it received a $225,000,000 dividend from GPS on December 18, 2020.

    b.  In other words, almost exactly 6 months after claiming that the NPBI technology could "virtually eliminate" COVID,

---

[176] *See, e.g., Id.* and Exhibit 17.
[177] Exhibits 26-32.

Defendants were able to obtain a $225,000,000 loan based on future revenues with the bulk of those funds heading to Defendant Falfurrias as a dividend.



---

[178] Exhibit 13 at GPSDE_0200054245.
[179] Exhibit 18.
[180] Exhibit 25.
[181] *See, e.g.*, Exhibits 18 and 19.



---

[182] Exhibit 8 at GPSDE_0200036301.

[183] *Id.*

[184] Exhibit 9 at GPSDE_0200053453 (emphasis added).

[185] Exhibit 10 at GPSDE_0200024723.



## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

214.   Any applicable statute of limitations has been tolled by Defendants' false representations concerning the performance and quality of the Products, and the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and Class Members were deceived regarding the Products and could not have reasonably discovered that the Products did not conform to the Defendants' representations.

---

[186] Exhibit 11 at GPSDE_0200266153; Exhibit 3 ("I'd like to arrange a meeting this week between your team and ours —  I think you, Ryan Krahl, and Tony Ponzo, and our team with me, our Marketing Director, our CEO, and our operating partner from Falfurrias Capital Partners is the right group. We are all here in Charlotte. Falfurrias office is in the Hearst Tower.").

215.   Plaintiff and Class Members did not discover and did not know of any facts that would have caused a reasonable person to expect that the Defendant was concealing the performance and efficacy of the Products. As alleged herein, the presence or risk of COVID-19 virus was material to Plaintiff and Class Members at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and Members of the Class would not have discovered through the existence of reasonable diligence that the Products did not work to eliminate the COVID-19 virus.

216.   At all times, Defendants are and were under a continuous duty to disclose to Plaintiff and the Class the true standard, quality, and grade of the Products.

217.   Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on Defendants' knowing, active, and affirmative concealment.

218.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statues of limitations in defense of this action.

## **FACTS SPECIFIC TO PLAINTIFF**

219.  On December 18, 2020, Plaintiff purchased Defendants' GPS-24-FC Ionization System from R. Brooks Mechanical, located in Rising Sun, Maryland.

220.  Plaintiff paid approximately $750.00 for the device and installation.

221.  Plaintiff had the device installed in his home for use at his home.

222.  Plaintiff was in the market for a device to improve air quality, particularly one that would mitigate the effects of COVID-19.

223.  Prior to purchasing, Plaintiff had observed and read Defendant's representations on its website, brochures, interviews, articles, videos, and social media that its Products could clean the air, effectively attack COVID-19, and supported by sound independent testing. Further, Plaintiff observed and read similar representations that were repeated by distributors and sellers of the Products.

224.  Plaintiff has seen Defendants' representations regarding Defendants' superior air treatment system, which persuaded him to keep using the device.

225.  At all relevant times, Plaintiff used and maintained the unit as would any reasonable consumer and in accordance with Defendants' instruction.

226.  At no point during his ownership or use of the Product did Plaintiff notice any improvement in the air quality and continued to endure the presence of airborne irritants, despite Defendants' claim that its Products would improve air quality.

227.  Plaintiff fears future injury and physical harm for himself, family members, friends, and other people that may have been exposed as a result of his use of the Product.

228.  He would not have purchased the Product if he had known about the defects or that Defendants were misrepresenting the performance, capabilities, and benefits of the Product. In particular, he would not have purchased the Product if he had known that Defendants' representations were false and that Defendants concealed the product's defective nature.

229.  Prior to the filing of this Complaint, Plaintiff sent a pre-suit notice, attached as Exhibit 1, concerning the defects described herein and consumers' experiences with the defects to Defendants.

## CLASS DEFINITIONS AND ALLEGATIONS

230.   Plaintiff, pursuant to Federal Rules of Civil Procedure
23(b)(2) and 23(b)(3), brings this action on behalf of the following
classes (collectively, the "Class," "Classes," and "Class Members"):

> **National Class:** All persons in the United States who
> purchased the Products.

> **Consumer Protection Multi-State Class:** All persons in
> the States of California, Delaware, Florida, Illinois,
> Maryland, Massachusetts, Minnesota, Missouri, New Jersey,
> New York, Pennsylvania, Texas, and Washington who
> purchased the Products.[187]

> **Delaware Subclass:** All persons in the State of Delaware
> who purchased the Products within the state or from the
> state.

231.   Excluded from the Classes are Defendants, their parents,
subsidiaries, affiliates, officers, and directors, those who purchased the
Products for resale, all persons who make a timely election to be

---

[187] The States in the Consumer Protection Multi-State Class are limited
to those States with similar consumer protection laws under the facts of
this case: California (Cal. Bus. & Prof. Code § 17200, et seq.); Delaware
(6 Del. C. §§ 2511, et seq.); Florida (Fla. Stat. § 501.201, et seq.); Illinois
(815 ILCS 505/1, et seq.); Massachusetts (Mass. Gen. Laws Ch. 93A, et
seq.); Michigan (Mich. Comp. Laws § 445.901, et seq.); Minnesota
(Minn. Stat. § 325F.67, et seq.); Missouri (Mo. Rev. Stat. 407.010, et
seq.); New Jersey (N.J. Stat. § 56:8-1, et seq.); New York (N.Y. Gen.
Bus. Law § 349, et seq.); Pennsylvania (73 Pa. Stat. Ann. §§ 201-1 et
seq.); and Washington (Wash Rev. Code § 19.86.010, et seq.).

excluded from the Classes, the judge to whom the case is assigned and any immediate family members thereof.

232.  The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendants have sold, at a minimum, tens of thousands of units of the Products to Class Members.

