IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBERT S. GARNER, on behalf of
himself and all others similarly situ-
ated,

   *Plaintiffs*,

v.

GLOBAL PLASMA SOLUTIONS, INC.,

   *Defendant*.

No. 1:21-cv-00665-SB

---

Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, Delaware; Dennis C. Reich, REICH & BINSTOCK, Houston, Texas; Steffan T. Keeton, KEETON FIRM LLC, Pittsburgh, Pennsylvania.

   *Counsel for Plaintiffs*

Adam W. Poff, Samantha G. Wilson, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, Delaware; Kelly A. Warlich, MCGUIREWOODS, Charlotte, North Carolina; R. Trent Taylor, MCGUIREWOODS, Richmond, Virginia.

   *Counsel for Defendant*

---

### MEMORANDUM OPINION

September 27, 2024

BIBAS, *Circuit Judge*, sitting by designation.

A plaintiff cannot sue for fraud based on statements that he never read nor relied on. Robert Garner alleges that Global Plasma Solutions lied about its air purifiers

during the Covid-19 pandemic. And he asks me to certify a class. Garner has enough evidence to show a genuine issue of material fact on one of his fraud theories but not the others. So I will grant summary judgment for Global Plasma on two out of three of Garner's theories of fraud. On Garner's one remaining theory of fraud, I decline to certify a class. Individual issues are likely to predominate, and Garner would not be a typical or adequate class representative.

## I. GARNER BOUGHT AN AIR PURIFIER, THEN BROUGHT FRAUD CLAIMS

Global Plasma sells air purifiers that use ionization technology. D.I. 83 at 2. Ordinary purifiers have a hard time removing small particles. D.I. 86-1 at 127–29, 137–40. Through a series of steps, ionizers make particles large enough to either fall out of the air or be filtered better. *Id.*

When it started up, Global Plasma did not focus much on filtering out pathogens. *See* D.I. 89-4 at 3. Early in the pandemic, Global Plasma pivoted to targeting Covid-19. *Id.* Internally, its employees expressed confidence that its products would work on the virus. *See, e.g.*, D.I. 89-16, 89-22, 89-37. So it spread the message to its clients and distributors. D.I. 89-12, 89-15, 89-19, 89-42, 89-43. Its sales skyrocketed. D.I. 89-35. But it did not test its products on Covid-19 until June 2020. D.I. 89-31.

Global Plasma typically does not sell its products directly to customers. D.I. 96 at 1. Rather, it sells to specialized authorized distributors. *Id.* These specialists study the customer's space beforehand to gauge if an ionizer would be effective. D.I. 83 at 3. *Id.* Global Plasma's typical customers include schools, hospitals, and office buildings. *Id.*

Garner did not follow this route. Instead, in 2021, he bought a Global Plasma ionizer from an unauthorized seller, installed it in his parents' home without telling them, and then uninstalled it shortly after. D.I. 83 at 6 (unauthorized seller); 86-1 at 29, 39, 41–44 (parents' home, uninstalling). And a few days after that, represented by his childhood friend with whom he had previously filed a different consumer class action, Mr. Garner filed a 108-page complaint suing Global Plasma. *Id.* at 15–17; *see also* Compl., D.I. 1.

Garner originally brought a whole slew of fraud claims, but only one claim, predicated on three theories, survived a motion to dismiss: that Global Plasma had lied that its ionizers (1) eliminate Covid-19, (2) do not emit harmful byproducts, and (3) are independently tested. *See generally Garner v. Glob. Plasma Sols. Inc.*, 590 F. Supp. 3d 738 (D. Del. 2022). Discovery went ahead.

Although discovery revealed a lot about Global Plasma's products, it did not reveal much about why Garner bought one. Though he alleged earlier that he had seen a wider array of information, he was not so forthright in his deposition. When asked how he found out about Global Plasma, he answered: "Through the internet." D.I. 86-1 at 19. When asked how he found it on the internet: "I cannot specifically recall." *Id.* And when asked if he could be more specific about anything else saw on Global Plasma's website: "I do not recall." *Id.* at 23.

Now, Global Plasma claims that Garner has not identified any evidence for Garner's three theories of fraud and moves for summary judgment. D.I. 81. For his part, Garner moves to certify a class. D.I. 87.

3

Although Garner's fraud claim survived a motion to dismiss, he now must pony up the proof. No longer do I assume that every fact alleged in the complaint is true. Instead, I shall grant summary judgment if "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Id.*

## II. MOST OF GARNER'S FRAUD THEORIES FAIL

Earlier in this lawsuit, it was enough for Garner to allege only that he saw general claims on Global Plasma's website. Now, at summary judgement, he needs more. At trial, he must satisfy five elements of fraud. *See Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 49 (Md. 2013) (The parties both apply Maryland law. D.I. 82 at 14; D.I. 97 at 15–16.). Garner's first two theories—that Global Plasma lied that its ionizers (1) eliminate Covid-19 and (2) do not emit harmful byproducts—fail on at least one of the five elements of fraud. The third theory survives.