233.  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

    a.  whether Defendants misrepresented material facts concerning the Products;

    b.  whether Defendants misrepresented material facts concerning the Products in the marketing of every Product;

    c.  whether Defendants' conduct was unfair and/or deceptive;

    d.  whether Defendants have been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for

Defendants to retain the benefits conferred upon them by Plaintiff and the Classes;

e.  whether Plaintiff and the Classes are entitled to equitable and/or injunctive relief;

f.  whether Defendants breached express warranties to Plaintiff and the Classes;

g.  whether Defendants breached implied warranties to Plaintiff and the Classes;

h.  whether Plaintiff and the classes have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

234.  Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all members of the Classes, purchased Defendant's Products in reliance of Defendants' misrepresentations and omissions. Plaintiff sustained damages from Defendants' wrongful conduct.

235.  Plaintiff will fairly and adequately protect the interests of the Classes and has retained counsel that is experienced in litigating

complex class actions. Plaintiff has no interests which conflict with those of the classes.

236.   A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, making it impracticable for Class Members to individually seek redress for Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

237.   The prerequisites to maintaining a class action for equitable relief are met as Defendants have acted or refused to act on grounds

generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

238.  The prosecution of separate actions by members of the classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

## CAUSES OF ACTION

### COUNT I
### Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO")
### (On Behalf of the National Class)

**a.    Violation of 18 U.S.C. § 1962(c)**

239.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

240.  This claim is brought by Plaintiff against Defendants for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq*.

241.  Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

242.  At all relevant times, each Defendant is and has been a "person" within the meaning of 18 U.S.C. § 1961(3), because they are capable of holding, and do hold, "a legal or beneficial interest in property."

243.  Each Defendant conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), as described herein.

244.  Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue under 18 U.S.C. § 1964(c) as he was injured in his business and/or property "by reason of" the RICO Act violations described herein.

245.  Plaintiff demands the applicable relief set forth in the Prayer for Relief below.

> 1. Defendants Participated in the Enterprise and Engaged in, or their Activities Affect, Interstate or Foreign Commerce.

246.  Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

247.  Global Plasma Solutions, Inc. is a corporation and therefore meets the definition of "enterprise" under the RICO Act. Specifically, GPS is registered as a corporate entity in the State of Delaware.



250.   Defendants and the Enterprise engaged in and affected interstate commerce because the Defendants and the Enterprise sold products across the United States, as alleged herein.

> 2.   "Conduct or Participate, Directly or Indirectly, in the Conduct of Such Enterprise's Affairs"

251.   "[T]o conduct or participate, directly or indirectly, in the conduct" of an enterprise, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

252.



> 3.   Defendant Falfurrias directly exercised control and participated in the Enterprise.

253.





### 4.  Fraudulent Marketing Scheme

### 5.  CARES ACT Scheme



6. "Pattern of Racketeering Activity"

266.  The Defendants did willfully or knowingly conduct or participate in, directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

267.  Specifically, the Defendants have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past five years, as described herein.

116

268.  The multiple acts of racketeering activity that the Defendants committed, or aided or abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

269.  The Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of the Enterprise's objectives through common misrepresentations, concealments, and material omissions.

270.  ███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

███████████████████████████████

████████████████████████████████

█████████████████████████████████████

█████████████████████████████

███████████████████████████████████

██████████████████████████

████████████████████████████████

█████████████████████████████



272.  The Defendants' predicate acts of racketeering (18 U.S.C. §

1961(1)) include, but are not limited to:

    a.  Mail Fraud: the Enterprise violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, fraudulent materials via U.S. mail or commercial interstate carriers for the purpose of deceiving the public, regulators, and Congress.

    b.  Wire Fraud: the Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, fraudulent materials by

wire for the purpose of deceiving the public, regulators, and Congress.

273. 

274. Illustrative and non-exhaustive examples include the following:

| From | To | Date | Description |
|---|---|---|---|
| GPS | Public (via internet, mail, GPS website, and virtual presentations) | June 10, 2020 (original publication) through present | "Global Plasma Solutions, the leader in Indoor Air Quality, announced today industry-leading ionization testing results, demonstrating a 99.4% reduction rate on a SARS-CoV-2 (COVID-19) surface strain within 30 minutes, the first instance in which an air purification company has effectively neutralized SARS-CoV-2." This was initially presented in the "Virtually Eliminates" Press Release, and other advertising campaigns transmitted via the mails and wires which targeted consumers seeking protection from COVID-19. The representations contained in this document  have been distributed to the public through the Enterprise more than 1,000 times. |
| GPS | Public (via internet, mail, GPS website, and virtual presentations) | June 10, 2020 (original publication) through present | "Global Plasma Solutions utilized its proprietary needlepoint bipolar ionization to inactivate SARS-CoV-2." This was initially presented in the "Virtually Eliminates" Press Release, and other advertising campaigns transmitted via the mails and wires which targeted consumers seeking protection from COVID-19. The representations contained in this document  have been distributed to the public through the Enterprise more than 1,000 times. |
| Charles Waddell | Public (via internet); Berkeley Unified School District, Berkeley, CA | March 21, 2021 | During the presentation entitled "Covid Strategies Webinar with Global Plasma Solutions," Charles Waddell claims that "a MERV 8 filter plus ionization will give you the equivalence of a MERV 13 filter." |
| GPS | Public (via internet - GPS website) | June 2020 through June 2021 | "independent testing," "safe and effective," "harmful byproducts," and "reduces pathogens"  These representations were removed from the website after intervention by the EPA in June 2021. |

| | | | |
|---|---|---|---|
| GPS | Public (via internet, mail, and email) | June 10, 2020 (original publication) through present | Testing summary entitled "Independent Laboratory Test Results" distributed to distributors, sales agents, and potential customers. This document has been distributed more than 1,000 times. |
| Charles Waddell | Email to Charlie Boyle | January 26, 2020 | "GPS' technology will kill the coronavirus." |
| Charles Waddell | Email to Denise Hayes | June 12, 2020 | "Our company appears to be the first that has confirmation the technology inactivates 'kills' COVID-19." |

275. The mail and wire transmissions described herein were made in furtherance of the Defendants' scheme and common course of conduct, thereby increasing GPS' sales. The sections cross-referenced in the chart detail how the Defendants caused such mailings or transmissions to be made. As described in those detailed factual allegations, the Defendants did so either by directly approving certain fraudulent statements or by setting in motion a scheme to defraud that would reasonably lead to such fraudulent statements being transmitted via the mail and wires.