The initial two elements of fraud require Garner to show that Global Plasma made statements that he relied on and that those statements are false. *Id.* He says he relied on statements on Global Plasma's website. D.I. 86-1 at 19–22. He alleges that the website said three things:

4

- First, that Global Plasma's technology "would eliminate COVID-19" in "real world situations." *Id.* at 21 (first quotation); *see also* D.I. 90 at 2 (second quotation).

- Second, that it "would actively eliminate volatile organic compounds from the air[.]" D.I. 86-1 at 21.

- And third, that it "had been validated by testing" and that the testing had been independent. *Id.* at 23; *see also* D.I. 90 at 2.

But now, after discovery, I can no longer just take Garner's word for it. He must support these allegations with evidence to create a genuine dispute of fact for each theory for each element of fraud. He does not do this for his fraud theories about Covid-19 or harmful byproducts. But he does for his theory that Global Plasma misrepresented that its testing was "independent."

**A. Garner never alleges he saw and relied on specific Covid-19 claims**

Garner is not clear about which statements he supposedly relied on that said that the ionizers eliminated Covid-19. Many of the statements Garner identifies in his brief opposing summary judgement are unhelpful. He cites a blizzard of statements that Global Plasma's employees made elsewhere to other people at other times. *See* D.I. 97 at 5–12. Some are internal statements that one employee made to another. *See, e.g.*, D.I. 89-16, 89-37. Some are statements that Global Plasma employees made to potential clients and distributors. *See e.g.*, D.I. 89-12, 89-15, 89-17, 89-19, 89-42, 89-43. And some are statements that Global Plasma made on its website only after Garner visited it in February 2021. *See, e.g.*, D.I. 86-1 at 22 (date Garner visited

5

website); D.I. 89-9 (press release responding to an academic paper that does not appear to have been available before March 2021).

Garner cannot claim that any of these statements deceived him. To be sure, these statements were ambitious. And some—like the claim that "[Global Plasma's] technology will kill the coronavirus" before any testing had been done—might have been overblown. D.I. 89-15, 89-17. But those claims were made to other people, not Garner.

So Garner cannot show "that the defendant … made a false representation *to the person defrauded.*" *Albright*, 71 A.3d at 49 (internal quotation marks omitted) (emphasis in original). Although in rare cases a plaintiff may rely on a statement made to a third party, he still must show he relied "either directly or indirectly, on the relevant misrepresentation." *Id.* at 50. Garner makes no such showing. He claims that Global Plasma's distributors repeated its message "as radio towers." D.I. 97 at 11. But he never produces any message from a distributor that he relied on.

The best candidate is a statement that "Global Plasma Solutions Virtually Eliminates Static SARS-CoV-2 with Proprietary NPBI™ Technology." D.I. 97 at 5–6 (citing D.I. 89–31). This is the title of Global Plasma's June 2020 press release. *See* D.I. 89-31. The release cites a study done by Aviation Clean Air "demonstrating a 99.4% reduction rate on a SARS-CoV-2 (COVID-19) surface strain within 30 minutes." *Id.* Garner argues that this study had some serious problems, most notably that it used a small chamber and did not use a control. D.I. 97 at 14.

But Garner never says, and offers no evidence, that he saw this press release through Global Plasma's website or that he relied on it. He admits that he never

6

looked at Global Plasma's testing. D.I. 86-1 at 23 ("I did not look at that testing.") (transcript 66:20–21). He never shows that the June 2020 press release was on the Global Plasma website in February 2021. He never alleges that while browsing the website as a potential consumer, he found an old press release. At most, he alleges that he "understood [Global Plasma's] representations to mean that [its products] could … specifically eliminate COVID-19." D.I. 89 at 2. Plus, he submits an archived copy of Global Plasma's "Testing" webpage, which refers to a different study but apparently not the one from the June 2020 press release. D.I. 89-7 (citing a study by Innovative Bioanalysis, while the June study was done by Aviation Clean Air).

The other tests in the record were conducted after Garner had already looked at the website, so he could not have relied on them. Even if he saw them, those tests showed that Global Plasma's ionizers reduced the amount of Covid-19 in a room, controlled for natural decay, by at least 99%. D.I. 84-1 at 16–26, 28–39, 50, 53–67. Garner's attacks on the tests are not convincing. They boil down to arguing that the tests use the wrong unit of measurement and that, under his preferred unit of measurement the results look worse. *See e.g.*, D.I. 86-2 at 45–46 (converting the test results into a different unit by adding additional assumptions and applying a formula). But the test results were reported plainly on the website in numeric form and were not accompanied by conclusions interpreting them. D.I. 89-7 at 5. Transforming the numbers into different numbers is not evidence that the original numbers were false or that the original tests were flawed.

Because Garner never specifies what statements he relied on and how they were false, Garner's Covid-19-based claims must stop here.