276. ███████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████
██████

277.  The Defendants used these mail and wire transmissions, directly or indirectly, in furtherance of this scheme by transmitting deliberately false and misleading statements to the public and to government regulators.

278. 

279.  The Defendants intended the public to rely on these false transmissions, and this scheme was therefore reasonably calculated to deceive persons of ordinary prudence and comprehension.

280.  

281.  Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the Defendants' books and records. Plaintiff has, however, described the types of predicate acts of mail and/or wire fraud, including the specific types of fraudulent statements upon which, through the mail and wires, the Defendants engaged in fraudulent activity in furtherance of their overlapping schemes.

123

282. 

### 7. Harm to Plaintiff

283.  For a pattern of racketeering activity to be a cognizable cause of civil RICO injury to a private plaintiff, one or more of the predicate acts must not only be the "but for" cause of the injury, but the proximate cause as well. A wrongful act is a proximate cause if it is a substantial factor in the sequence of responsible causation. Plaintiff must show a direct relation between the injury asserted and the injurious conduct alleged. What matters, though, is not whether there is a direct relationship between the plaintiff and defendant, but whether

there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury .

284.   Plaintiff and all members of the National Class were directly injured by the Defendants' conduct, and such injury would not have occurred but for the predicate acts of the Defendants. The combined effect of the Defendants' fraudulent acts induced Plaintiff and the Class Members to purchase Products that they would not have purchased or, in the alternative, to pay more for the Products than they would have otherwise paid had they known that the Products were not effective in killing COVID-19 in real world conditions products or had they known that the representations were not supported by third-party, independent testing.

285.   There are no intervening acts or parties that could interrupt the causal chain between the Defendants' mail and wire fraud, and the Plaintiff's and the Class Members' injuries. The Defendants made false and misleading statements directly to the public.

### b.   Violation of 18 U.S.C. § 1962(d)

286.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

287.  Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

288.  The Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the Defendants agreed to facilitate the operation of the Enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c), as described herein.

289.  The Defendants' agreement is evidenced by their predicate acts and direct participation in the control and operation of the Enterprise, as detailed above in relation to the Defendants' substantive violation of Section 1962(c).

290.  ████████████████████████████████████████

████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

██████████████████████████████████



291.   Each Plaintiff and all members of the Class were directly injured by reason of the RICO violations, and such injury would not have occurred but for the predicate acts of the Defendants, which also constitute the acts taken by the Defendants in furtherance of their conspiracy pursuant to Section 1962(d). The combined effect of the Defendants' acts of mail and wire fraud in furtherance of their conspiracy were inducing Plaintiff and the Class Members to purchase the Products that they would not have purchased, or—in the alternative—to pay more for the Products than they would have otherwise paid, had they known that the Products were not effective at eliminating COVID-19 or if they had known that the representations were not supported by independent testing.

292.  There are no intervening acts or parties that could interrupt the causal chain between the RICO Act violations in furtherance of their RICO conspiracy and Plaintiff's and the Class Members' injuries. The Defendants, in furtherance of their conspiracy to operate and manage the Enterprise made false and misleading statements directly to the public.

## COUNT II
## Deceit and Fraudulent Concealment
## (On Behalf of the National Class and, alternatively, the Delaware Subclass)

293.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

294.  Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Delaware Subclass.

295.  Defendants made false representations concerning the performance and quality of the Products, and the quality of the Defendant's brand. Further, Defendants concealed and suppressed material facts concerning the performance and quality of the Products, the quality of the Defendants' brand, the Products' capabilities and

benefits, and the Products' defects. Defendants knew, or in the exercise of reasonable diligence should have known, of the defects and misrepresentations of the capabilities and benefits of the Products but failed to disclose these facts prior to or at the time it marketed Products and sold them to consumers. Defendants engaged in this concealment in order to increase sales of its Products and command a higher price for its Products.

296.  Plaintiff and Class Members had no reasonable way of knowing that Defendants' representations were false and misleading, or that Defendants had omitted to disclose highly important details relating to the Products' performance and the defects. Plaintiff and Class Members did not and could not reasonably discover Defendant's deception on their own.

297.  Defendants had a duty to disclose the true performance of the Products because the scheme and its details were known and accessible only to Defendants; Defendants had superior knowledge and access to the relevant facts; and Defendants knew these facts were neither known to, nor reasonably discoverable by, Plaintiff and the Class Members.

298.  Defendants still have not made full and adequate disclosures and continues to defraud consumers by concealing material information regarding the true performance of the Products.

299.  Plaintiff and Class Members were unaware of the omitted material facts and would not have purchased the Products had they known of the facts Defendants suppressed. Plaintiff's and Class Members' actions in purchasing the Products were justified. Defendants were in exclusive control of the material facts and such facts were not reasonably known to the public, Plaintiff, or Class Members.

300.  Plaintiff and Class Members relied to their detriment upon Defendant's representations, fraudulent misrepresentations, and material omissions regarding the quality of the Products, the Products' effectiveness, and the Products' defects in deciding to purchase their devices.

301.  Plaintiff and Class Members sustained damage as a direct and proximate result of Defendants' deceit and fraudulent concealment. Among other damages, Plaintiff and Class Members did not receive the value of the premium price they paid for their Products. Plaintiff and Class Members would not have purchased Products – or would have

purchased them at a much lower price – had they known of the

Products' inability to safely and effectively cleanse the air of the

COVID-19 virus owing to the defects.