### B. Garner never shows that Global Plasma's claims about byproducts were false

Garner also claims that Global Plasma falsely said its devices do not emit ozone or other harmful byproducts and he relied on these statements. To support this claim, Garner submits pages from Global Plasma's website that boast that the technology "does not produce ozone" and that its customers "can feel confident that they aren't creating new problems while trying to solve another." D.I. 89-8 at 4. Although Global Plasma protests that these pages are from May (three months after Garner used the website), this court can reasonably infer that they fairly represent what the website looked like in February. *Hugh v. Butler Cnty. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

Still, Garner never shows that this statement was wrong. *See Albright*, 71 A.3d at 49. The expert Garner retained to speak on this question threw in the towel, offering no opinion about whether the technology emits harmful byproducts. *See, e.g.*, 86-1 at 157 ("Q: Are you aware of any test that shows the [Global Plasma] device caused an increase in VOCs or other byproducts? A: I have not seen such data."). And Global Plasma's expert cites a bunch of tests showing that its devices do not increase harmful byproducts. *See* D.I. 86-2 at 68–69. Plus, the device Garner bought was certified to emit less than 5 parts-per-billion of ozone. D.I. 86-2 at 16 (products satisfy UL 2998); 69–70 (UL 2998 standard means ozone free). Garner argues 5 parts per billion is still greater than 0. But that does not matter. The measuring equipment has an error range of a few parts, so 5 is as close to 0 as possible. D.I. 86-2 at 69–70.

Because Garner offers no evidence that the ionizer that he bought emits ozone or another hazardous byproduct, this claim can go no further.

### C. Garner does create a genuine factual dispute about independent testing

Garner finds more luck with his claim that Global Plasma lied about whether its testing was independent. He identifies statements on their website in which Global Plasma claimed to have "Independent Testing" or "[t]hird-party testing" *See e.g.*, D.I. 89-7 at 2. And he alleges that he relied on those statements. D.I. 86-1 at 23 (that there had been testing); D.I. 90 at 2 (that testing was independent).

Global Plasma had its devices tested by third parties. But it paid them for the tests. D.I. 82 at 18. Global Plasma argues that the labs were independent legal entities with no shared employees. *Id.* at 6–7. But they were still paid to conduct the tests. A jury could reasonably infer that this arrangement tainted their independence.

Garner has shown enough to create a genuine dispute of material fact on the other elements of fraud too. The month before he visited Global Plasma's website, Chief Technology Officer Charles Waddell sent an internal email stating: "We don't truly have 3rd party testing, except field testing[.]" D.I. 89-64. That supports an inference that Global Plasma knew that its testing was not "truly" independent but told potential buyers so anyway. Garner's claim about testing can proceed on the narrow ground that he has raised a genuine dispute of material fact about whether it was "independent."

9

### III. I WILL NOT CERTIFY A CLASS

Garner also asks me to certify a class under Rule 23(b)(3). I decline to do so for two reasons: First, individual issues are likely to predominate over common ones. *See* Fed. R. Civ. P. 23(b)(3). Whether someone relied on a statement is a highly fact-intensive, individual-specific inquiry. Second, Garner is a highly atypical buyer of a Global Plasma device, so he is unlikely to represent the class adequately. *See* Fed. R. Civ. P. 23(a)(3–4).

*First*, individual issues will likely predominate. Both a false representation and reliance are essential elements of fraud. *Albright*, 71 A.3d at 49. And when the evidence required to show an essential element of a claim differs between plaintiffs, a court cannot certify a 23(b)(3) class. *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018). Garner argues that I can logically infer reliance and that, even if not, the other elements of fraud are shared and predominate. D.I. 101 at 6–8. I disagree.

But the first part of this opinion shows both the fact-bound challenge of proving reliance and the individualized nature of identifying a false representation. Global Plasma said different things to different people at different times. And the truth of those statements *differed* over time. It is hard enough to figure out whether one plaintiff relied on a false representation, and if so, which one. Yet Garner wants to certify a class of plaintiffs who bought ionizers between March 9, 2020, and June 25, 2021. D.I. 87. This sweeps in too many potentially false representations and too many differing theories of reliance.

*Second*, Garner is not only an atypical plaintiff, but also unlikely to represent the class adequately. *See* Fed. R. Civ. P. 23(a)(3), (4). A representative is neither typical

nor adequate when he is "subject to a unique defense that is likely to become a major focus of the litigation." *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006). That is because the representative's interests differ from those of the class, creating an incentive to "devote time and effort to the defense at the expense of issues that are common and controlling for the class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009) (citing *Beck*, 457 F.3d at 297).

Garner differs in important ways from the rest of the class. He is not an organizational buyer. He did not interact with distributors or Global Plasma itself, but only browsed the website. D.I. 86-1 at 19–22. He never had Global Plasma, nor its distributors, do a study to assess if the technology would work in his space. *Id.* And he installed the device himself. *Id.* All that differentiates him from the typical customer. Global Plasma deems Garner a budding professional plaintiff and will press that argument to challenge his claim of reliance. D.I. 95 at 19–20.

For these two independent reasons, I decline to certify a class.

* * * * *

Garner raises facts sufficient to survive summary judgment only on his fraud theory that Global Plasma falsely said whether its testing was "independent." And he fails to meet the Rule 23(b)(3) and 23(a) requirements to certify a class for that theory. So I grant the defendant's motion for summary judgment on two of his fraud theories, and conclude that Garner must proceed individually on the one fraud theory that remains.

11