302.   Defendants' acts were done maliciously, oppressively,

deliberately, with intent to defraud, and in reckless disregard of

Plaintiff's and Class Members' rights and well-being, to enrich

Defendants. Defendants' conduct warrants an assessment of punitive

damages in an amount sufficient to deter such conduct in the future,

which amount is to be determined according to proof.

## COUNT III
## Breach of Express Warranty
## (On Behalf of the National Class and, alternatively, the Delaware Subclass)

303.   Plaintiff repeats and realleges each and every allegation

contained in the foregoing paragraphs as if fully set forth herein.

304.   Plaintiff asserts this claim individually and on behalf of the

National Class. In the alternative, this claim is brought on behalf of the

Delaware Subclass.

305.   Defendants created an express warranty within the meaning

of the U.C.C. and the respective state statutes under which Plaintiff

alternatively assert this claim.

306.  In particular, Plaintiff and Class Members, who purchased the Products received materially similar, if not identical, written warranties from the Defendants.

307.  At all relevant times, including prior to and at the time of their purchases of Products, Plaintiff and Class Members relied on Defendants' claims, promises, and representations. These promises were part of the basis of the bargain connected with these transactions for the sale of goods, and thus qualify as "express warranties" as defined by the U.C.C.

308.  Defendants breached their express warranty by:

a. selling Plaintiff and Class Members Products that were unable to safely and effectively cleanse the air after representing that the Products use "the safest, most effective technology on the market" which "is effective against COVID-19."

b. Selling Plaintiff and Class Members Products that had representations that were supported by independent studies conducted in real world conditions;

    c.  selling Plaintiff and Class Members Products containing

         defective materials responsible for the defects, which caused

         the Products to fail to function properly; and

    d.  failing to adequately repair or replace Products affected by

         these defects.

309.  Defendants did not furnish an effective remedy to Plaintiff and Class Members. Despite opportunities to honor the promises in its express warranty, Defendants failed to provide Plaintiff and Class Members with conforming Products free of defects and failed to repair the Products to make them conform to the representations made at the time of sale.

310.  Plaintiff and Class Members experienced the defects within the warranty period. In breach of the express warranty, Defendants failed to inform Plaintiff and Class Members that the Products contained defective materials and workmanship and failed to replace or repair the defective Products.

311.  Defendants breached the express warranty that promised to replace or repair and correct manufacturing, materials or workmanship defects, and to provide Products conforming to the warranties. To date,

Defendants have not replaced nor repaired or adjusted the Products, and has been unable to repair or adjust, the defects in the Products.

312.   Through advertisements, public statements, and other statements disseminated through print and online media, Defendants expressly warranted several attributes and qualities of the Products by representations as detailed above, such as:

a.   "[Products use] the safest, most effective technology on the market."

b.   "[Product] is effective against COVID-19."

c.   "[Product is] completely safe for humans and animals."

d.   "[Product has] no health concerns."

e.   "[Product is] a safe, effective solution."

f.   "[Product is] unlike many other solutions on the market, GPS NPBI technology is also safe for occupied spaces."

g.   "[Product] is proven by independent laboratory testing."

313.   Class Members were exposed to and relied on the foregoing statements when they decided to buy the Products. Accordingly, Defendants' express warranties formed part of the basis of the bargain

that was reached when Plaintiff and Class Members purchased their Products.

314.   Defendants breached these express warranties because the Products did not, in fact, use "the safest, most effective technology on the market" that were "effective against COVID-19." Defendants failed to adequately repair or replace Plaintiff's and Class Members' Products when they reported that they suffered from the defects during the warranty period. Despite reasonable opportunities to honor the promises in its express warranties, Defendants failed to provide Plaintiff and Class Members with conforming, non-defective Products.

315.   Defendants received timely notice of the breaches experienced by Plaintiff and Class Members. Defendants had exclusive knowledge of the defects before the Products were sold. Defendants also received notice of the defects by the large volume of complaints lodged by concerned citizens and consumers about the defects shortly after the product was publicly revealed. These complaints were received directly from consumers as well as from vendors who sold the Products who received the complaints and relayed them to Defendants.

316.  Plaintiff and Class Members used their Products in a manner consistent with the Products' operating instructions. Plaintiff and Class Members performed their duties under the terms of the foregoing express warranties or have been excused from such performance as a result of Defendants' conduct described herein.

317.  Any attempt by Defendants to disclaim or limit the express warranties vis-à-vis consumers would be inappropriate under these circumstances. Any such asserted limitation is unconscionable and unenforceable because Defendants knowingly sold a defective product without informing consumers and because Defendants failed to honor their express promises.

318.  As a direct and proximate result of Defendants' breaches of express warranty, Plaintiff and Class Members have suffered economic damages, including costly repairs, loss of use, replacement costs, substantial loss in value and resale value of the Products, and other harm.

## COUNT IV
### Breach of the Implied Warranty of Merchantability
### (On Behalf of the National Class and, alternatively, the Delaware Subclass)

136

319.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

320.  Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Delaware Subclass.

321.  Defendants are a "merchant" as defined under the U.C.C. and by the respective state statutes under which Plaintiff alternatively asserts this claim.

322.  The Products are "goods" as defined under the U.C.C. and by the respective state statutes under which Plaintiff alternatively brings this claim.

323.  Defendants impliedly warranted that the Products were of a merchantable quality. The law implies a warranty that the Products were merchantable in the relevant transactions. The Products, when sold and at all times thereafter, were not in merchantable condition due to the defects and other conditions as alleged above and are not fit for the ordinary purpose for which air treatment systems are used, e.g., to safely cleanse the air of the COVID-19 virus.

324.  At the point of sale, the Products contained unseen manufacturing or materials defects whose manifestation renders the product ineffective. These defects in the Products existed when the Products left Defendants' possession and rendered them unfit for their ordinary and intended purpose. At all relevant times, including when the Products entered the stream of commerce and were purchased by Plaintiff and Class Members, the Products were defective and not capable of functioning as advertised.

325.  Defendants breached the implied warranty of merchantability because the Products are not of a merchantable quality, but instead contained the defects. Had Plaintiff and Class Members known of the defects, they would not have purchased Defendants' Products, or would have paid less for them.

326.  Plaintiff and Class Members' interactions with Defendant suffice to create privity of contract between Plaintiff and Class Members, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and Class Members are intended third party beneficiaries of contracts (including implied warranties) between

Defendant and the retailers who sell the Products. Defendants' warranties were designed for the benefit of consumers who purchased the Products.

327.  As a direct and proximate result of the breach of said warranties, Plaintiff and Class Members were injured and are entitled to damages.

328.  Defendants' attempts to disclaim or limit the implied warranty of merchantability vis-à-vis consumers are unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold a defective product without informing consumers about the defects.

329.  The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiff and the Class Members. Among other things, Plaintiff and members of the Class had no meaningful choice in determining these time limitations, terms which unreasonably favor Defendants. A gross disparity in bargaining power existed between Defendant and Class members, as only Defendants knew or should have known that the Products were

defective at the time of sale and that the devices were not of merchantable quality.

330.   Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

331.   Defendants were provided notice of these issues. Defendants had exclusive knowledge of the defects before the Products were sold. Defendants also received notice of the defects by the large volume of complaints lodged by concerned citizens and consumers about the defects. These complaints were received directly from consumers as well as from vendors who sold the Products who received the complaints and relayed them to Defendants.

332.   Additionally, Defendants were aware of these issues by the academic papers, news articles, and other medium which covered the deceptions and defects described herein.

333.   Prior to the filing of this Complaint, Plaintiff sent a pre-suit notice, attached to this Complaint as Exhibit 1, concerning the defects

described herein and consumers' experiences with the defects to both Defendant and retailer.

334.   Defendants' breach of the implied warranty of merchantability damaged Plaintiff and Class Members in an amount to be determined at trial.

## COUNT V
## Breach of the Implied Warranty of Fitness for a Particular Purpose
### (On Behalf of the National Class and, alternatively, the Delaware Subclass)

335.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

336.   Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Delaware Subclass.

337.   Defendants are a "merchant" as defined under the UCC.

338.   The Product are "goods" as defined under the UCC.

339.   Defendants engaged in a focused marketing campaign to consumers concerned about air quality from the COVID-19 pandemic and has reason to know that Plaintiff and Class Members purchased the Products for a particular purpose, e.g., to eliminate the COVID-19

virus, and that Plaintiff relied on Defendants' skill or judgment to furnish devices that accomplished that purpose and others.

340.   Plaintiff did in fact rely on Defendants' skill or judgment to furnish devices that accomplished that purpose and others.

341.   Defendants breached the implied warranty of fitness because the Products were incapable of satisfying that purpose, among others, due to the defects and other conditions as alleged above.

342.   Plaintiff was harmed by Defendants' breach of the implied warranty of fitness by, inter alia, overpaying for the Products.

343.   Plaintiff and Class Members' interactions with Defendants suffice to create privity of contract between Plaintiff and Class Members, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and Class Members are intended third party beneficiaries of contracts (including implied warranties) between Defendants and the distributors and retailers who sell the Products. Defendants' warranties were designed for the benefit of consumers who purchased the Products.

344.  As a direct and proximate result of the breach of said warranties, Plaintiff and Class Members were injured and are entitled to damages.

345.  Defendants' attempts to disclaim or limit the implied warranty of fitness vis-à-vis consumers are unconscionable and unenforceable. Specifically, Defendants' warranty limitations are unenforceable because Defendants knowingly sold a defective product without informing consumers about the defects.

346.  The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiff and members of the Classes. Among other things, Plaintiff and members of the Classes had no meaningful choice in determining these time limitations, terms which unreasonably favor Defendants. A gross disparity in bargaining power existed between Defendants and Class members, as only Defendant knew or should have known that the Products were defective at the time of sale and that the devices were not of merchantable quality.

347.  Plaintiff and Class Members have complied with all obligations under the warranty or otherwise have been excused from

performance of said obligations as a result of Defendants' conduct described herein.

348.   Defendants were provided notice of these issues by complaints lodged by consumers before or within a reasonable amount of time after the allegations of the defects became public.

349.   Prior to the filing of this Complaint, Plaintiff sent pre-suit notice, attached as Exhibit 1, concerning the defects and other consumers' experiences with the defects.

## COUNT VI
### Violation of State Consumer Protection Statutes
### (On Behalf of the Consumer Protection Statutes of Multi-State Class)

350.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

351.   Plaintiff asserts this claim individually and on behalf of the Consumer Protection Multi-State Class.

352.   The Consumer Protection Acts of the States in the Consumer Protection Multi-State Class prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

353.   Defendants intended that Plaintiff and each of the other members of the Consumer Protection Multi-State Class would rely upon

their deceptive conduct, and a reasonable person would in fact be misled by its deceptive conduct.

354.  As a result of the Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiff, and each of the other members of the Consumer Protection Multi-State Class, have sustained damages in an amount to be proven at trial.

355.  In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT VII
## Violation of the Delaware Consumer Fraud Act ("DCFA"), Del. Code Ann. Tit. 6 §§ 2511, *et seq.* (On Behalf of the Delaware Subclass)

356.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

357.  Plaintiff asserts this claim individually and on behalf of the Delaware Subclass.

358.  This cause of action is brought pursuant to the Delaware Consumer Fraud Act ("DCFA"). 6 Del. C. §§ 2511, *et seq.* The express purpose of the DCFA is to "protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices" and it is

the "intent of the General Assembly that such practices be swiftly stopped and that this subchapter shall be liberally construed and applied to promote its underlying purposes and policies." 6 Del. C. § 2512.

359.  The DCFA declares unlawful "the act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged." 6 Del. C. § 2513.

360.  Plaintiff and Defendants are a "person" as defined by the DCFA. 6 Del. C. § 2511(7).

361.  Defendants' Products are "merchandise" within the meaning of the DCFA. 6 Del. C. § 2511(6).

362.  The DCFA declares certain actions as unlawful "unfair practices." 6 Del. C. § 2511(9). Defendant's unfair or deceptive trade practice in violation of the DCFA includes "any act or practice that

causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves." 6 Del. C. § 2511(9).

363.  As set forth more thoroughly above, Defendant's claims are false, deceptive, and misleading to consumers because Defendants' Products do not safely clean the air of the COVID-19 virus.

364.  Plaintiff has standing to pursue this claim because he has been injured by virtue of suffering a loss of money and/or property as a result of the wrongful conduct alleged herein. Plaintiff would not have purchased Defendants' Products (or paid a premium for them) had he known the truth concerning the Products' defects. As a direct result of Defendants' actions and omissions of material facts, Plaintiff and Delaware Subclass members did not obtain the value of the products for which they paid; were induced to make purchases that they otherwise would not have; and lost their ability to make informed and reasoned purchasing decisions.

365.  The damages suffered by Plaintiff and the Delaware Subclass were directly and proximately caused by the deceptive, misleading and unfair practices of Defendants as described above.

366.  Plaintiff and the Delaware Subclass make claims for actual damages, attorney's fees and costs.

## COUNT VIII
## Unjust Enrichment
### (On Behalf of the National Class and, alternatively, the Delaware Subclass)

367.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

368.  Plaintiff asserts this claim individually and on behalf of the National Class. In the alternative, this claim is brought on behalf of the Delaware Subclass.

369.  At all times relevant hereto, Defendants deceptively marketed, advertised, and sold merchandise to Plaintiff and the Classes.

370.  The Products purchased by Plaintiff and the Class Members did not provide the promised performance and instead contained uniform defects.

371.  Plaintiff and Class Members conferred upon Defendants non-gratuitous payments for the Products that they would not have if not for Defendants' deceptive advertising and marketing.

372.   Defendants received funds directly from consumers and through the distribution and sale of the Products.

373.   Proceeds from sales of the Products – including Plaintiff's purchase – were received by Defendants.

374.   These proceeds benefited Defendants by boosting its sales revenue and its bank accounts with ill-gotten gains premised from deceptive conduct.

375.   Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff and Class Members, with full knowledge and awareness that, as a result of Defendants' deception, Plaintiff and Class members were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendants and reasonable consumers would have expected.

376.   At the time of Plaintiff and Class Members' purchases, Defendants knew of the Products' defects and true efficacy. Knowing that their representations were false, Defendant sold the Products to Plaintiff and Class Members at a premium price. Accordingly, Defendants continue to retain a benefit improperly obtained to the detriment of Plaintiff and Class Members.

377.  Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendants' misrepresentations about the Products, which caused injuries to Plaintiff and Class Members because they would not have purchased the Products if the true facts had been known.

378.  Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff and Class Members is unjust and inequitable, Defendants must pay restitution to Plaintiff and Class Members for their unjust enrichment, as ordered by the Court.

## **RELIEF DEMANDED**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the members of the Classes;

b. For an order declaring the Defendants' conduct violates the statutes and laws referenced herein;

c. For an order awarding, as appropriate, compensatory and monetary damages, restitution or disgorgement to Plaintiff and the Classes for all causes of action;

d. For an order requiring Defendants to immediately cease and desist from selling its misbranded Products in violation of law; enjoining Defendants from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendants to engage in corrective action;

e. For pre-judgment and post-judgment interest on all amounts awarded;

f. For an order awarding punitive damages;

g. For an order awarding attorneys' fees and expenses and costs of suit; and

h. Granting such other relief as the Court deems just and appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: January 29, 2024                 Respectfully submitted,

OF COUNSEL:                          FARNAN LLP

REICH & BINSTOCK LLP             */s/ Michael J. Farnan*
Dennis C. Reich, Esq.                  Brian E. Farnan (Bar No. 4089)
4265 San Felipe, Suite 1000           Michael J. Farnan (Bar No. 5165)
Houston, TX 77024                     919 N. Market St., 12th Floor
Phone: (713) 622-7271                 Wilmington, DE 19801
Fax: (713) 623-8724                   Phone: (302) 777-0300
dreich@reichandbinstock.com           Fax: (302) 777-0301
                                      bfarnan@farnanlaw.com
THE MILLS LAW FIRM                    mfarnan@farnanlaw.com
Michael A. Mills, Esq.
8811 Gaylord Drive                    *Attorneys for Plaintiff and the*
Suite 200                            *Classes*
Houston, TX 77024
Phone: (832) 548-4414
Fax: (832) 327-7443
mickey@millsmediation.com

THE KEETON FIRM LLC
Steffan T. Keeton, Esq.
100 S Commons, Ste. 102
Pittsburgh, PA 15212
1-888-412-5291
stkeeton@keetonfirm.com

# EXHIBIT B

| | |
|---|---|
| **From:** | Warlich, Kelly A. |
| **To:** | Muckenfuss, Robert A.; Dennis Reich; Wilson, Samantha; Mickey Mills (mickey@millsmediation.com); stkeeton@keetonfirm.com |
| **Cc:** | Ben Black |
| **Subject:** | RE: Bellyard Partners, LLC v. Falfurrias Capital Partners, LP et al. |
| **Date:** | Wednesday, August 21, 2024 12:22:04 PM |

Dennis,

As discussed on our meet and confer a few minutes ago, Section G of the Bellyard complaint appears to use and rely on Protected Material as defined in the Garner Protective Order.  Specifically, the following paragraphs are identical or substantially identical to allegations in the proposed Second Amended Complaint in Fishlock that expressly cited and relied on exhibits that were designated confidential or AEO under the Garner Protective Order: Paragraphs 154i, 160-161, 164-168, and 170.  The removal of the citations to the confidential/AEO exhibits does not remedy the violation of the Protective Order, which expressly states in paragraph 7.1: "The Parties *shall not use* any Protected Material in connection with *other litigations, lawsuits,* or matters, including but not limited to those litigations where one of the Parties to this Litigation is a party."  During our meet and confer, you did not identify any material outside the scope of the Protective Order that you are relying on to make these allegations, and we are not aware of any information in the public domain that would support these allegations.  Please confirm by the end of this week what you are relying on to make these allegations.

Kelly

**Kelly A. Warlich**
Associate
McGuireWoods LLP
T:  +1 704 343 2333 | M: +1 203 856 9251
kwarlich@mcguirewoods.com

---

**From:** Muckenfuss, Robert A. <RMuckenfuss@mcguirewoods.com>
**Sent:** Wednesday, August 21, 2024 11:59 AM
**To:** Dennis Reich <dreich@reichandbinstock.com>; Warlich, Kelly A. <KWarlich@mcguirewoods.com>; Wilson, Samantha <SWilson@ycst.com>; Mickey Mills (mickey@millsmediation.com) <mickey@millsmediation.com>; stkeeton@keetonfirm.com
**Cc:** Ben Black <BBlack@reichandbinstock.com>
**Subject:** RE: Bellyard Partners, LLC v. Falfurrias Capital Partners, LP et al.

I have explained the reasons for the meet and confer.  I initially noted we didn't need to have the call and then same day sent another email stating we still needed to have the call.  All of your conspiracy allegations in the GA complaint against Falfurrias are not in the public domain.  I note you accepted the invite and we will call-in.

---

**From:** Dennis Reich <dreich@reichandbinstock.com>
**Sent:** Wednesday, August 21, 2024 11:49 AM

**To:** Muckenfuss, Robert A. <RMuckenfuss@mcguirewoods.com>; Warlich, Kelly A. <KWarlich@mcguirewoods.com>; Wilson, Samantha <SWilson@ycst.com>; Mickey Mills (mickey@millsmediation.com) <mickey@millsmediation.com; stkeeton@keetonfirm.com
**Cc:** Ben Black <BBlack@reichandbinstock.com>
**Subject:** RE: Bellyard Partners, LLC v. Falfurrias Capital Partners, LP et al.

<div style="background-color:purple; color:yellow; text-align:center; font-weight:bold;">

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

</div>

I thought that was off the table after you said in an email on August 19 with a request not to serve your client and that you would accept service. You further stated that there was no need to go forward with the meet and confer. What is the reason that you changed your mind? Also, I have requested that you provide in writing all claims that you are making which you say violate the protective order. You haven't done so, so I don't think a call will be productive based on our past experience with meet and confer calls with you.

Dennis Reich

Please cc all case related communications to Attorneys - Ben Black bblack@reichandbinstock.com and Josh Bauer jbauer@reichandbinstock.com
Paralegal – Christina Brown cbrown@reichandbinstock.com
Parlegal – Jenny Lott jlott@reichandbinstock.com

---

**From:** Muckenfuss, Robert A. <RMuckenfuss@mcguirewoods.com>
**Sent:** Wednesday, August 21, 2024 10:42 AM
**To:** Dennis Reich <dreich@reichandbinstock.com>; Warlich, Kelly A. <KWarlich@mcguirewoods.com>; Wilson, Samantha <SWilson@ycst.com>; Mickey Mills (mickey@millsmediation.com) <mickey@millsmediation.com; stkeeton@keetonfirm.com
**Cc:** Ben Black <BBlack@reichandbinstock.com>
**Subject:** RE: Bellyard Partners, LLC v. Falfurrias Capital Partners, LP et al.

The purpose of the call is to meet and confer per the court's rules on the issue of whether you violated the protective order in Garner by filing the complaint in GA. There are specific factual allegations in the GA case that are not in the public domain. The Garner protective order expressly prohibits the use of confidential information in any other case for any reason. I had subsequently emailed you saying we needed to have the meet and confer.

---

**From:** Dennis Reich <dreich@reichandbinstock.com>
**Sent:** Wednesday, August 21, 2024 11:38 AM
**To:** Muckenfuss, Robert A. <RMuckenfuss@mcguirewoods.com>; Warlich, Kelly A.

<KWarlich@mcguirewoods.com>; Wilson, Samantha <SWilson@ycst.com>; Mickey Mills (mickey@millsmediation.com) <mickey@millsmediation.com; stkeeton@keetonfirm.com
**Cc:** Ben Black <BBlack@reichandbinstock.com>
**Subject:** RE: Bellyard Partners, LLC v. Falfurrias Capital Partners, LP et al.

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

Robert and Kelly,
Please explain the purpose of the call that has been  rescheduled after you had said that there was no need for it. (See below)  Without knowing in advance what the purpose of the call is, I see no reason to have it go forward and take up the time of a half dozen lawyers.
Dennis

Dennis Reich

Please cc all case related communications to Attorneys - Ben Black bblack@reichandbinstock.com and Josh Bauer jbauer@reichandbinstock.com
Paralegal – Christina Brown cbrown@reichandbinstock.com
Parlegal – Jenny Lott  jlott@reichandbinstock.com

---

**From:** Dennis Reich
**Sent:** Wednesday, August 21, 2024 8:25 AM
**To:** Muckenfuss, Robert A. <RMuckenfuss@mcguirewoods.com>; Warlich, Kelly A. <KWarlich@mcguirewoods.com>; Wilson, Samantha <SWilson@ycst.com>; Mickey Mills (mickey@millsmediation.com) <mickey@millsmediation.com; stkeeton@keetonfirm.com
**Cc:** Ben Black <BBlack@reichandbinstock.com>
**Subject:** FW: Bellyard Partners, LLC v. Falfurrias Capital Partners, LP et al.

Robert,
In your email below dated August 19 you stated that " ...We won't need to conduct the meet and confer at this point." Your colleague  Kelly Warlich has scheduled a meet and confer for today,  so I am now confused by what appears to be contradictory actions. What is the purpose of the Meet and Confer that you have put on the calendar for today at noon Eastern?

Dennis

Dennis Reich

Please cc all case related communications to Attorneys - Ben Black bblack@reichandbinstock.com

and Josh Bauer jbauer@reichandbinstock.com
Paralegal – Christina Brown cbrown@reichandbinstock.com
Parlegal – Jenny Lott  jlott@reichandbinstock.com

---

**From:** Muckenfuss, Robert A. <RMuckenfuss@mcguirewoods.com>
**Sent:** Monday, August 19, 2024 2:28 PM
**To:** Dennis Reich <dreich@reichandbinstock.com>
**Cc:** Warlich, Kelly A. <KWarlich@mcguirewoods.com>; Mickey Mills <mickey@millsmediation.com>;
Steffan Keeton <stkeeton@keetonfirm.com>; Adam Poff <apoff@ycst.com>; Wilson, Samantha
<SWilson@ycst.com>
**Subject:** Re: Bellyard Partners, LLC v. Falfurrias Capital Partners, LP et al.

Please do not serve my client with the GA complaint. We will accept service. We won't
need to conduct the meet and confer at this point.

**Robert A. Muckenfuss**
Partner
McGuireWoods LLP
201 North Tryon Street
Suite 3000
Charlotte, NC 28202-2146
T:  +1 704 343 2052
M: +1 704 517 5949
F:  +1 704 444 8707
rmuckenfuss@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com



> On Aug 19, 2024, at 12:15 PM, Dennis Reich
> <dreich@reichandbinstock.com> wrote:
>
> **EXTERNAL EMAIL; use caution with links and attachments**
>
> Mr. Muckenfuss,

I am currently out of my home state and on vacation with my family. My team and I will be available for a meet and confer as stated by my legal assistant on Aug. 21 at 11:00 AM Central. August 21 is the earliest date that I can have my team available for the call.  It appears that you are trying to concoct an emergency when none exists. The meet and confer date which I proposed is 4 business days after the date which you requested one. In the past when I have requested meet and confers you have given me dates the following week or indicated that there was nothing to discuss. When we would have the calls you have at times misrepresented the state of the record. As an example, you said on a meet and confer for Fishlock— "No date for Amendment appears in the Garner scheduling order" which was untrue or continuously interrupt and talk over opposing counsel who was trying to educate you on a matter of local practice that is used to amend a scheduling order when there has been a mistake or misapprehension that may require correction.

In light of your past behavior on meet and confer calls, it would be far more productive for you to identify prior to our call, in writing what you claim is a violation of the protective order in Garner. We carefully vetted the Complaint filed in the new Georgia case and only used publicly available information and information that was obtained from online investment research services about GPS and Falfurrias to factually support the Georgia Complaint.

My team will be available to meet and confer at 11:00 AM Central on August 21, 2024.

If that time doesn't work for you give me another time on that date or August 22 and I'll make every effort to make it work.


Dennis Reich

Please cc all case related communications to Attorneys - Ben Black
bblack@reichandbinstock.com and Josh Bauer jbauer@reichandbinstock.com
Paralegal – Christina Brown cbrown@reichandbinstock.com
Paralegal Jenny Lott jlott@reichandbinstock.com

---

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

# EXHIBIT C

| From: | Dennis Reich |
|---|---|
| To: | Muckenfuss, Robert A.; Mickey Mills (mickey@millsmediation.com); Michael J. Farnan; stkeeton@keetonfirm.com |
| Cc: | Warlich, Kelly A.; Wilson, Samantha; Michael J. Farnan; Adam Poff |
| Subject: | Bellyard Complaint |
| Date: | Friday, August 23, 2024 6:04:22 PM |

**\*\*EXTERNAL EMAIL; use caution with links and attachments\*\***

Robert and Kelly,

We have carefully reviewed your contention  that there has been a violation of the Protective Order entered in Garner. You fail to identify any specific  documents or protected material that meets the definition of Protected Materials contained within the Protected Order that form the basis of the conspiracy allegations found in certain paragraphs of  the Bellyard Complaint which has been  filed in Georgia. There is no foundation to your claim and it appears that you are trying to obtain a summary disposition of a case without a legal or factual basis. Accordingly, we object to your characterization that the Bellyard complaint filed in Georgia violates an order of a Federal Court in the District of Delaware and therefore requires no further response.

Sincerely,

Dennis Reich
Reich and Binstock LLP


Respectfully,
**Dennis C. Reich**
**Partner**

Please cc all case related communications to Attorneys –
Ben Black bblack@reichandbinstock.com and Josh Bauer jbauer@reichandbinstock.com
Paralegal to Bob Binstock – Christina Brown cbrown@reichandbinstock.com
Paralegal to Dennis Reich – Jenny Lott jlott@reichandbinstock.com



4265 San Felipe, Suite 1000
Houston, Texas 77027
Telephone: 713-622-7271
Fax: 713-623-8724
Website: reichandbinstock.com



Unless expressly stated in this email, nothing in this message should be regarded as a digital or electronic signature or writing. The information contained in this electronic mail transmission is intended by Reich and Binstock, LLP for receipt by the named individual or entity to which it is directed. This electronic mail transmission may contain information that is privileged or otherwise confidential. It is not intended for transmission to or receipt by anyone other than the named addressee (or person authorized to deliver it to the named addressee).  It should not be copied or forwarded to any unauthorized persons. If you have received this electronic transmission in error, please delete it from your system without copying or forwarding it, and notify the sender of the error by reply email or by calling the law offices of Reich and Binstock, LLP at 713-622-7271, so that our address record can be corrected. Thank you